**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

NEODRON LTD.,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 6:20-cv-00212-ADA

**DECLARATION OF RICHARD A. FLASCK IN SUPPORT OF PLAINTIFF NEODRON LTD.'S OPENING CLAIM CONSTRUCTION BRIEF**

## I. INTRODUCTION

1. I have been retained as an expert in this case by Neodron Ltd. ("Neodron"). I have been asked to consider and opine on claim constructions for a number of disputed claims terms in several of the patents-in-suit, which include U.S. Patent Nos. 7,821,502 ("'502 patent") and 10,146,351 ("'351 Patent"). I address these claim terms in separate sections below for each term.

2. In forming my opinions, I have reviewed, considered, and had access to the patent specifications and claims, their prosecution histories, the parties' proposed claim constructions, and the extrinsic evidence cited by the parties in connection with those proposed constructions. I have also relied on my professional and academic experience in the fields of thin film devices, flat panel displays, active matrix, LED, OLED, touchscreens, and touch panels. I reserve the right to consider additional materials as I become aware of them and to revise my opinions accordingly.

## II. QUALIFICATIONS

3. My qualifications for forming the opinions set forth in this Declaration are summarized here and explained in more detail in my curriculum vitae, which is attached as Exhibit A.

4. I received a Bachelor of Science degree in Physics from the University of Michigan, Ann Arbor, in 1970. I thereafter received a Master of Science degree in Physics from Oakland University in Rochester, Michigan, in 1976. I am the founder and CEO of RAF Electronics Corp., where I developed and patented Liquid Crystal on Silicon (LCOS) microdisplay projection technology using active matrix transistor arrays as well as developed proprietary LED-based Solid State Lighting (SSL) products.

5. After receiving my bachelor's degree, I was employed as a scientist and a manager by Energy Conversion Devices, Inc., from 1970 through 1982. My work at Energy Conversion Devices concerned the development of electroluminescent displays, thin film photovoltaics, ablative imaging films, non-volatile memory, multi-chip modules, and superconducting materials. After leaving Energy Conversion Devices, I founded and served as CEO of Alphasil, Inc., where I developed amorphous silicon thin film transistor (TFT) active matrix liquid crystal displays (AMLCDs). My work at Alphasil included thin film transistor array substrate process and circuit design, data driver and gate driver design, scalers, video circuits, gamma correction circuits, backlighting, and inverter design. At Alphasil I also designed and incorporated touch panel screens into active matrix display devices. The touch panel technologies included surface acoustic wave and capacitive sensing. I worked at Alphasil from 1982 through 1989.

6. After leaving Alphasil, I founded RAF Electronics Corp., described above. I have served as CEO of RAF Electronics since that time. At RAF I developed HDTV projection technology including transistor array substrates for LCOS devices and the associated optical systems. My activities at RAF have included developments in lighting systems using both traditional LED and OLED (Organic Light Emitting Diode) technologies. In 2016 I was granted US Patent 9,328,898 which includes OLED and LED technology and lighting systems. In 2019 RAF received a CalSEED grant from the California Energy Commission to develop ultra-efficient lighting products and explore establishing a Central Valley manufacturing facility.

7. In 1997, I took the position of President and COO at Alien Technology Corporation, where I was responsible for completing a Defense Advanced Research Projects Agency (DARPA)

contract, and for implementing MEM fluidic self-assembly (FSA) technology. I left that position in 1999.

8. In 2002, I co-founded and served as COO of Diablo Optics, Inc., where I developed, produced, and commercialized key optical components for HDTV projectors, such as polarization optics, condenser lenses, projection lenses, and ultra-high performance optical interference filters using thin film stacks in conjunction with LED and thin film transistor arrays and devices. I left Diablo in 2007.

9. I am listed as an inventor on twenty-six patents issued in the United States and foreign countries, including one United States design patent. My inventions concern technologies including LED devices, semiconductor materials, glass materials, non-volatile memory cells, thin film transistors, flat panel backplanes and displays, and wafer based active matrices, and various transistor array substrates.

10. I have authored or co-authored twenty-five articles or conference presentations, including numerous papers and presentations concerning lighting and display technologies. My curriculum vitae (Exhibit A) lists these articles, conference presentations, and patents.

11. I am also a member of several professional organizations, including the OSA, SPIE, AES, SID, and the IEEE.

12. In summary, I have almost 50 years of experience in the field of high-tech product development including flat panel displays, transistor array substrates, touchscreens and touch panels, and OLED and LED devices.

13. In the past twelve years, I have served as an expert witness for patent infringement litigation (or arbitrations) or PTAB proceedings in numerous cases, which are set forth in my CV (Exhibit A).

## III. TECHNOLOGY BACKGROUND

14. The asserted patents generally relate to devices containing a touch-sensitive display (which may be referred to as a "touchscreen") that allows a user to interact with an electronic device with a finger or stylus. This display may include a touch sensor overlaid on or incorporated into a display screen. A touch sensor is used to determine the location touch as a set of x and y coordinates.

A capacitive touch system can be designed to detect and report a two-dimensional coordinate (e.g., x, y position) identifying the location of the user's finger or stylus. When a finger touches a capacitive touch sensor, it interacts with electrical fields projected from the sensor. In particular, the finger creates a capacitive coupling between the user's body and the portion of the sensor near the touch. This effect is commonly referred to as a change in capacitance within the touchscreen at the location of the touch. A touch controller, microprocessor, or other related application specific integrated circuit ("ASIC") may be employed to measure this electrical effect and process information from that measurement to determine the touch's position on the screen.



15. The most common type of capacitive touch sensing is "mutual capacitance" sensing. Mutual capacitance refers to the capacitance between a drive electrode (or "drive line") and a sense electrode (or "sense line").






16. In a common mutual-capacitance implementation, the touch sensor includes an array of electrodes that are arranged along x- and y-axes to form capacitive nodes where the electrodes intersect, as depicted above. By convention, the transmit or "drive" electrodes are commonly referred to as the X axis, and the receive or "sense" electrodes are referred to as the Y axis. Mutual capacitive sensing uses a transmit-receive process to induce charge across the gap between an emitting electrode and a collecting electrode (the transmitter and the receiver respectively, also referred to as X and Y). As a finger touch interacts with the resulting electric field between the transmitter and receiver electrodes, the amount of charge coupled from transmitter to receiver is changed. Conceptually, when a finger comes near a capacitive node, it effectively "steals" charge from the drive electrode, which reduces the capacitance of the node in a measurable way, as depicted below:




17. The electrodes used for mutual capacitive sensing may be formed in numerous ways. Some electrodes are formed from a transparent conductive material called Indium Tin Oxide ("ITO"). Other electrodes are formed from opaque metallic conductors such as silver or copper. For opaque metals to be usable as touch screen electrodes, they need to be formed into fine mesh patterns that allow light from the underlying display to pass through. In each case, the conductive material is patterned to form electrodes.

18. In order to form the X-Y array of electrodes typically used for mutual capacitive sensing, in which one set of electrodes runs vertically and another runs horizontally, some provision must be made to prevent the two sets of electrodes from making direct electrical contact with each other. One way to accomplish that is by putting the vertical electrodes and horizontal electrodes on separate layers, one above the other.

## IV. <u>BACKGROUND OF THE PATENTS</u>

### A. U.S. Patent No. 7,821,502 ("'502 patent")

19. The '502 Patent, titled "Two-dimensional Position Sensor," was issued by the United States Patent and Trademark Office on October 26, 2010. Atmel Corporation, the original assignee of the '502 Patent, was a pioneer in the development of practical and high-

performing touch sensor devices. The ’502 Patent teaches innovative designs for positional capacitive touch sensors that provide accurate touch response while minimizing the number of sensing channels by employing a trace layout that includes wrap-around connection outside the sensing area. *See* ’502 Patent at 1:27-2:61; 3:10-47.

20. For example, in one embodiment of the ’502 Patent, a position sensor comprises a substrate with an arrangement of electrodes mounted on a surface, where the electrodes define an array of sensing cells arranged in columns and rows to form a capacitive sensing area, where the sensing cells each include a column sensing electrode and a row sensing electrode, where the column sensing electrodes of the same column are electrically coupled together and the row sensing electrodes of the same row are electrically coupled together.

21. For example, Fig. 3 of the ’502 Patent shows an embodiment that has row wrap-around connections (e.g., element 38), which lie “outside of the sensing area…to ensure the respective row sensing electrodes of the other rows are connected together.” ’502 Patent at 6:53-7:10 (“The connection **38** runs around the outside of the sensing area to connect the electrode **34** providing the row sensing electrodes in columns x1 and x2 of row y2 with the electrode **36** providing the row sensing electrodes in columns x3 and x4 of row y2. Thus, all row sensing electrodes in this row are electrically connected together. Similar wrap-around connections outside of the sensing area are made to ensure the respective row sensing electrodes of the other rows are connected together.”).




Fig. 3

’502 Patent Fig. 3.

**B. U.S. Patent No. 10,146,351 (“’351 patent”)**

22. The ’351 patent is titled “Position-sensing and force detection panel.” It describes a touch position sensor with force detection circuitry for determining the amount of force applied to the touch panel. ’351 patent at Abstract. In one embodiment, the touch sensor uses a “mutual capacitance” configuration that consists of two layers of horizontal and vertical conductors that intersect at nodes. *Id.* at 1:37–54. When an object (such as a finger) touches the surface of the panel, a change in capacitance occurs at one or more of the nodes. *Id.* This allows the touch sensor to determine (a) that touch has occurred and (b) the location of the touch. *Id.*

23. These concepts are illustrated in annotated Figure 2 below. In the figure, the horizontal layer "drive electrodes 4X" and vertical "sense electrodes 5Y" crossover at "intersections 11" *Id.* at 3:25-48. The drive electrodes and sense electrodes are connected via "connecting lines" to "control unit 20." *Id.* at 3:42–65. Using those lines, the control unit senses the changes in capacitance at each intersection to detect the presence and location of touches. *Id.*




FIG. 2

24. The '351 patent touch sensor includes an associated "force sensor" that measures the amount of force applied to the panel. *Id.* at 4:3–25. The force sensor distinguishes between different touch events, such as a soft touch or firm press. *Id.* The force sensor can compare

amount of force detected against a threshold and execute different functions depending on whether it exceeds the threshold. *Id.*

25. The ’351 patent is directed to a ***resistive*** force sensor by describing “a *resistive* force sensitive element” that “can be used to measure the amount of force applied to the panel.” *Id.* at 4:17-25. A resistive force sensor measures force by measuring changes in resistance of material. This works because the resistance of the material depends on the amount of force applied. If enough force is applied, the resistance decreases; if little or no force is applied, the resistance remains the same.

26. The ’351 patent discloses a mobile electronic device with a novel combination of elements, including a display and related components, capacitive touch sensor, resistive force sensor, and force sensor circuitry with an integrator circuit and voltage driver. For example, Figure 1 shows the touch panel and display in an exemplary embodiment:




FIG. 1

## V. LEVEL OF ORDINARY SKILL IN THE ART

27. In my opinion, a person of ordinary skill in the art ("POSITA") for the patents I discuss here would be a person with a bachelor's degree in physics, electrical engineering, or a related field, and at least two years of experience in the research, design, development, and/or testing of touch sensors, touchscreens and display stacks, human-machine interaction and interfaces, and/or graphical user interfaces, and related firmware and software. A person with less education but more relevant practical experience, or vice versa, may also meet this standard.

28. I further note that I am at least a POSITA and that for 40 years I have worked with colleagues who are POSITAs. Thus, I am well qualified to give technical opinions from the perspective of a POSITA.

## VI. CLAIM CONSTRUCTION PRINCIPLES

29. I understand that a claim construction inquiry begins and ends in all cases with the actual words of the claim. Thus, quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular terms. I further understand that to begin with, the context in which a term is used in the asserted claim can be highly instructive. The patent specification can also shed light on the meaning of claim terms.

30. I understand that when conducting a claim construction inquiry, district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims. Simply put, claim construction is not an obligatory exercise in redundancy. I further understand that where a term is used in accordance with its plain meaning, the court should not re-characterize it using different language.

31. I understand that there is a "heavy presumption" that claim terms carry their full ordinary and customary meaning, unless the accused infringer can show the patentee expressly relinquished

claim scope. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. Thus, the task of comprehending the claims often involves little more than the application of the widely accepted meaning of commonly understood words.

32. I understand that without clear and unambiguous disclaimer, courts do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even only a single embodiment. Similarly, statements during patent prosecution do not limit the claims unless the statement is a clear and unambiguous disavowal of claim scope.

33. I understand that Defendant bears the burden of proving that a claim is indefinite by clear and convincing evidence. I understand that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## VII. DISPUTED TERMS

### A. DISPUTED TERMS FOR THE '502 PATENT

#### 1. "sensing cells" (claims 1-2, 4-8, 11-14, 16)

| Neodron's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning, which is "sensing cells" | "the area whose boundaries are fixed by the portions of a column sensing electrode and a row sensing electrode at the intersection of a row and column in the array that forms the sensing area"<br><br>Otherwise, indefinite |

34. This term "sensing cells" is readily understandable to a person of ordinary skill. I agree with Neodron that it does not need to be construed. In fact, the claims of the '502 patent themselves provide ample context and guidance about what the claims mean by "sensing cells." For example,

claim 1 of the '502 patent recites "wherein the electrodes define an array of sensing cells (1) arranged in columns and rows (2) to form a capacitive sensing area of the sensor, each sensing cell (3) including a column sensing electrode and a row sensing electrode, (5) the column sensing electrodes of sensing cells in the same column being electrically coupled together and (5) the row sensing electrodes of sensing cells in the same row being electrically coupled together." '502 patent claim 1.

35. I disagree with Defendant's proposal. For example, Defendant's proposal appears to add numerous words to a simple claim term. Moreover, Defendant's language appears to be unsupported by the patent's specification, as Defendant's language does not appear in the specification of the '502 patent. Further, Defendant's language is less clear than the claim language itself and appear to add requirements from example embodiments in the patent. I did not find clear statement in the specification that indicate that "sensing cells" should be interpreted in the manner proposed by Defendant. And Defendant's proposal also appears to be inconsistent with the claim language itself. For example, "the portions of a column sensing electrode and a row sensing electrode at the intersection of a row and column" appears to create tension with dependent claim 11 that does not and could not require these importations. That is because, in claim 11, "the column sensing electrode and the row sensing electrode in each sensing cell are interleaved with one another."

36. I also disagree with Defendant's alternative argument that this claim term renders the '502 patent claims indefinite. This claim term "sensing cells" is clear to a person of ordinary skill. Indeed, as I explained above, "sensing cells" is a plain and ordinary term, and the claims themselves provide ample guidance from the claim language surrounding the claim term "sensing cells." A person of ordinary skill would readily understand the scope of the term, as well as the claims here.

**2. "sensing area" (claims 1-2, 4-8, 11-14, 16)**

| Neodron's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |

| | |
|---|---|
| "an area defined by the sensing cells" | "an area whose boundaries are fixed by the outermost edges of the sensing cells of the position sensor"<br><br>Otherwise, indefinite |

37. The claim language is informative and makes clear that electrodes, namely "a column sensing electrode and a row sensing electrode," "define an array of sensing cells." '502 Patent at claim 1. In turn, it is those resulting "sensing cells" that define the disputed "sensing area" because the resulting "sensing cells [are] arranged in columns and rows to form a capacitive sensing area of the sensor":

> wherein the electrodes define an array of ***sensing cells*** arranged in columns and rows ***to form a capacitive sensing area of the sensor***, each sensing cell including a column sensing electrode and a row sensing electrode, the column sensing electrodes of sensing cells in the same column being electrically coupled together and the row sensing electrodes of sensing cells in the same row being electrically coupled together

'502 Patent Claim 1 (emphasis added). This is the reading that a POSITA would observe from the independent claims.

38. Further, the intrinsic record confirms that each "sensing cell" is formed of at least one row-sensing electrode and at least one column-sensing electrode. For example, the patent specification states that each sensing cell includes a column sensing electrode and a row sensing electrode. *See, e.g.* '502 Patent at 2:51-55 ("wherein the electrodes define an array of sensing cells arranged in columns and rows to form the sensing area, ***each sensing cell including a column sensing electrode and a row sensing electrode…***" (emphasis added); '502 Patent at 4:57-61 ("each sensing cell including a column sensing electrode and a row sensing electrode."); '502 Patent at 6:8-9 ("Each sensing cell includes a row sensing electrode 30 and a column sensing electrode 32.").

39. Each depiction of a "sensing cell" in the 502 Patent includes both a row-sensing electrode

and a column-sensing electrode. For example, Fig. 3 depicts an exemplary sensing cell 28 surrounded by a dotted outline. This sensing cell, like all the other sensing cells in Fig. 3, contains a row-sensing electrode (in this case, y1) and a column-sensing electrode (in this case, x3):




Fig. 3

’502 Patent at Fig. 3; *see also* ’502 Patent at 5:58-6:7.

40. The dependent claims also consistently support this construction. For example, though each sensing cell must include at least a portion of at least one row sensing electrode and one column sensing electrode, the claims consistently refer to the “sensing cells” that exist at and defines the boundary or “edge” of a sensing area. *See, e.g.*, ’502 Patent at Claim 4 (“The position sensor of **1**, wherein the column sensing electrodes of a column ***of sensing cells at an edge of the sensing area*** are

electrically coupled to one another by column wrap-around connections made outside of the sensing area.") (emphasis added).

41. This relationship between the sensing cells, and its role in defining the sensing area, is further discussed in the specification. *See, e.g.*, '502 Patent at 3:48-51 ("The ***sensing cells*** may be arranged into three or four columns. ***This can provide*** a position sensor with sufficient resolution ***over a typically sized sensing area*** for most applications.") (emphasis added). In other words, the sensing cells define the "edge" of the sensing area:

> ***In sensing cells in columns at the edge of the sensing area*** (i.e. columns x1 and x3, e.g. sensing cell 86) the row sensing electrode runs continuously through the sensing cell with the column sensing electrode comprising two conductive regions on either side of the row sensing electrode.

'502 Patent at 10:67-11:5 (emphasis added); *see id.* at 3:17-20 ("The column sensing electrodes of a column of sensing cells at an edge of the sensing area may be electrically coupled to one another by column wrap-around connections made outside of the sensing area in a similar fashion.").

42. Like the example of dependent claim 4, the '502 Patent further makes clear that, unlike the role of the sensing cell, the sensing electrodes do not have to run to the "very edge" of the sensing area:

> It is noted that although one is shown in FIG. 3, a connection outside of the sensing area between the row sensing electrodes at opposing ends of row y1 is not required because the spines connecting between the column sensing electrodes of columns x2 and x3 ***need not extend to the very edge of the sensing area*** and a connection running along the top edge of the sensing area could be used to connect between the row sensing electrodes in row y1 (not shown).

'502 Patent at 7:3-10 (emphasis added).

**3. "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area" (claims 1-2, 4-8, 11-14, 16)**

| Neodron's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |

| | |
|---|---|
| Plain and ordinary meaning, which is "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area" | "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area," where the row wrap-around connection must wrap around electrodes in the row other than the two electrodes at opposing ends of the row, but need not have any particular shape and need not be connected to the ends of the two electrodes at opposite ends of the row. |

43. In my opinion, Neodron's claim construction proposal, shown above, is consistent with and faithful to the intrinsic record because it gives proper meaning to the claim term "respective row-wrap-around connections made outside of the sensing area." For example, Fig. 3 of the '502 Patent shows an embodiment that has row wrap-around connections (e.g., element 38), which lie "outside of the sensing area…to ensure the respective row sensing electrodes of the other rows are connected together." '502 Patent at 6:53-7:10. This portion of the specification makes clear that the species of "connections" recited are "connections" configured to "run[] around the outside of the sensing area to connect the electrode 34 providing the row sensing electrodes in columns x1 and x2 of row y2 with the electrode 36 providing the row sensing electrodes in columns x3 and x4 of row y2." '502 Patent at 6:62-66; '502 Patent at 6:66-7:3 ("Thus all row sensing electrodes in this row are electrically connected together. Similar wrap-around connections outside of the sensing area are made to ensure the respective row sensing electrodes of the other rows are connected together."); *see also id.* at Fig. 3 (below).




Fig. 3

44. As further evidence, during prosecution the patentee made clear that not every "connection" between rows qualifies as a "wrap-around" connection. The patentee also explained the purpose of "row wrap-around connections" is to couple the opposing ends of the row electrodes together:

> For example, claim 1 recites, in part, "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area."
>
> *Mabusth shows only one end of a column of electrode plates 44 coupled to something other than an adjacent electrode plate.* (Mabusth; FIG. 4.) Adjacent electrode plates within the column are connected together with conductors 46 located on the bottom surface of the substrate. (Mabusth;

> FIG. 4; col. 4, lines 49-55) *The conductors 46 are positioned completely within the sensing area of the electrode pattern. (Mabusth; FIG. 4)*
>
> Thus, Mabusth does not show or teach electrodes of sensing cells at opposing ends of a row (or column) connected ***using a wrap-around connection,*** in contrast to the above quoted elements of independent claim 1. Additionally, since Mabusth does not show or teach such a wrap-around connection, Mabusth also does not teach or show that such connections are made outside the sensing area, as also quoted above in claim l.

Ex. 29 (Response to Office Action, November 24, 2009) (emphasis added); *see* Ex.28 (Mabusth) at Fig. 4.




Fig.4

45. In another response, the patentee gave a similar explanation to distinguish over the prior art that did not show a coupling at opposing ends of row sensing electrodes:

> FIG. 4 of Mabusth shows electrode plates forming column electrodes. "The plates of each column Xl through X12 are connected together by means of plated-through holes 44 and conductors 46 which are located on the bottom surface of substrate 28 (as shown in FIG. 4)." (Mabusth; col. 4, lines 50-54). The rejection appears to state that a column of plates at the edge of the sensing area in FIG. 4 of Mabusth "teaches where at least one of the rows are electrically coupled to one another in Figs. 3 & 4". (Office Action, section 7) However, claim 1 recites "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another". Mabusth does not show electrode plates at opposing ends of a row (or column) electrically coupled together as required in claim 1.
>
> Additionally, claim 1 goes on to recite that the above-quoted row sensing electrodes are coupled to one another ***"by respective row wrap-around connections made outside of the sensing area".*** In contrast to the above- quoted elements of claim 1 and the assertions of the rejection, the conductors 46 connecting one sensing plate to another sensing plate in FIG. 4 of Mabusth appear to all be shown within the sensing area of the touch sensitive device.

Ex. 30 at 0059 (Response to Office Action, April 19, 2010) (emphasis added); *see* Ex. 28 (Mabusth) at Fig. 4.

46. Based on my review of the intrinsic record, it is clear that "row wrap-around connections" connect to the opposing ends of a row electrode, where the "connection" is routed and runs around the outside the touch sensing area.

### B. DISPUTED TERMS FOR THE '351 PATENT

#### 1. "a limiting resistance element connected in series with the [first]/[second] variable resistance element" (claims 4 [first] and 7 [second])

| Neodron's Proposed Construction | Defendant's Proposed Construction |
|---|---|

| | |
|---|---|
| Plain and ordinary meaning, which is "a limiting resistance element connected in series with the first variable resistance element." | "a **non-variable** resistance element connected in series with the [first]/[second] variable resistance element **that limits the maximum current flow through the variable resistance element to the input of the integrator circuit**" |

47. A POSITA would readily understand that the term "a limiting resistance element connected in series with the first variable resistance element" has a plain and ordinary meaning and would readily be able to apply that plain and ordinary meaning. In fact, each part of this term is likely covered in a first-semester electronics course. There is no doubt in my mind that this term needs no construction. The term means a limiting resistance element connected in series with the first variable resistance element. An example of a limiting resistance element is displayed schematically as $R_L$ 24 in Figure 3:




FIG. 3

'351 Patent Fig. 3. Similar elements are visible in Figures 4 and 5.

48. Defendant's proposal seems designed to accomplish two things: (1) insert the extraneous words "non-variable" to the claim phrase "resistance element"; and (2) insert extraneous language regarding one typical function of the limiting resistance element. I disagree with both insertions.

49. First, there is no support for inserting "non-variable" to the claim phrase "resistance element." A POSITA would readily understand that the genus of resistance elements includes both variable and fixed resistance elements. The resistance elements usually thought of as "fixed," such as the common carbon-film resistors familiar from children's electronics kits, have values that can vary based on humidity, temperature, and other effects and that vary considerably from piece to piece. Variable resistance elements comprise not only the force sensing designs described elsewhere in the '351 patent but also familiar variable resistance elements such as the common potentiometer, familiar from volume knobs and all manner of dials. A POSITA would readily understand that a "fixed" resistance element in a circuit might be replaced with a variable resistance element, such as a trim potentiometer, for numerous reasons such as adjustability, calibration, design flexibility, et cetera. Outside esoteric applications like calibration references, there are few applications that strictly require a "non-variable" resistance element. A POSITA therefore would not expect that an ordinary term like "resistance element" would necessarily mean "non-variable resistance element."

50. I also note that the term "non-variable resistance element" is not in common usage. I have never encountered the phrase. Indeed, searching on Google for instances of the phrase "non-variable resistance element" returns, as of October 22, 2020, precisely one result. Searching for "resistance element" returns "approximately 292,000 results." The phrase does not appear anywhere in the '351 patent specification.

51. Second, I disagree with Defendant's insertion of the phrase "that limits the maximum current flow through the variable resistance element to the input of the integrator circuit." At one level, this description appears to be at best unnecessary, as "series resistance"

would typically limit the maximum current flow. A typical circuit involving a light-emitting diode, for example, places the diode in series with a "current limiting resistor." Due to Ohm's law (V = IR, equivalently I = V/R, where V is voltage, I is current, and R is resistance), a (relatively) high current across a resistor can typically only exist if there is also a (relatively) high voltage drop across the resistor. If the voltage drop is fixed or limited, for example due to the presence of a constant-voltage power supply, then the current flow through the circuit can often be inherently limited. For example, in the case of a 100 Ω series resistor and a maximum 5 V voltage drop, the maximum possible current through the circuit is 5 / 100 = 0.050 A. This is a typical result of placing a resistance in series with other circuit elements. The '351 patent specification describes this typical behavior at 4:65-5:10.

52. In that light, Defendant's additional language can only undermine a correct understanding of the contextual claim language. A series resistance might and often does serve other functions in addition to limiting the maximum current through a circuit. Defendant's proposed construction might be misinterpreted to unnecessarily exclude such embodiments. For example, a series resistance might be implemented with a trim potentiometer to allow both setting the maximum current through the circuit and adjusting the current through the circuit during some other, non-maximum state. For example, the equation at 5:20-22 of the '351 Patent explains an exemplary relationship between the measurement current $I_n$ and the (variable) force sensitive resistance $R_Q$. The resistance $R_Q$ could depends on the composition of the force sensitive resistor and on the amount of force applied. It might be beneficial to tune the amount of current corresponding to a typical exerted force so that the current falls within the measurement

capacity of the circuit. Adjusting the resistance of the limit resistor in series with the circuit could have that effect, in addition to limiting the maximum current.

**2. "a bias resistance element connected in parallel with the [first]/[second] variable resistance element" (claims 3 [first] and 6 [second])**

| Neodron's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, which is "bias resistance element connected in parallel with the first variable resistance element." | "a **non-variable** resistance element connected in parallel with the [first]/[second] variable resistance element **that provides a current path to the input of the integrator if the variable resistance element has a very high value**" |

53. A POSITA would readily understand that the term "a bias resistance element connected in parallel with the [first]/[second] variable resistance element" has a plain and ordinary meaning and would readily be able to apply that plain and ordinary meaning. In fact, as with the previous term, each part of this term is likely covered in a first-semester electronics course. There is no doubt in my mind that this term needs no construction. The term means a bias resistance element connected in parallel with the first variable resistance element. An example of a bias resistance element is displayed schematically as $R_B$ 25 in Figure 3:




FIG. 3

'351 Patent Fig. 3. Similar elements are visible in Figures 4 and 5.

54. Defendant's proposal seems intended, similarly to the previous term, to accomplish two things: (1) insert the extraneous words "non-variable" to the claim phrase "resistance element"; and (2) insert extraneous language regarding one typical function of the bias resistance element. I disagree with both insertions.

55. First, the insertion of the extraneous words "non-variable" is improper here for the same reasons as with the previous term, "limiting resistance element." The same discussion above applies to this term.

56. Second, the extraneous language "that provides a current path to the input of the integrator if the variable resistance element has a very high value" appears to be, at best, unnecessary, duplicative, and potentially confusing. Much as with the "bias resistance element" term, at some level this language merely recites a typical function of a bias resistance element: to provide an alternate current path. I note that the '351 Patent specification describes this typical function at 5:11-19. However, a POSITA would readily understand that this description is just that—a description of a typical function. The language is not appropriate for inclusion in the claim itself. For example, a POSITA would readily understand that a bias resistor could typically provide an alternative current path whether or not the variable resistance element has a very high value. The bias current could depend on the voltage drop across the circuit, the value of the bias resistance element, the value of the limiting resistance element, and the value of the variable resistance element. Although it might be quite low in certain configurations, this current path could typically be present irrespective whether the variable resistance element has a very high or a very low value. In fact, in the exemplary embodiment shown in Figure 3 and described at 4:45-22, a POSITA could calculate that if the limiting

resistance is 100 Ω, the bias resistance is 1 MΩ, and the circuit voltage $V_{dd} - V$ is, for example, 5 V, the bias current would reach approximately 5 μA when the variable resistance element reaches a resistance of approximately 2 kΩ and would remain largely the same no matter how high the variable resistance becomes. Two kilo-ohms may not be considered a "very high value," so a POSITA would readily understand that the bias resistance element could provide an alternate current path even when the variable resistance element does not have a very high value.

**3. "circuitry operable to determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel" (claims 1-10)**

| Neodron's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning; no construction necessary.<br><br>Not subject to § 112 ¶ 6, but should the Court interpret this to be subject to § 112 ¶ 6, then the function and corresponding structure would be:<br><br>Function: determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel.<br><br>Structure: (a) simple threshold at the output of the integrator; (b) control unit 20; (c) circuit 32; (d) circuit 33; or (e) circuit 34, and equivalents thereof | Construction: plain and ordinary meaning, which is "electrical hardware, not software, to determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel"<br><br>Alternatively: "circuitry" is a nonce word and subject to § 112 ¶ 6.<br><br>Function: determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel.<br><br>Structure: (a) simple threshold on the output of the integrator, (b) control unit 20 performing the algorithm at 5:20-33, (c) control unit 20 performing the algorithm at 6:48-55, or (d) control unit 20 performing the algorithm at 7:30-39 and equivalents thereof |

**4. "wherein the circuitry is operable to determine an amount of force applied to the sensing area using a differential measurement" (351 claim 9)**

| Neodron's Proposed Construction | Defendant's Proposed Construction |
|---|---|

| | |
|---|---|
| Plain and ordinary meaning; no construction necessary.<br><br>Not subject to § 112 ¶ 6, but should the Court interpret this to be subject to § 112 ¶ 6, then the function and corresponding structure would be:<br><br>Function: determine an amount of force applied to the sensing area using a differential measurement<br><br>Structure: (a) control unit 20; (b) circuit 33; or (c) circuit 34, and equivalents thereof | Construction: plain and ordinary meaning, which is "wherein the **<u>electrical hardware, not software</u>**, to determine an amount of force applied to the sensing area using a differential measurement"<br><br>Alternatively: "circuitry" is a nonce word and subject to § 112 ¶ 6.<br><br>Function: determine an amount of force applied to the sensing area using a differential measurement<br><br>Structure: (a) control unit 20 performing the algorithm at 6:48-55 or (b) control unit 20 performing the algorithm at 7:30-39 and equivalents thereof |

57. The term "circuitry" is a readily understandable and ordinary term. A person of ordinary skill and even layperson would readily understand what "circuitry" means without further interpretation. Accordingly, I agree with Neodron that "circuitry" requires no construction.

58. I disagree with Defendant's proposal that "circuitry" must be "electrical hardware, not software." Many circuits include software, including programmable circuits, such as, e.g., programmable logic devices (PLDs) that can be configured and even reconfigured after manufacture, using software programs, or circuits that include embedded software or firmware. An example of a PLD is a field-programmable gate array (FPGA), which can be programmed after being soldered down to the circuit board. Some of the available software programming languages that can be used to program circuits include hardware description languages (HDLs), including Verilog and VHDL.

59. The term "circuitry" connotes sufficient structure to a person of ordinary skill. Both parties appear to agree that it does. A person of ordinary skill would understand the term

"circuitry" connotes the combination of electrical devices and conductors interconnected to form a conducting path, with potential use of embedded software or programmable components.

60. Further, claim 1 of the '351 patent recites the objective and operations of the claimed "circuitry," e.g., "circuitry operable to determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel." Accordingly, the claim itself provides the specific configurations, objectives, and operations of the claimed "circuitry." A person of ordinary skill would understand the structural arrangements of the circuitry together with the qualifying language of the claims and understand that "circuitry" connotes sufficient structure.

61. A person of ordinary skill would not understand "control unit 20" disclosed in the '351 patent to refer to a general-purpose computer or a microprocessor. Rather, it is taught as a special purpose component, and a person of ordinary skill in the art would understand that to be the case. For instance, "control unit 20" is a structure that typically could include current integrator circuit, as disclosed in the '351 patent. *See, e.g.,* '351 patent at 4:32-44. Indeed, "control unit 20" has specific functionality that is more restrictive than a general-purpose computer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 23, 2020.

By: *[signature]*

Richard A. Flasck

# Exhibit A

# Curriculum Vitae of Richard A. Flasck

My forty-nine year professional career has involved high tech product development, intellectual property (IP) issues, projection displays, lens and optical system design, thin film optical filters, non-imaging optics, LCD flat panel displays and modules, backlighting of flat panel displays, light emitting diode (LED) product development, injection molding, chip-on-board development, and High Definition Television (HDTV) systems.

I am an inventor on twenty-six patents (26), both US and foreign, including one US design patent. I have concluded several licensing agreements, demonstrating both technical innovation and expertise in Intellectual Property (IP) issues. Additionally, on several occasions I have testified before the US International Trade Commission and in US District Court as an expert witness on display technology.

I am also an author of twenty-five (25) published papers and conference presentations.

**Education**

- 1970 BS – Physics University of Michigan (Ann Arbor, MI)
- 1976 MS – Physics Oakland University (Rochester, MI)

**Employment**

- 1989 – Present
  - Organization: RAF Electronics Corp.
  - Position: Founder and CEO
    - Developed, patented, and licensed Liquid Crystal on Silicon (LCOS) microdisplay technology. Engaged in development and patent prosecution of proprietary LED based Solid State Lighting (SSL) products. Etendue limited optics, non-imaging and hybrid optics, thermal management, layout and electronic drive of LED arrays. Expertise in semiconductor IC's, Active Matrix Liquid Crystals Displays (AMLCD), thin films, optics, and video electronics. Optics and electronics manufacturing, technical consulting and independent testifying expert witness work in numerous patent lawsuits.

- 2002-2007
  - Organization: Diablo Optics, Inc.
  - Position: Co-founder and COO
    - Development, production and commercialization of key optical components for HDTV projectors. Polarization optics, condenser lenses, projection lenses, ultra-high performance optical thin film stacks. Established, and managed international supply chain. Developed domestic and international customers.

- 1997 – 1999
  - Organization: Alien Technology Corporation
  - Position: President and COO
    - Responsible for successful MEM fluidic self-assembly (FSA) technology implementation and completion of a DARPA contract. Managed company growth from a four-person start-up to a VC funded twenty person operation. Cleanroom, photolith, thin film deposition (back-end) semiconductor processing.

- 1982-1989
  - Organization: Alphasil, Inc.
  - Position: Founder and CEO
    - Pioneered amorphous silicon thin film transistor (TFT) active matrix Liquid Crystal Displays (AMLCD). World's first amorphous silicon TFT LCD pilot line in 1986. TFT process and circuit design, data driver and gate driver design, scalers, video circuits, backlighting, and inverter design.

- 1970 – 1982
  - Organization: Energy Conversion Devices, Inc.
  - Position: Scientist, Manager
    - Originated, managed, developed, and licensed several high tech products including thin film photovoltaics, ablative imaging films, EEPROMs, multi-chip modules, and superconducting materials.

**Professional Affiliations**

- Member - SPIE, OSA, SID, IEEE, AES
- Co-Chairman – SPIE/ IS&T Symposium on Electronic Imaging (1991 and 1992)
- Current Board Member - RAF Electronics Corp.
- Former Board Member - Alphasil, Inc., Somanetics Corporation, Diablo Optics, Inc.

## Testifying Expert Witness Experience in Patent Litigation

Date 2006 - 2007
Law Firm Bingham McCutchen LLP
Client Defendant - Seoul Semiconductor Company, Inc.
Case Nichia Corporation v. Seoul Semiconductor
3:06-cv-0162 United States District Court, Northern District of California
Services Expert witness, reports, deposition, trial testimony

Date 2007-2008
Law Firm Orrick, Herrington & Sutcliffe LLP
Client Respondent - Acer Incorporated and Acer America Corporation
Case Hewlett Packard v. Acer Incorporated et al.
U. S. International Trade Commission Investigation No. 337-TA-606
Services Expert witness, reports, deposition, ITC hearing testimony

Date 2008
Law Firm Fish & Richardson P.C.
Client Complainant - Samsung
Case Samsung v Sharp
U. S. International Trade Commission Investigation No. 337-TA-631
Services Expert witness, reports, ITC hearing testimony

Date 2008 - 2009
Law Firm Fish & Richardson P.C.
Client Respondent - Samsung
Case Sharp v Samsung
U. S. International Trade Commission Investigation No. 337-TA-634
Services Expert witness reports, deposition, ITC hearing testimony

Date 2008 - 2009
Law Firm Howrey LLP
Client Complainant - O2Micro
Case O2Micro v Monolithic Power Systems, MicroSemi
U. S. International Trade Commission Investigation No. 337-TA-666
Services Expert witness, reports, deposition, ITC hearing testimony

Date 2014
Law Firm Kenyon & Kenyon
Client Petitioner: Sony
Case IPR: No. IPR2014-0168 Patent: USP 7,612,843
Services Declaration supporting IPR and litigation prep

Date 2014 - 2015
Law Firm Prebeg, Faucett & Abbott PLLC
Client Plaintiff - Masakazu Ushijima
Case Ushijima v. Samsung
1:12-cv-00318-LY United States District Court, Western District of Texas
Services Expert witness, reports, deposition, trial testimony

| | |
|---|---|
| Date | 2015 |
| Law Firm | Lerner, David, Littenberg, Krumholz & Mentlik, LLP |
| Client | Petitioner: Sony Corporation |
| Case | Delaware Display Group LLC and Innovative Display Technologies LLC v Sony Corp. et al., Case No. 1:13-cv-02111-UNA (D. Del.). |
| Services | Multiple expert declarations supporting IPR and litigation prep |

| | |
|---|---|
| Date | 2015-2016 |
| Law Firm | Marc Labgold PC |
| Client | IPR petitioner: Funai Corporation |
| Case | Funai v Gold Charm Limited Case No. IPR2015-01468 |
| Services | Expert Declarations and deposition |

| | |
|---|---|
| Date | 2015 |
| Law Firm | Sidley Austin LLP |
| Client | Defendant Exar Corporation |
| Case | Phenix, LLC v Exar et al. Case No. 6:15-CV-00436-JRG-KNM. |
| Services | Expert Declaration and deposition |

| | |
|---|---|
| Date | 2016 |
| Law Firm | Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. |
| Client | Defendant Funai Corporation |
| Case | MiiC v Funai. C.A. No. 14-804-RGA. |
| Services | Expert Declaration |

| | |
|---|---|
| Date | 2016 |
| Law Firm | Gibson, Dunn & Crutcher LLP. |
| Client | Defendant Vizio, Inc. |
| Case | Delaware Display Group LLC v Vizio. Case No. 13-cv-02112-RGA. |
| Services | Expert Invalidity Report and deposition |

| | |
|---|---|
| Date | 2017 |
| Law Firm | Andrews Kurth Kenyon LLP |
| Client | Defendant Sony. |
| Case | ARRIS v Sony US International Trade Commission Investigation No. 337-TA-1060 |
| Services | IPR Expert Declaration |

| | |
|---|---|
| Date | 2018 |
| Law Firm | Taft Stettinius &Hollister LLP |
| Client | Petitioner BlueHouse Global, LTD.. |
| Case | BlueHouse v Semiconductor Energy Laboratory Co. LTD IPR Petitions |
| Services | IPR Expert Declaration for five patents |

| | |
|---|---|
| Date | 2018 |
| Law Firm | K&L Gates LLP |
| Client | Defendant Wistron Corp. |
| Case | Phenix, LLC v Wistron Case No. 2:17-cv-00711-RWS |
| Services | Expert Declaration, deposition |

| | |
|---|---|
| Date | 2018 |
| Law Firm | Goodwin LLP et al. |
| Client | Respondent Absen et al. |
| Case | Ultravision v Absen et al ITC Investigation No. 337-TA-1114 |
| Services | Expert Report |

| | |
|---|---|
| Date | 2018 |
| Law Firm | DLA Piper. |
| Client | Petitioner Viavi Solutions, inc.. |
| Case | Viavi v Materion Corp PRG Unassigned US Pat No. 9,989684 |
| Services | Declaration for PGR |

| | |
|---|---|
| Date | 2019 |
| Law Firm | Jones Day |
| Client | Petitioner NEC |
| Case | NEC v Ultravision IPR2019-01123, IPR2019-01117 |
| Services | Declarations for IPRs |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas OLED Ltd. |
| Case | Solas v Samsung Case No. 2:19-cv-00152-JRG |
| Services | CC Declaration and Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas OLED Ltd. |
| Case | Solas v LG / Sony Case No. 6:19-cv-00236-ADA |
| Services | CC Declarations and Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Neodron |
| Case | Neodron v Lenovo / Motorola Case No. 3:19-cv-05644-SI |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Neodron |
| Case | Neodron v Dell Case No. 1:19-cv-00819-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Neodron |
| Case | Neodron v HP Case No. 1:19-cv-00873-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Neodron |
| Case | Neodron v Microsoft Case No. 1:19-cv-00874-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Neodron |
| Case | Neodron v Amazon Case No. 1:19-cv-00898-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Neodron |
| Case | Neodron v Samsung Case No. 1:19-cv-00903-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas |
| Case | Solas v Samsung Case 2:19-cv-00152-JRG |
| Services | Claim construction declaration and deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas OLED Ltd. |
| Case | Solas v Dell Case No. 6:19-cv-00514-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas OLED Ltd. |
| Case | Solas v Google Case No. 6:19-cv-00515-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas OLED Ltd. |
| Case | Solas v Apple Case No. 6:19-cv-00537-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Plaintiff Solas OLED Ltd. |
| Case | Solas v HP Case No. 6:19-cv-00631-ADA |
| Services | CC Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Solas OLED Ltd. |
| Case | LGD v Solas OLED Case IPR2020-00177 |
| Services | IPR Declaration, Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Neodron Ltd. |
| Case | Samsung v Neodron Case IPR2020-00192 |
| Services | IPR Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Neodron Ltd. |
| Case | Samsung v Neodron Case IPR2020-00234 |
| Services | IPR Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Neodron Ltd. |
| Case | Samsung v Neodron Case IPR2020-00225 |
| Services | IPR Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Neodron Ltd. |
| Case | Samsung v Neodron Case IPR2020-00406 |
| Services | IPR Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Neodron Ltd. |
| Case | Samsung v Neodron Case IPR2020-00267 |
| Services | IPR Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Russ August & Kabat |
| Client | Patent Owner Neodron Ltd. |
| Case | Samsung v Neodron Case IPR2020-00267 |
| Services | IPR Declaration |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Goodwin |
| Client | Govision. |
| Case | Ultravision v Govision Case 2:18-cv-00100-JRG-RSP |
| Services | Invalidity Expert Report, Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Goodwin |
| Client | Shenzhen Absen |
| Case | Ultravision v Shenzhen Absen Case 2:18-cv-00112-JRG-RSP |
| Services | Invalidity Expert Report, Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Goodwin |
| Client | Barco |
| Case | Ultravision v Barco Case 2:18-cv-00253-JRG-RSP |
| Services | Invalidity Expert Report, Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Goodwin |
| Client | Yaham Optoelectronics |
| Case | Ultravision v Yaham Optoelectronics Case 2:18-cv-00118-JRG-RSP |
| Services | Invalidity Expert Report, Deposition |

| | |
|---|---|
| Date | 2020 |
| Law Firm | Goodwin |
| Client | Ledman Optoelectronic |
| Case | Ultravision v Ledman Optoelectronic Case 2:18-cv-00101-JRG-RSP |
| Services | Invalidity Expert Report, Deposition |

Date 2020
Law Firm Russ August & Kabat
Client Patent owner Solas
Case Samsung v Solas Case IPR2020-00140
Services IPR Declaration

Date 2020
Law Firm Russ August & Kabat
Client Patent Owner Solas
Case Samsung v solas Case IPR2020-00320
Services IPR Declaration

Date 2020
Law Firm Russ August & Kabat
Client Patent Owner Neodron Ltd.
Case Samsung v Neodron Case IPR2020-00515
Services IPR Declaration

Date 2020
Law Firm Russ August & Kabat
Client Patent Owner Neodron Ltd.
Case Dell, Lenovo, HP v Neodron Case IPR2020-00731
Services IPR Declaration

Date 2020
Law Firm Russ August & Kabat
Client Patent Owner Neodron Ltd.
Case Samsung v Neodron Case IPR2020-00308
Services IPR Declaration

## Patents & Patent Applications

| Patent | Date | Description |
|---|---|---|
| 9,328,898 | 5/3/16 | High Efficiency Hybrid Illumination System |
| 6,266,037 | 7/24/01 | Wafer Based Active Matrix |
| 700353/1991 | 8/19/99 | Wafer Based Active Matrix |
| 0438565B1 | 6/4/97 | Wafer Based Active Matrix |
| 5,123,847 | 6/23/92 | Method of Manufacturing Flat Panel Back Planes, Display Transistors |
| 5,108,172 | 4/28/92 | An Improved Active Matrix Reflective Image Plane Module and Projection System |
| UM-68958 | 2/21/92 | Wafer Based Active Matrix |
| 5,024,524 | 6/18/91 | Reflective Image Plane Module |
| UM-67108 | 12/14/91 | An Active Matrix Reflective Projection Apparatus |
| D320,403 | 10/1/91 | Liquid Crystal Screen for Overhead Projector |
| 5,022,750 | 6/11/91 | An Active Matrix Reflective Projection System |
| 4,842,378 | 6/27/89 | Method of illuminating Flat Panel Displays to Provide CRT Appearing Displays |
| 4,820,222 | 4/11/89 | Method of manufacturing Flat Panel Backplanes Including Improved Testing and Yields Thereof and Displays Made Thereby |
| 4,736,229 | 4/5/88 | Method of Manufacturing Flat Panel Backplanes, Display Transistors and Displays Made Thereby |
| 4,651,185 | 3/17/87 | Method of Manufacturing Thin Film Transistors and |

| | | |
|---|---|---|
| | | Transistors Made Thereby |
| 4,599,705 | 7/8/86 | Programmable Cell for Use in Programmable Electronic Arrays |
| 4,545,112 | 10/8/85 | Method of Manufacturing Thin Film Transistors and Transistors Made Thereby |
| 4,499,557 | 2/12/85 | Programmable Cell for Use in Programmable Electronic Arrays: Doped Amorphous Silicon Alloy |
| 4,458,297 | 7/3/84 | Universal Interconnect Substrate |
| 4,339,255 | 7/13/82 | Method and Apparatus for Making Modified Amorphous Glass Materials |
| 4,332,466 | 6/1/82 | Apparatus for Producing Microform Records at High Speed from Computer or Other Electronic Data Signal Sources |
| FR2489843A1 | 3/12/82 | Apparatus and Method for Producing Amorphous Modified Glass |
| GB2083455A | 9/7/81 | Spinning Ribbons of Metallic, Dielectric, and Semiconductor Modified Amorphous Glass Materials |
| 4,170,728 | 10/9/79 | Heat Applying Microfilm Recording Apparatus |
| 3,983,076 | 9/28/76 | N-Type Amorphous Semiconductor Materials: Chalcogenides |
| DE2429507 | 1/23/75 | N Conductivity Amorphous Semiconductor Material |

**Papers and Conference Presentations**

1. J. Ferry, R. Winston, R. Flasck, "Nonimaging Optics Applications in Theater Lighting", SPIE Optics+Photonics Conference, San Diego, CA, August 19, 2018

2. Richard Flasck, "Ultra High Efficiency Beam Forming Solid State Lighting Luminaires", SAIC Non-Imaging Optics Workshop, La Jolla, CA, August 24, 2013

3. Richard Flasck, "Ultra High Efficiency Beam Forming Solid State Lighting Luminaires", Society for Information Display Conference, Boston, June 7, 2012.

4. R. Flasck, " Design, Production, and Application of High Performance Dichroic Coatings - One Step Beyond the Cutting Edge – ", presented at the SAIC Non-Imaging Optics Workshop, La Jolla, CA, August 25, 2007

5. R. Flasck, "The Critical Role of Optical Interference Coatings in High Brightness – Etendue Limited Systems Such as HDTV Projectors", at The 2007 Optical Interference Coatings Topical Meeting and Tabletop Exhibit, Optical Society of America, June 7, 2007.

6. R. Flasck, "X-Cubes – Revisited for LCOS", Bay Area Society for Information Display Meeting, October 24, 2002

7. R. Flasck, "The Care and Feeding of Single Crystal Silicon Light Valve Design," Society for Information Display FPD Strategic and Technical Symposium, September 9-10, 1998.

8. R. Flasck, "The Care and Feeding of Single Crystal Silicon Light Valve Design, " Stanford Resources 1998 Display Conference

9. R. Flasck, and E. Rawson, "High Optical Efficiency PDLC/CMOS Projection Systems," IC Expo/WESCON 1996

10. R. Flasck, "Current and Near Term Applications of Flat Panel Display Devices," Applications of Electronic Imaging; John Urbach, Editor; Proceedings of SPIE, Vol 1082 (1989). – Invited Critical Review Paper

11. R. Flasck, "U.S. Display Suppliers and Developers: Comments on Developments and Manufacturing," Flat Panel Displays 1988 Conference and Exhibition; Stanford Resources, Inc. (1988). – Invited Presentation and Expert Panel Member

12. S. Ladderman, A. Bienenstock, R. Flasck, and F. Betts, "Structural Studies of Sputtered Ni-As-O Films," Journal of Non-Crystalline Solids, Vol 70, Num 3, 409-427 (1985).

13. R. Flasck, and S. Holmberg, "Amorphous Silicon Thin Film Transistor (TFT) Driven Liquid Crystal Displays (LCD)," Advances in Display Technology V, Elliott Schlam, Editor, Proceedings of SPIE, Vol 526, 94-98 (1985).

14. S. Ovshinski, K. Sapru, and R. Flasck, "Modification of $SiO_2$," Bulletin of the American Physical Society, Vol 23, Num 3, 461 (1978).

15. R. Flasck, M. Izu, K. Sapru, T. Anderson, S. Ovshinski, and H. Fritzsche, "Optical and Electronic Properties of Modified Amorphous Materials," Proceedings of the Seventh International Conference on Amorphous and Liquid Semiconductors, University of Edinburgh, Scotland, 527-528 (1977).

16. S. Ovshinski, R. Flasck, M. Shaw, and K. Dec, "An Experimental Study of Threshold Switching in Some Binary Chalcogenide Based Glass Films," Tr. 6-iMezhdunar.Konf.po Amorfin. I Zhidk, Poluprovodn, (1975). Struktura I Svoistva Nekristal. Poluprovodn., 190-194 (1976).

17. M. Tenhover, P. Boolchand, and R. Flasck, "Mossbauer Effect Studies in Amorphous $As_xTe_{1-x}$ Binary, "Bulletin of the American Physical Society, Vol 21, Num1, 20 (1976).

18. P. Boolchand, M. Tenhover, and R. Flasck, "Te-125 Mossbauer Effect in Amorphous $As_xTe_{1-x}$," Bulletin of the American Physical Society, Vol 21, Num 3, 460 (1976).

19. M. Tenhover, P. Boolchand, and R. Flasck, "Amorphous to Crystalline Transition in $As_xTe_{1-x}$ System," Bulletin of the American Physical Society, Vol 21, Num7, 928 (1976).

20. H. Rockstad, R. Flasck, and J. P. deNeufville, Bulletin of the American Physical Society, Vol 18, 454 (1973).

21. H. Rockstad, and R. Flasck, "Photo –thermopower in Amorphous Chalcogenide Films," Proceedings of the Fifth International Conference on Amorphous and Liquid Semiconductors, Garmisch-Partenkirchen, Germany, 1311-1315 (1973).

22. R. Flasck, and H. Rockstad, "The Thermal Conductivity of Some Chalcogenide Glasses," Journal of Non-Crystalline Solids, Vol 12, 353-356 (1973).

23. H. Rockstad, and R. Flasck, Bulletin of the American Physical Society, Vol 17, 116 (1972).

24. H. Rockstad, R. Flasck, and S. Iwasa, “Seebeck Coefficient in Amorphous Chalcogenide Films,” Journal of Non-Crystalline Solids, Vol 8-10, 326-333 (1972).

25. D. Meyer, and R. Flasck, “New Configuration for a Dipole Magnet for Use in High Energy Physics Applications,” Nuclear Instrumentation and Methods, Vol 80, Num 2, 339-341 (1970).