# Exhibit 4

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.
Petitioner

v.

Neodron, Ltd.
Patent Owner

Case No. IPR2020-01331
U.S. Patent No. 7,821,502

# PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 7,821,502

## TABLE OF CONTENTS


I. INTRODUCTION ........................................................................ 1

II. SUMMARY OF THE '502 PATENT ........................................................ 1

A. DESCRIPTION OF THE '502 PATENT'S ALLEGED INVENTION ........................... 1

B. SUMMARY OF THE '502 PATENT PROSECUTION ............................................ 5

C. PERSON HAVING ORDINARY SKILL IN THE ART ........................................... 6

III. REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37 C.F.R. § 42.104 ..................... 7

A. GROUNDS FOR STANDING UNDER 37 C.F.R. § 42.104(A) ................................ 7

B. DISCRETIONARY CONSIDERATIONS - 35 U.S.C. § 314(A) ............................... 7

1. Whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted. ............................................ 11

2. Proximity of the court's trial date to the Board's projected statutory deadline for a final written decision. ........................................ 12

3. Investment in the parallel proceeding by the court and the parties. ........ 14

4. Overlap between issues raised in the petition and in the parallel proceeding. ......................................................................... 14

5. Whether the petitioner and the defendant in the parallel proceeding are the same party. ..................................................................... 15

6. Other circumstances that impact the Board's exercise of discretion, including the merits. .......................................................... 15

C. IDENTIFICATION OF CHALLENGE UNDER 37 C.F.R. § 42.104(B) AND RELIEF REQUESTED ........................................................................ 17

D. CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3) ............................. 17

IV. CLAIMS 1-24 OF THE '502 PATENT ARE UNPATENTABLE ............ 25

A. GROUND 1: *GRUMMER* IN VIEW OF *TAGG* RENDERS OBVIOUS CLAIMS 1-6, 8-14, 16-17, AND 20-23 ................................................................ 25

B. GROUND 2: *GRUMMER* IN VIEW OF *TAGG* IN FURTHER VIEW OF *GILLESPIE* RENDERS OBVIOUS CLAIMS 7, 15, 18-19, AND 24 ................................. 73

V. CONCLUSION ............................................................................ 83

VI. MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) ..................... 84

A. REAL PARTY-IN-INTEREST .......................................................... 84

B. RELATED MATTERS ..................................................................... 84

C. LEAD AND BACK-UP COUNSEL ......................................................... 84

# I. INTRODUCTION

Petitioner Apple Inc. ("Petitioner") requests *Inter Partes* Review ("IPR") of claims 1-24 (the "Challenged Claims") of U.S. Patent No. 7,821,502 ("the '502 Patent").

# II. SUMMARY OF THE '502 PATENT

## A. Description of the '502 Patent's Alleged Invention

The '502 Patent generally relates to a capacitive sensor comprising column and row electrodes formed on a single surface of a substrate for determining the position of an object. *'502 Patent* (Ex. 1001), Abstract, 5:37-42. The column and row electrodes define a sensing area in which the position of a finger or other object can be determined. *Id.* at 5:44-47. The electrodes form an array of sensing cells within this sensing area where the column electrodes are electrically coupled together and the row electrodes in each row are electrically coupled together via connections either within or outside the sensing area. *Id.* at 6:29-7:10. This arrangement is depicted below in Figure 3:




Fig. 3

*Id*. at Fig. 3. As emphasized in the below annotated Fig. 3, the pair of row sensing electrodes 30 in columns x1 and x2 (red) are connected within the sensing area as are the pair of row sensing electrodes 30 in columns x3 and x4 (green). Because the two pairs cannot connect within the sensing area, wrap-around connection 38 (blue) is used, outside the sensing area, to connect all four electrodes in row y2:




Fig. 3

*Id*. at Fig. 3 (annotated), 6:44-7:3 (describing the same).

Similarly, column sensing electrodes 32 in columns x2 (red) and x3 (green) are connected internally via connections 51 (orange) and 53 (yellow), respectively (referred to as a spine). Column sensing electrodes in columns x1 and x4 are connected by connections 40 (blue) and 41 (blue) laying outside the sensing area:



Fig. 3

*Id*. at Fig. 3 (annotated), *Id*. at 6:29-33, 7:11-16 (describing the same).

The capacitive sensor further includes a series of capacitive measurement channels coupled to the respective rows and columns of sensing electrodes. *Id.* at 7:59-62. These capacitive measurement channels 42 are shown as two separate banks in Figure 3 above. *Id.* at 7:65-8:7, Fig. 3. The specification notes these channels "may comprise charge transfer circuitry," which generates signals indicative of the capacitive values for each row and column. *Id.* at 3:37-40, 7:62-65.

These signals are provided to processing circuitry configured to determine the interpolated position of the object. *Id.* at 7:62-65, 8:30-44.

### B. Summary of the '502 Patent Prosecution

The Application that resulted in the '502 Patent was filed on July 5, 2006 as U.S. Patent Application No. 11/428,670 ("the '670 Application"). The '670 Application claims priority to a provisional application filed on July 8, 2005. *Id*. Petitioner applies July 8, 2005 as the priority date for the Challenged Claims.

During prosecution of the '502 Patent, the Examiner issued two office actions. In the first, dated June 24, 2009, the Examiner rejected then-pending claims 1-3, 6-15, and 17-24 as anticipated or obvious over U.S. Patent No. 4,550,221 ("*Mabusth*") alone or in combination with U.S. Patent No. 5,463,388 ("*Boie*"). *'502 File History* (Ex. 1002), 93-101. Then-pending claims 25-27, which ultimately issued as claims 22-25, received a first action allowance noting the prior art of record did not teach the "column sensing electrode compris[ing] a continuous spine within the sensing area" and where another column electrode is connected via external connections. *Id*. at 99.

In response, on Nov. 24, 2009 Applicant attempted to traverse the rejection (amending then-pending independent claims 1 and 20 for "clarity" and "readability"), arguing that neither *Mabusth* alone or in combination with *Boie* teaches or renders obvious the claimed "wrap-around connection" made outside of

the sensing area. *Id*. at 109-111. On February 19, 2010, the Examiner rejected Applicant's arguments and issued a Final Rejection rejecting then-pending claims 1-4, and 6-24 in view of the same prior art. *Id*. at 128-135 (noting *Mabusth* teaches rows "electrically coupled to one another…through the connection holes…which satisfy the limitation of outside of the sensing area").

Via a supplemental response on April 19, 2010, and a Request for Continued Examination on May 19, 2010, Applicant argued that *Mabusth* did not teach the subject matter of claim 1 where row sensing cells at "opposing ends" of a row are coupled together via "wrap-around connections made outside of the sensing area." *Id*. at 145-152. Applicant amended independent claim 20 to similarly recite, "connecting a first broken segment at a first end of one of the at least one row or column to a second broken segment at a second end of the one of the at least one row or column using a wrap-around connection lying outside of the active sensing region." *Id*. at 161-164.

The Examiner issued a Notice of Allowance on June 18, 2010.

### C. Person Having Ordinary Skill in the Art

A person having ordinary skill in the art ("PHOSITA") at the time of the '502 Patent would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least two years of experience in the research, design, development, and/or testing of human-machine

interfaces such as touch sensors or other capacitive sensors and the firmware or system software that govern said interfaces, or the equivalent, with additional education substituting for experience and vice versa. *Najafi Decl.* (Ex. 1003), ¶¶26-28.

## III. REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37 C.F.R. § 42.104

### A. Grounds for Standing Under 37 C.F.R. § 42.104(a)

Petitioner certifies that the ’502 Patent is available for IPR and that Petitioner is not barred or estopped from requesting IPR challenging the claims of the ’502 Patent. Specifically, (1) Petitioner is not the owner of the ’502 Patent, (2) Petitioner has not filed a civil action challenging the validity of any claim of the ’502 Patent, and (3) this Petition is filed less than one year after Petitioner was served with a complaint alleging infringement of the ’502 Patent.

### B. Discretionary Considerations - 35 U.S.C. § 314(a)

#### a. The *General Plastics* Factors Favor Institution

Any argument by Patent Owner that the Board should exercise its discretion under either 35 U.S.C. §§ 314(a) or 325(d) should be rejected. Patent Owner may argue that the ’502 Patent is already at issue in *Samsung Elecs. Co., Ltd., et al. v. Neodron Ltd.*, IPR2020-00282 (“Samsung IPR”) and *Lenovo (United States) Inc., et al. v. Neodron Ltd.*, IPR2020-00688 (“Lenovo IPR”). But the facts here do not support a discretionary denial because, *inter alia*, Apple is not a party in those IPRs

and has never before petitioned for an *inter partes* review of any claim of the '502 Patent, Apple was sued months after those petitions were filed, and the grounds here are substantially different from those in the Samsung and Lenovo IPRs.

The Board has set forth seven factors that it considers in determining whether to exercise its discretion to deny a petition under § 314(a):

1. Whether the same petitioner previously filed a petition directed to the same claims of the same patent;
2. Whether at the time of filing of the first petition the petitioner knew of the prior art asserted in the second petition or should have known of it;
3. Whether at the time of filing of the second petition the petitioner already received the patent owner's preliminary response to the first petition or received the Board's decision on whether to institute review in the first petition;
4. The length of time that elapsed between the time the petitioner learned of the prior art asserted in the second petition and the filing of the second petition;
5. Whether the petitioner provides adequate explanation for the time elapsed between the filings of multiple petitions directed to the same claims of the same patent;
6. The finite resources of the Board; and
7. The requirement under 35 U.S.C. § 316(a)(11) to issue a final determination not later than 1 year after the date on which the Director notices institution of review.

*General Plastic Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 15-19 (September 6, 2017) (precedential). Here, these factors weigh heavily in favor of institution.

With respect to the first factor, that Apple is not a party to the prior IPRs and that this is Apple's first challenge to the '502 Patent "weigh[] especially heavily against a discretionary denial." *Unified Patents, Inc. v. Certified Measurement, LLC*, IPR2018-00548, Paper No. 7 at 7-8 (Sep. 5, 2018). To be sure, "application of the *General Plastic* factors is not limited solely to instances when multiple petitions are filed by the same petitioner." *Valve Corp. v. Electronic Scripting Product, Inc.*, IPR2019-00062, Paper No. 11 at 2 (Apr. 2, 2019). In *Valve*, however, the Board found that the petitioner (Valve) had a "significant relationship" with the previous petitioner (HTC) and filed its petition only after HTC's petition had been denied by the Board. *Id.* at 9-10, 12-13. Apple neither had nor has any such "significant relationship" with the petitioners in the prior '502 Patent IPRs.

Additionally, Apple is not similarly situated to the petitioners in the prior IPRs, who were sued separately from Apple and served with a complaint well before Apple. Specifically, Samsung filed its IPR on December 13, 2019, and Lenovo filed its IPR on March 13, 2020—both before Patent Owner filed district court litigation against Apple on March 23, 2020. Further, while Patent Owner filed a preliminary response in the Samsung IPR, that response too was filed <u>before</u> Patent Owner filed the district court action against Apple. As such, Patent Owner cannot claim gamesmanship by Apple with respect to the prior IPRs.

The second to fifth factors "bear little relevance" here because Apple has never before challenged the '502 Patent. *Unified Patents*, at 7-8 ("Once resolution of factor 1 indicates that Petitioner had not previously filed a petition against the same patent, factors 2-5 bear little relevance unless there is evidence in the record of extenuating circumstances such as a showing that there was a previous petitioner who challenged the same patent and that the previous petitioner and the current petitioner planned the staggered petitions.") (internal citation omitted). No such extenuating circumstances are present here.

As to the sixth factor, Apple has filed this petition on wholly different grounds than the prior IPRs, and Patent Owner controlled the timing of filing the district court complaint against Apple. *Google LLC v. Realtime Adaptive Streaming* LLC, IPR2019-01033, 2019 WL 6999146, at *8 (refusing to exercise discretion to deny institution where Petitioner filed IPR with entirely new grounds from prior IPR and where Petitioner had no control over when Patent Owner instituted litigation against Petitioner).

And, as to the seventh factor, there is no readily identifiable roadblock for the Board to issue a final determination within the statutory one-year limit. Similarly, this is also not a case where the Board should exercise its discretion under § 325(d) to deny the petition because none of the prior art references applied in this petition were previously considered by the Patent Office.

Accordingly, the Board should reach the merits of this petition, and institute review of all challenged claims.

**b. The *Fintiv* factors strongly favor institution**

Under recent precedent, the Board may consider parallel litigation, including an early trial date, as part of its discretionary power to institute under 35 U.S.C. § 314(a). *NHK Spring Co., Ltd. v. Intri-Plex Technologies, Inc.*, IPR2018-00752, Paper 8 at 19–20 (PTAB Sept. 12, 2018) (precedential); *see also Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 at 6 (PTAB March 20, 2020) (enumerating six factors that "relate to whether efficiency, fairness, and the merits support the exercise of authority to deny institution in view of an earlier trial date in [a] parallel proceeding") (precedential). For the reasons discussed below, including that the parallel district court litigation here is in its infancy, the panel should not exercise its discretion to deny institution.

1. *Whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted.*

While Apple has not yet sought to stay the parallel litigation[1], the potential of stay exists because (1) the parallel litigation is in its earliest stages; (2) this proceeding could substantially simplify the issues before the district court; and (3) a stay will not unduly prejudice Neodron. *See, e.g.*, *Crossroads Sys., Inc. v. Dot Hill*

[1] *Neodron, Inc. v. Apple Inc.*, 6:20-cv-00212 (W.D. Tex. 2020).

*Sys. Corp.*, No. A-13-CA-800-SS, 2015 WL 3773014, at *2-4 (W.D. Tex. Jun. 16, 2015) (granting stay and noting "the outcomes of the IPRs have clear and important implications for any subsequent proceedings in this Court"); *e-Watch, Inc. v. ACTi Corp., Inc.*, No. SA-12-CA-695-FB, 2013 WL 6334372, at *7-9 (W.D. Tex. Aug. 9, 2013) (similarly granting stay). Indeed, "[c]ongress intended for district courts to be liberal" in granting stays pending PTAB proceedings. *IOENGINE, LLC v. PayPal Holdings, Inc.*, Nos. 18-452-WCB; 18-826-WCB, 2019 WL 3943058, at *3 (D. Del. Aug. 21, 2019); 157 Cong. Rec. S1363 (Mar. 8, 2011) (Sen. Schumer) (Congress placed "a very heavy thumb on the scale in favor of a stay being granted"); *NFC Tech. LLC v. HTC Am., Inc.*, 2015 WL 1069111, at *7 (E.D. Tex. Mar. 11, 2015) ("[A]fter the PTAB has instituted review proceedings, the parallel district court litigation ordinarily should be stayed.").

2. *Proximity of the court's trial date to the Board's projected statutory deadline for a final written decision.*

The district court, just recently, issued its order setting a *Markman* hearing on January 15, 2021. *See* Dkt. 25 (Ex. 1018). No trial date was set. While a concrete trial date remains uncertain, the parties can approximate trial at the *earliest* on or around mid-to-late January 2022 (one year after *Markman* date) per the court's scheduling order. *See* Dkt. 29 (Ex. 1019). This speedy trial date ignores the impact

of the COVID-19 pandemic on trial schedules[2] and the fact that Apple has filed a motion to transfer venue. Further, should litigation remain in the Western District of Texas, this date ignores any scheduling extensions requested by the parties and the congestion of the court's docket, particularly when considering the popularity of Judge Albright's court for patent plaintiffs. Comparatively, the Board's projected statutory deadline for its final written decision ("FWD") would similarly fall approximately mid-to-late January 2022, potentially *before* even the *earliest* date of trial.

This factor weighs in favor of institution. *Sand Revolution II, LLC, v. Continental Intermodal Group – Trucking LLC*, IPR 2019-01393, Paper 24, at *9-10 (PTAB Jun. 16, 2020) (refusing to exercise 314(a) discretion and explaining this factor weighs in favor of institution although there was a relatively close trial date to a FWD when comparing the uncertainty surrounding that scheduled trial

[2] Texas's Governor Greg Abbott just recently stated on July 10, 2020 that the "worst is yet to come" as Texas works its way through the massive increase (reporting just under 10,000 new cases per day) in people testing positive, explaining "[i]f we do not slow the spread of COVID-19…the next step would have to be a lockdown." Ex. 1020.

compared to the Board's strict adherence to the § 316(a)(11) one-year statutory deadline, even in light of the COVID-19 pandemic).

3. *Investment in the parallel proceeding by the court and the parties.*

Neodron recently filed its complaint less than four months ago on March 23, 2020, and Apple recently filed its answer on May 18, 2020. Neither the parties nor the court have invested time litigating invalidity. Preliminary invalidity contentions are not due until September 11, 2020, and all discovery (apart from claim construction discovery) is stayed until after the *Markman* hearing on January 15, 2021. Moreover, Apple was extremely diligent in filing this petition, filing just months after Neodron served its complaint. Accordingly, this factor weighs strongly in favor of institution.

4. *Overlap between issues raised in the petition and in the parallel proceeding.*

As noted above, Apple has yet to present any invalidity theories before the district court. Accordingly, there is no overlap. Recognizing the goal of minimizing duplicative effort, however, if this IPR is instituted, Apple stipulates that it will not pursue invalidity of the challenged claims in the district court litigation using the grounds asserted in this petition.

This factor weighs strongly in favor of institution.

5. *Whether the petitioner and the defendant in the parallel proceeding are the same party.*

The parties are the same. However, members of the Board have noted that *Fintiv* "says nothing about situations in which the petitioner is the same as, or is related to, the district court defendant." *Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15, at *10-11 (PTAB May 15, 2020) (APJ Crumbley, dissenting) (further explaining if "th[is] factor weighs in favor of denial if the parties are the same," this could "tip the scales against a petitioner merely for being a defendant in the district court" and "would seem to be contrary to the goal of providing district court litigants an alternative venue to resolve questions of patentability").

Instead, this factor plays a role only where a petitioner is unrelated to a defendant in a district court proceeding. *Fintiv*, IPR2020-00019, Paper 11 at 13-14 (describing only the situation in which the factor is "weighed ... against exercising discretion"). Thus, this factor does not support discretionary denial.

6. *Other circumstances that impact the Board's exercise of discretion, including the merits.*

As detailed in Sec. IV. below, the strength of Petitioner's unpatentability arguments weigh heavily in favor of institution. *See Apple Inc. v. Maxell, Ltd.*, IPR2020-00204, Paper 11 at 19 (PTAB Jun. 19, 2020) (considering such a circumstance).

Additionally, Petitioner has not previously challenged this patent. Indeed, this patent has never been challenged in a PTAB post-issuance proceeding. For at least these reasons, this factor weighs against discretionary denial.

Further, additional circumstances strongly favor institution. For example, Petitioners note that *Fintiv's* and *NHK's* focus on the trial date is misplaced as a basis for the Board's exercise of its discretion under 314(a). Exalting a trial date as the benchmark over the statutory filing window undermines Congressional intent to allot petitioner's a one-year window to file a petition from service of a complaint; undermines the AIA's and USPTO's objectives of improving patent quality; ignores the abolition of unjust infringement verdicts rendered on invalid patents; ignores the practical realities of shifting litigation dockets; ignores the vast resources saved from unnecessary post-trial activity; and permits district courts and patent owners to manipulate the availability of IPRs. All-in-all, discretionary denial based purely on the state of parallel proceedings significantly curtails the availability of IPRs as an alternative forum for challenging patent validity—depriving petitioners what is otherwise available to them by statute.

In summary, the *Fintiv* factors altogether weigh strongly against discretionary denial.

### C. Identification of Challenge Under 37 C.F.R. § 42.104(b) and Relief Requested

In view of the prior art and evidence presented, claims 1-24 of the ’502 Patent are unpatentable and should be cancelled. 37 C.F.R. § 42.104(b)(1). Further, based on the prior art references identified below, IPR of claims 1-24 should be granted. 37 C.F.R. § 42.104(b)(2).

| Proposed Grounds of Unpatentability | Exhibits |
|---|---|
| **<u>Ground 1:</u>** U.S. Patent. No. 4,233,522 to Grummer et al. (“*Grummer*”) in view of U.S. Patent Pub. No. 2003/0067451 to Tagg et al. (“*Tagg*”) renders obvious claims 1-6, 8-14, 16-18, and 20-23. | Ex. 1004, Ex. 1005 |
| **<u>Ground 2:</u>** *Grummer* in view of *Tagg* in further view of U.S. Patent No. 5,880,411 to Gillespie et al. (“*Gillespie*”) renders obvious claims 7, 15, 19, and 24. | Ex. 1004, Ex. 1005, Ex. 1006 |

Section IV identifies where each element of the Challenged Claims is found in the prior art. 37 C.F.R. § 42.104(b)(4). The exhibit numbers of the supporting evidence relied upon to support the challenges are provided above and the relevance of the evidence to the challenges raised are provided in Section IV. 37 C.F.R. § 42.104(b)(5). Ex. 1001–Ex. 1020 are also attached.

### D. Claim Construction Under 37 C.F.R. § 42.104(b)(3)

In this proceeding, claims are interpreted under the same standard applied by Article III courts (i.e., the *Phillips* standard). *See* 37 C.F.R. § 42.100(b); *see also* 83 Fed. Reg. 197 (Oct. 11, 2018); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

Cir. 2005) (*en banc*). Under this standard, words in a claim are given their plain meaning, which is the meaning understood by a person of ordinary skill in the art in view of the patent and file history. *Phillips*, 415 F.3d 1303, 1312-13.

With the exception of "sensing area," "active sensing region," and "wrap-around connection," Petitioner proposes no claim language requires express construction to resolve the grounds presented herein.

#### 1. "sensing area"

Independent claims 1 and 22 recite a "sensing area." *'502 Patent* (Ex. 1001), claims 1 and 22 (reciting a "sensing area"); *see also* dependent claims 4, 6, 14, 15, 23, 24.

The '502 Patent is clear that a "sensing area" is defined by the outside edges of the electrodes positioned on the perimeter of the electrode pattern. *'502 Patent* (Ex. 1001), Abstract ("[t]he electrodes are arranged so as to define an array of sensing cells arranged in columns and rows to form a sensing area"), 2:47-52 (explaining the "sensing area" is bound by the area at which the position of an object may be determined), 4:52-58 ("there is provided a capacitive position sensor for determining the position of an object in a sensing area"), 5:44-47, 5:58-60, 7:3-10 ("very edge of the sensing area" defined by sensing electrodes), 8:32-34, 10:67-11:2, Fig. 3, Fig. 4. The purpose of defining this outer boundary is to provide "electrical connection[s] [] outside of the sensing area so that there is no requirement for

electrical connections to cross within the sensing area." *Id*. at Abstract. In other words, one goal of the '502 Patent is to avoid electrical connections that cross over electrodes, routing such connections instead outside the electrode pattern. Confirming this goal, the '502 Patent states "[t]he ideal touch surface" would "require only one sensing layer with no crossovers in the sensing region." *Id*. at 2:34-40. To accomplish this, the '502 Patent describes wrap-around connections "made outside of the sensing area" connecting row and/or column electrodes at opposing ends. *Id*. at 2:54-61, 3:17-20. 6:44-66. Fig. 3 below illustrates such an arrangement in which the electrical connections (e.g., 38 and 41) are connected to the outside edges of the electrodes at the perimeter of the electrode pattern and do not cross over any portion of any electrode:




Fig. 3

*Id*. at Fig. 3.

These points of attachment are further identified below in annotated Fig. 3, with connection points between electrodes and electrical connections "outside of the active sensing region" in red:




Fig. 3

*Id*. at Fig. 3 (annotated). As depicted in Figs. 4, 5a, and 5b below, touches adjacent to an electrode may be sensed (i.e., the electrode will detect a change in capacitance), and therefore touches that occur just outside the edge of the sensing area (i.e., over the electrical connections) may be sensed even though such touches are "outside the sensing region:"



Fig. 4



Fig. 5A



Fig. 5B

*Id*. at Figs. 4, 5a, 5b; *see also Najafi Decl*. (Ex. 1003), ¶¶ 32-36 (explaining that a finger just beyond the edge of a perimeter electrode will generate a capacitance change at least at said perimeter electrode, consistent with Figs. 5a and 5b, and concluding that the "sensing area" must be defined by the edges of the perimeter electrodes, rather than the general area within which a touch can be detected because such an area can extend beyond the edges of the electrodes and into the region the '502 Patent expressly describes as "outside of the sensing area"). But even for such a touch, the position reported will be within the boundaries of an electrode rather than outside it. *Id*. (further noting the processor cannot determine the X/Y location of a touch beyond the boundaries of the electrodes). This is because it is not possible to interpolate a position beyond an edge of the outermost electrodes. *Id*. Simply put,

the sensing area is the area where the position reporting occurs (i.e., where the electrodes are), not where the sensed object is located. *Id*.

Accordingly, the claimed "sensing area" must be defined by the outside edges of the perimeter electrodes, rather than the area within which a touch may be detected.

### 2. "active sensing region"

Apart from one short paragraph in the summary of the invention reciting nearly identical claim language to independent claim 17, the phrase "active sensing region" only appears in method claim 17. *Compare id*. at 4:25-44 *with* claim 17. As used therein, the method of forming an "active sensing region" comprises "depositing a single layer of patterned conductive material on a substrate," and just as with the claimed "sensing area," this pattern "compris[es] rows and columns of electrodes." *Compare* claim 17 *with* claims 1 and 22. Further, to make this region "active," these rows and columns of electrodes are "connected to individual ones of capacitive sensing channels[.]" *Id*. at claim 17. Consistent with the rest of the intrinsic record, this active sensing region can sense the "coordinate position of an object adjacent the active sensing region." *Id*., 5:44-47, 8:32-34 12:4-8. Also consistent with the intrinsic record and with independent claims 1 and 22, the "wrap-around connection" recited in claim 17 lies "outside of the active sensing region." *Najafi Decl*. (Ex. 1003), ¶ 37.

Accordingly, the claimed "active sensing region" should be construed commensurate with the claimed "sensing area." Namely, it is the area defined by the outside edges of the perimeter electrodes.

### 3. "wrap-around connection"

Independent claim 1 recites a "row wrap-around connections," and dependent claim 4 recites "column wrap-around connections[.]" Independent claim 17 recites a "wrap-around connection" that connects broken segments of a row or column. *'502 Patent* (Ex. 1001), claims 1 and 17; *see also id*. at dependent claims 2-4.

The '502 Patent explains that these "wrap-around connections" are used to electrically couple either row or column electrodes at opposite ends of a row or column, and wrap around other electrodes in the row or column. *'502 Patent* (Ex. 1001), 2:57-61, 3:17-20, 6:66-7:3. The '502 Patent fails to provide any additional guidance concerning the geometry or point of attachment for these wrap-around connections, such that the wrap-around connections must retain a particular shape or connect to a particular location of an electrode. For example, Fig. 3 of the '502 Patent illustrates a row wrap around connection 38 that connects to the outermost right and left edges of the electrodes at opposite ends of a row, and an external column connection 40 that connects to a center location on the sides (rather than the uppermost and lowermost edges) of electrodes at opposite ends of a column.

Accordingly, the claimed "wrap-around connection(s)" should be defined as electrical connections for connecting either column or row electrodes that wrap around other electrodes in the row or column, irrespective of their shape or point of attachment to an electrode. *Najafi Decl*. (Ex. 1003), ¶ 38.

## IV. CLAIMS 1-24 OF THE '502 PATENT ARE UNPATENTABLE

### A. Ground 1: *Grummer* in View of *Tagg* Renders Obvious Claims 1-6, 8-14, 16-17, and 20-23

**Overview of *Grummer***

U.S. Patent No. 4,233,522 to Grummer et. al ("*Grummer*") was published on November 11, 1980 and is prior art to the '502 Patent under at least 35 U.S.C. § 102(b) (pre-AIA). *Grummer* was not cited or considered during prosecution of the '502 Patent.

*Grummer* is directed to a capacitive touch panel comprising an array of touch sensitive cells, each cell containing a row sensing electrode and a column sensing electrode connected together by narrow strips of conductors. *Grummer* (Ex. 1004), Abstract, 12:5-27. *Grummer* discloses embodiments where its touch sensitive cells are formed in a single layer over a transparent substrate to provide a "much simpler construction" than two-layered devices. *Id.* at 13:18-22, 11:64-66. A 4x4 matrix employing such a single layer construction is illustrated in the top-right of Fig. 7 below:




*Id.* at Fig. 7[3]. As shown, switch cells SW-1 to SW-7 (remaining switch cells not labeled for simplicity) are formed over transparent substrate 93, such as glass, and are connected to row and column capacitive measurements circuits 123 and 125 respectively. *Id.* at 12:37-55. Outputs from these measurement circuits can be sent to a microprocessor to provide a coordinate position of a touch. *Id.* at 13:8-10, 5:41-61. Further, as explained in detail below, *Grummer* discloses configurations of the

[3] Note the top row configuration in *Grummer's* Figure 7 embodiment aligns with the '502 Patent's explanation that "a connection outside of the sensing area [for the top row] is not required because the spines connecting between the column sensing electrodes…need not extend to the very edge of the sensing area." *'502 Patent* (Ex. 1001), 7:3-10.

disclosed electrodes comprising a continuous spine connection separating broken segments of other rows or columns of electrodes. *See*, *e.g*., *id*. at Fig. 7.

Because *Grummer*, like the ’502 Patent, discloses a capacitive sensor for detecting touch-sensitive input for interaction with a touch operated device, *Grummer* is in the same field of endeavor as the ’502 Patent. *Compare id*. at 1:5-10, 2:64-68 *with ’502 Patent* (Ex. 1001), 1:5-17, 3:65-4:2. Accordingly, *Grummer* is analogous art to the ’502 Patent. *Najafi Decl.* (Ex. 1003), ¶¶ 29-31, 39-43.

**<u>Overview of *Tagg*</u>**

U.S. Patent Publication No. 2003/0067451 to Tagg et al. (“*Tagg*”) was published on April 10, 2003 and is prior art to the ’502 Patent at least under 35 U.S.C. § 102(b) (pre-AIA). *Tagg* was not cited or considered during prosecution of the ’502 Patent.

*Tagg* generally discloses a capacitive touch screen including a plurality of electrodes arranged in rows and columns. *Tagg* (Ex. 1005), Abstract, [0089], [0201] (explaining that *Tagg’s* rows and columns are formed in separate stacked layers glued together on the same side of a substrate, e.g., row layer 314 and column layer 315). As depicted below in Figures 23 and 24, each end of *Tagg’s* linear electrodes may be “electrically connected” to the opposing end of the same electrode by conductive wires:


319
313
312
309
320
321
322
323
324
325
326
327
311
310
318
314
315
316
301
302
303
304
305
306
307
308
317


404
401
402
403

*Id*. at Figs. 23 and 24. As detailed below, these connections (e.g., conductive silver wires) wrap-around *Tagg's* electrode configuration formed by the depicted linear rows and columns of sensing electrodes. *Id*. Moreover, *Tagg's* processor is operable to "interpolate" the position of a touch input by taking a proportion of two averages on the orthogonal grid formed by the electrodes. *Id.* at [0125]-[0126].

Because *Tagg*, like the '502 Patent, discloses a capacitive sensor for detecting touch-sensitive input for interaction with a touch operated device, *Tagg* is in the same field of endeavor as the '502 Patent. *Compare id*. at [0001], [0084] *with '502 Patent* (Ex. 1001), 1:5-17, 3:65-4:2. *Tagg* is also directed to solving the same or similar problems as the '502 Patent, including Claim 20, which is directed to interpolating the location of a touch to reduce errors in position determinations. *Compare Tagg* (Ex. 1005), [0125]-[0128] *with '502 Patent* (Ex. 1001), 8:30-44, 9:24-54. Accordingly, *Tagg* is analogous art to the '502 Patent. *Najafi Decl.* (Ex. 1003), ¶¶ 29-31, 44-47.

**Motivation to Combine *Grummer* and *Tagg***

As discussed above, *Grummer* discloses embodiments in which its touch sensitive cells are formed in a single layer over a transparent substrate to provide a simplified single-layer arrangement. This single-layer arrangement is illustrated below with row electrodes (blue) and column electrodes (red) formed in the same layer:




*Id.* at Fig. 7 (annotated); *see also id*. at 12:5-27 (noting a switch cell (boxed in green) comprises one blue row electrode and one red column electrode, where row electrodes in switch cells 1 and 2 are connected together by narrow conductor 102 and column electrodes in switch cell 1 and 5 are connected together by narrow conductor 114, and where the narrow conductors are made from the same material as the electrodes and are annotated with the same color as the electrodes to which they are connected). As shown, the rows below the topmost row are broken (the first of which is highlighted light blue), requiring cross over connectors within the sensing area, such as at intersection 127, to complete the electrical connection between these broken row segments. *Id*. at 12:28-33. *Grummer* touts the advantages of completing the electrical connection of these broken segments, stating that

connecting broken row electrodes "increase[s] the capacitive coupling between the touch capacitance and the voltage divider circuitry," which a PHOSITA would appreciate reduces the relative impact of noise to the system resulting in a more accurate determination of the XY location of a touch on the sensing array. *Id*. at 3:39-51, 14:3-9; *see also Najafi Decl.* (Ex. 1003), ¶¶ 52-53.

Despite using cross over connectors in this embodiment, *Grummer* expressly disparages their use within the sensing area, noting, "[e]limination of conductor cross overs removes the inherent disadvantages associated with such design and substantially simplifies and improves panel fabrication." *Id.* at 13:26-31, 14:2-9; *Najafi Decl.* (Ex. 1003), ¶¶ 52-53. Consistent with this disparagement, *Grummer* describes an embodiment that removes conductor cross overs within the sensing area, but relies on a two-layer, rather than single-layer construction to facilitate this configuration. *Grummer* (Ex.1004), 13:35-14:32, Figs. 8A-8B; *Najafi Decl.* (Ex. 1003), ¶ 53. *Grummer*, however, acknowledges that there are downsides to this alternative architecture, noting the one-sided architecture previously discussed with regard to Figure 7 "is of a much simpler construction." *Grummer* (Ex. 1004) at 13:11-22; *Najafi Decl.* (Ex. 1003), ¶ 53.

Based on *Grummer's* descriptions of the (1) Figure 7 and (2) Figures 8A-8B embodiments (and the express motivations for those embodiments), a PHOSITA would have recognized an improved structure for a capacitive sensing circuit

incorporates the beneficial aspects of both embodiments without the expressly noted detriments, resulting in a one-sided architecture without cross over conductors within the sensing area. *Grummer* (Ex. 1004) at 13:11-31; *Najafi Decl.* (Ex. 1003), ¶¶ 52-54. Although *Grummer* alone does not provide a solution for both expressly desired properties, a PHOSITA would have looked to solutions in the art that would enable this ideal arrangement that *Grummer* suggests. *Id*.

*Tagg* describes one such solution. Namely, *Tagg* teaches a similar capacitive touch detector with electrodes in rows and columns in which its electrodes are electrically connected via wrap around conductive wires 309:




*Tagg* (Ex. 1005), Fig 23. A closer look at these electrical connections is provided below:




*Id.* at Fig. 24. As illustrated, *Tagg* teaches a configuration that connects electrodes on one end of a column to electrodes on the opposite end of a column with connections that wrap around the sensing area. Although Fig. 24 above illustrates only the column electrodes and their respective wrap around connections, a PHOSITA would have understood the row-sensing electrodes would similarly be able to employ wrap around connections consistent with those illustrated in Fig. 24. *Najafi Decl.* (Ex. 1003), ¶¶ 54-55 (noting the top right corner of Fig. 23 illustrates similar wrap around connections for both the row-sensing electrodes and column-sensing electrodes). This arrangement, implemented in *Grummer's* single-layer Fig. 7 embodiment, would support connecting the broken row segments without internal crossovers—the ideal combination *Grummer* suggested. *Id.*

Combining *Tagg's* wrap-around connections into *Grummer's* system without using cross over connections within the sensing area would have only required minor modifications to *Grummer's* narrow conductor material connecting its electrodes. *Najafi Decl.* (Ex. 1003), ¶¶ 52-61 (explaining that the wide paddle-like structures are the capacitive sensing electrodes and the narrow connections connecting these paddle electrodes are merely conductors without sensing capabilities).

As depicted below, *Grummer's* Fig. 7 embodiment includes two types of crossover connections within the sensing area—a first set (green) that connect the row electrodes to the outside circuitry and a second set (orange) that connect the left side row electrodes to the right side row electrodes over the spine connectors:



*Grummer* (Ex. 1004), Fig. 7 (annotated). To maintain a single-layer construction without either type of internal crossover as expressly preferred by *Grummer*, *Grummer's* conductor configuration would be modified as follows:




*Id*. at Fig. 7 (modified and annotated). Modified Figure 7 above depicts an electrode and conductor arrangement that obviates the need for the left-side crossovers and the central crossovers within the sensing area. *Najafi Decl.* (Ex. 1003), ¶¶ 52-61 (further noting the lead lines may employ jumpers to extend over electrically conductive wrap-around connections or may simply be routed over these connections when the wrap-arounds are formed of electrically insulated free wires).

As depicted above, to obviate the need for left-side crossovers, the narrow conductor material on *Grummer's* edge column electrodes could have simply been

routed outside the border of its switch cells. *Id*. Because a narrow conductor extension is used on the bottom of each column to extend the connections to external circuitry, this portion of the modification could have been completed with existing manufacturing techniques already inherent in the *Grummer* fabrication process. *Id*. With the narrow conductor material extended, *Grummer's* original crossover connections can be used to connect the row electrodes to external circuitry, but those crossovers now comply with *Grummer's* express disclosure to avoid crossovers within the sensing area. *Id*.

As also depicted above, to obviate the need for *Grummer's* center crossovers, *Tagg's* external wrap-around connections are used to electrically connect broken row segments on opposing sides of the electrode array. *Id*.

Modifying *Grummer's* connecting material to extend beyond the dashed switch cell boundary, as already present in the unmodified Figure 7 in the topmost row and at the bottom of each column (and additionally as shown in Fig. 3B), would have had minimal effect on *Grummer's* capacitive measurements. *Id* at ¶ 59. *Grummer* repeatedly describes the capacitive effect of a user contacting its capacitor touch plates (i.e., electrodes), but fails to mention any capacitive readings resulting from a user touching the disclosed conductor material. *Id*. Indeed, *Grummer* explains that its "connecting conductor runs are made sufficiently narrow so as to minimize stray capacitance between conductors, being typically, on the order of three mils."

*Grummer* (Ex. 1004), 15:10-14. Thus, a PHOSITA would have understood that *Grummer's* connecting conductor runs could be modified without interfering with the accuracy of *Grummer's* capacitive readings. *Najafi Decl.* (Ex. 1003)*,* ¶ 59 (additionally explaining that *Grummer's* system would be rendered inoperable by conductor runs that sense capacitance changes from a user's touch sufficient enough to actuate a switch cell because they expand across multiple cells, meaning touching one run would actuate multiple switch cells).

These minor modifications present *Grummer's* ideal combination discussed above, connecting broken row segments without internal crossovers by employing *Tagg's* wrap-around connections. *Id*. at ¶¶ 52-61[4] A PHOSITA would have understood that this modification appreciates an increase in capacitive coupling from connecting broken row segments, as expressly noted by *Grummer*, thus reducing the impact of environmental noise on the system while simplifying and reducing the cost of manufacture. *Id*. (discussing *Grummer* at 14:3-9 (increased capacitive coupling); U.S. Patent No. 7,382,139 to Mackey at 1:33-38 (reduced cost); U.S. Patent No. 7,812,268 to Ely at 5:23-29 (increased reliability)). Moreover, a PHOSITA would

[4] Petitioner's proposed modifications are limited to four-by-four matrices or smaller in order to completely obviate the need for internally disposed cross-over connectors.

have been motivated to combine *Tagg's* wrap-around connections into the modified system of *Grummer* to provide the simplest design possible (one-layer, no internal cross over conductors) to further maximize the transparency of the structure, another expressly stated design motivation from *Grummer*. *Grummer* (Ex. 1004) at 2:7-10; *Najafi Decl.* (Ex. 1003), ¶ 61 (noting a PHOSITA would have appreciated that because the edge crossover connections are positioned outside the dashed boundary here, any inherent disadvantages are minimized such that transparency would not be affected by crossovers external to the dashed boundary).

In addition to the express benefits described in the art above, similar sensing electrode geometries with external electrical connections were well-known prior to the '502 Patent. One example is reproduced below from U.S. Patent Pub. No. 2004/0125087 to Taylor et al. ("*Taylor*"):



*Taylor* (Ex. 1007), Fig 5 (excerpted); *Najafi Decl.* (Ex. 1003), ¶ 60 (discussing *Taylor's* teachings of a single layer touchpad employing a disposed conductive material to detect the touch of an object with the above-depicted electrode arrangement). That such arrangements were known further supports a conclusion that a PHOSITA would have been motivated to reconfigure *Grummer's* modified system to permit the advantageous implementation of the wrap-around connections taught by *Tagg*, thereby creating the ideal combination of features expressly desired by *Grummer*. *Id.* A PHOSITA would have had a reasonable expectation of success combining *Tagg's* wrap-around connections to *Grummer's* system at least because each teaches a similar capacitive screen device capable of detecting a user's touch input, *Tagg* already contemplates single surface arrays of electrodes, and such a configuration was already well-known in the art. *Compare Grummer* (Ex. 1004), 1:5-10 *with Tagg* (Ex. 1005), [0085], [0087]-[0088], [0136], [0172]; *Najafi Decl.* (Ex. 1003), ¶¶ 61.

***i. Claim 17***[5]

***17[P] A method comprising:***

To the extent the preamble is deemed limiting, *Grummer* discloses a "capacitive touch switch array" suited for use with data processing equipment and electronic displays. *Grummer* (Ex. 1004) at 2:46-53, Abstract, Fig. 1. *Grummer* specifically discusses the method of fabrication of its touch switch array. *Id.* at 13:29-31, 15:19-29.

***[17(a)] depositing a single layer of patterned conductive material on a substrate to form an active sensing region of a capacitive sensor,***

*Grummer* teaches depositing a "pattern" of "conductive material," such as indium tin oxide—the same conductive material described by the '502 Patent, *see '502 Patent* (Ex. 1001) at 3:65-67—deposited on a transparent substrate such as glass. *Grummer* (Ex. 1004) at 11:64-66, 13:38-44. *Grummer* expressly states that the embodiment of Figure 7 is provided as a single layer resulting in a "much simpler construction." *Id*. at 13:18-22 (explaining the "conductive material [is] on only one side of the substrate").

[5] Independent Claim 17 includes a more comprehensive set of limitations than the other challenged independent claims. Accordingly, Petitioner has mapped Claim 17 first to streamline the subsequent internal cross references in Ground 1.

*Grummer* discloses that its single-layer pattern of conductive material is deposited as row and column electrodes, forming an array of switch cells. *Id*. at 2:46-57, 11:67-12:4. As seen in annotated Figure 7 below, each switch cell (an exemplary one of which is highlighted green) contains one row sensing electrode (such as electrode 100, highlighted blue) and one column sensing electrode (such as electrode 101, highlighted red), where electrodes in adjacent cells are connected via conductors (e.g., row electrodes connected by conductor 102, column electrodes connected by conductor 114):




*Id*. at Fig. 7 (annotated), *see also id.* at 12:5-27. *Grummer* explains that a switch cell is actuated "through concurrent touching of the cell's two capacitor touch plates."

*Id*. at 7:64-66, 12:56-58 (noting the operation of the single layer embodiment is comparable to the multi-layers embodiments described therein), 13:1-3. Indeed, *Grummer* states that outputs from its detection circuitry connected to its electrode array "provide a coordinate identification" of a touch. *Id*. at 13:8-10. Thus, *Grummer's* array of electrodes formed of a single layer of conductive material deposited on a substrate forms an active sensing region defined by the outside edges of the perimeter electrodes where a user's touch may be registered. *Supra*, Sec. IIID.2; *see also Najafi Decl.* (Ex. 1003)*,* ¶¶ 37, 48-49.

***[17(b)] the pattern comprising rows and columns of electrodes connected to individual ones of capacitive sensing channels,***

As discussed above, *Grummer* discloses an array of sensing electrodes comprising row sensing electrodes and column sensing electrodes. *Supra*, Fig. 7 (annotated). Specifically, *Grummer* expressly calls out "first and second groups of switch cells defining a system of coordinates, **such as rows and columns**, for specifying the location of each switch cell within the array." *Id.* at 3:29-38 (emphasis added).

Further, as clearly seen when viewed in full, the first row of the row sensing electrodes is connected to a particular row detection circuit 123, and each subsequent row is connected to its corresponding unique row detection circuit (not numbered):




*Id.* at Fig. 7. Similarly, the first column of the column sensing electrodes is connected to a particular column detection circuit 125, and each subsequent column is connected to its corresponding unique column detection circuit (not numbered). *Id.*; *see also id.* at 12:37-51 (explaining the connections between the row and column electrodes and their respective row and column detection circuits). Each unique row column detection circuit constitutes a capacitive sensing channel outputting the amplitude of the corresponding row or column's capacitance. *Najafi Decl.* (Ex. 1003), ¶ 50.

***[17(c)] and wherein at least one row or column is broken into a plurality of segments within the active sensing region;***

*Grummer* discloses that its row sensing electrodes may be broken into a plurality of segments (first two segments of which highlighted light blue) within the active sensing region:




*Id.* at Fig. 7 (annotated). As with the ’502 Patent, these segments are positioned on either side of a central disposition of conductive material (a “spine,” using the terminology of the ’502 Patent) connecting column electrodes within the sensing area. *Compare id.* at 12:5-27, Fig. 7 *with ’502 Patent* (Ex. 1001), 6:29-59, Fig. 3.

***[17(d)] connecting a first broken segment at a first end of one of the at least one row or column to a second broken segment at a second end of the one of the at least one row or column using a wrap-around connection lying outside of the active sensing region, the plurality of segments including the first broken segment and the second broken segment;***

As discussed above, *Grummer* discloses broken segments (first two segments of which highlighted light blue) within all rows other than the top row:




*Id.* at Fig. 7 (annotated). The broken segments are connected by crossover connectors, such as at intersection 127, overlaying the central "spine" to complete the electrical connection of each row. (Ex. 1004) at 12:28-33. As discussed above, it would have been obvious to modify *Grummer* pursuant to *Tagg* in order to obtain the *Grummer*-acknowledged benefits of a single-layer construction without internal

crossovers. As also described above, *Grummer's* Fig. 7 embodiment modified accordingly results in the following:




*Id*. at Fig. 7. Because *Tagg's* wrap-around connections are positioned outside the area defined by the outside edges of the array of electrodes without crossing internally in the sensing area, *Tagg's* wrap-around connections lie "outside of the active sensing region." *Supra*, Sec. III.D.2-D.3.; *see also Tagg* (Ex. 1005), [0194]; *Najafi Decl.* (Ex. 1003), ¶¶ 52-61.

***[17(e)] connecting the rows and columns to individual sensing channels of a multi-channel capacitive sensor circuit having multiple outputs representing amplitudes of capacitance on the rows and columns; and***

*Grummer* discloses row electrodes and column electrodes connected to individual sensing channels of a multi-channel capacitive sensor. *Supra,* [17(b)].

*Grummer* explains that when a user touches the row and column electrodes, the respective row and column detection circuits output the amplitude of capacitance (as a function of measured voltage) to provide a "coordinate identification" of a user's touch. *Grummer* (Ex. 1004), 12:56-13:10 (noting Figure 7's measurement circuit outputs the voltage pulses identified in Figure 6).

A PHOSITA would have understood that *Grummer's* output in the form of voltage represents a change in capacitance (i.e., a change in the amplitude of capacitance). *Najafi Decl.* (Ex. 1003)*,* ¶¶ 62-64. In *Grummer's* capacitive measurement system, a user's touch on a given row and column completes a circuit in detection circuitry 123 and 125, causing a change in capacitance unique to that particular row or column. *Id.* (discussing *Grummer* at 10:63-11:20, 12:56-13:10). For example, voltage pulses from clock source 120 are applied to each row and column, where when touched, this voltage is reduced, and a touch capacitance is generated indicating to a microprocessor what row/column was touched. *Id.* Thus, the output of the row and column touched represents an amplitude of capacitance measured by the sensor circuit. *Id.*

***[17(f)] providing a processor operable to process the multiple outputs to determine a XY coordinate position of an object adjacent the active sensing region.***

*Grummer* provides a microprocessor 6 that controls the operation of its capacitive measurement device, including an electronic input-output display.

*Grummer* (Ex. 1004), 4:65-5:8, 5:41-61. This microprocessor is illustrated below in Figure 2 (boxed in red):



FIG. 2

*Id*. at Fig. 2 (annotated). As discussed above, *Grummer's* microprocessor is operable to process these multiple outputs to determine the "coordinate identification" (i.e., XY coordinate position) of an object touching or approaching the input-output display screen (i.e., adjacent to the active sensing region).

Alternatively, it would have been obvious to a PHOSITA to modify *Grummer's* microprocessor to employ well-known coordinate identification algorithms, as disclosed by *Tagg*. *Najafi Decl.* (Ex. 1003), ¶¶ 65-67 (noting voltage readings would function similarly in interpolation algorithms as capacitance readings). For example, *Tagg* discloses that interpolation algorithms may be used to identify the X and Y coordinates of a touch on a touch device. *Tagg* (Ex. 1005), [0090]-[0100] (disclosing interpolation techniques for single surface electrode arrays), [0112], [0178], [0207]-[0211], *see also id*. at [0201] (disclosing that *Tagg*, like *Grummer*, maintains unique measurement channels for each row and column as

*Tagg's* eight rows and eight columns are connected to a "16 channel capacitance measuring device"). The motivation to modify *Grummer's* coordinate identification with well-known interpolation algorithms is express in *Tagg*. *Id*. at Abstract (noting improvement in signal processing allow for "more reliable touch detection," such as "interpolation methods"), [0085] (noting interpolation determines position information to a "much finer resolution"), [0125]-[0128] (noting interpolation calculations are immune to noise; smooth random error; and are more accurate because they are conducted in real-time). A PHOSITA would have appreciated a reasonable expectation of success in making this combination because it would have required only minor software modifications to employ well-known position determination algorithms to *Grummer's* coordinate determination. *Najafi Decl.* (Ex. 1003), ¶¶ 65-67.

***ii. Claim 22***

***22[P] A capacitive position sensor for determining the position of an object in a sensing area, the sensor comprising***

To the extent the preamble is deemed limiting, *Grummer*, or alternatively *Grummer* in view of *Tagg*, discloses a capacitive touch switch array that functions with a processor to determine the coordinate position of an object in a sensing area. *Supra*, Claim [17(a)], [17(f)]; Sec. III.D.1 (construing "sensing area").

***[22(a)] a substrate having a surface with an arrangement of conductive electrodes mounted thereon, wherein the electrodes define an array of sensing cells arranged in columns and rows to form the sensing area,***

*Supra*, Claim [17(a)]-[17(b)] (discussing how *Grummer* discloses a single-layer pattern of conductive material deposited as row and column electrodes on a substrate, such as glass, presenting switch (i.e., sensing) cells formed of row and column electrodes connected by narrow conductors, where the electrodes define the sensing area).

***[22(b)] each sensing cell including a column sensing electrode and a row sensing electrode,***

*Supra*, Claim 17(a).

***[22(c)] the column sensing electrodes of sensing cells in the same column being electrically coupled together and the row sensing electrodes of sensing cells in the same row being electrically coupled together,***

As seen below in annotated Figure 7, *Grummer* discloses column sensing electrodes (highlighted red) of switch cells in the same column electrically coupled together by narrow conductors (e.g., 114) and row sensing electrodes (highlighted blue) of switch cells in the same row electrically coupled together by narrow conductors (e.g., 102):




*Grummer* (Ex. 1004), Fig. 7 (annotated); *Najafi Decl.* (Ex. 1003), ¶ 48. As discussed above, it would have been obvious to modify *Grummer's* narrow conductor connections to incorporate *Tagg's* wrap-around connections to complete the electrical connection between *Grummer's* segments of row sensing electrodes without crossing over *Grummer's* central electrode spine. *Najafi Decl.* (Ex. 1003), ¶¶ 52-61 (discussing the modified Figure 7 below):




*See also supra*, Claim [17(d)].

***[22(d)] wherein at least one column sensing electrode comprises a continuous spine within the sensing area,***

*Supra*, Claim 17(d) (discussing how, in annotated Figure 7, the central column conductors constitute the claimed "continuous spine" within the sensing area). Moreover, *Grummer's* disclosed spine is "continuous," consistent with the '502 Patent's disclosure. For example, the '502 Patent explains that "it is not necessary for the position sensor to have a continuous spine within the sensing area to connect between column sensing electrodes in columns that are not at an edge of the sensing area." *'502 Patent* (Ex. 1001), 11:40-43. With respect to Fig. 3 below, the '502 Patent explains the spines depicted in columns x2 and x3 (orange and yellow) can be "broken" at some point along their length:




*Id*. at Fig. 3 (annotated). This allows row electrodes in columns x1/x2 to connect to row electrodes in columns x3/x4, which would avoid the need for wrap-around connector 38 for a given "broken" row. *Id*. at 11:43-55.

*Grummer's* electrode and conductor configuration discloses this "continuous spine," as depicted below in annotated and modified Fig. 7:




*Id*. at Fig. 7 (modified). Further, the top row configuration in *Grummer's* Figure 7 embodiment aligns with the '502 Patent's explanation that "a connection outside of the sensing area [for the top row] is not required because the spines connecting between the column sensing electrodes…need not extend to the very edge of the sensing area." *'502 Patent* (Ex. 1001), 7:3-10.

Alternatively, it would have been obvious to a PHOSITA that rows and columns of sensing electrodes differ only in terms of orientation chosen by the designer of the system, operating in substantially the same manner. *Najafi Decl.* (Ex. 1003), ¶¶ 68-70 (discussing how the '502 Patent itself states the terms "row" and "column" are agnostic to orientation, citing *'502 Patent* (Ex. 1001), 5:60-64). In this regard, it would have been obvious to a PHOSITA to invert *Grummer's* electrode

configuration such that the rows are converted to columns, and vice versa. *Id*. An example of this modified configuration is depicted below, merely rotating Figure 7 ninety degrees:




*Id*. As shown above, the far-right column (columns now blue) discloses a "continuous spine within the sensing area," where the remaining column electrodes in subsequent columns are connected via connections external to the sensing area (pink). *Id*.

***[22(e)] and at least one other column sensing electrode is made electrically continuous via connections external to the sensing area.***

*Supra*, Claim 17(d). *See also supra*, limitation 23(d) (describing that the external conductor runs on either side of the sensing area as seen in modified Figure 7 of *Grummer*, reproduced below, constitute a connection external to the sensing area connecting column electrodes or alternatively as seen in the rotated modified Figure 7, similarly reproduced below, the pink wrap-around connections disclose the claimed "connections external to the sensing area"):






***iii. Claim 1***

***1[P] A position sensor comprising:***

To the extent the preamble is deemed limiting, *Grummer* in view of *Tagg* discloses a capacitive touch switch array that functions with a processor to determine the coordinate position of an object in a sensing area. *Supra*, Claim [17(a)], [17(f)].

***[1(a)] a substrate having a surface with an arrangement of electrodes mounted thereon,***

*Supra*, Claim [17(a)]-[17(b)].

***[1(b)] wherein the electrodes define an array of sensing cells arranged in columns and rows to form a capacitive sensing area of the sensor, each sensing cell including a column sensing electrode and a row sensing electrode, the column sensing electrodes of sensing cells in the same column being electrically coupled together and the row sensing electrodes of sensing cells in the same row being electrically coupled together, and***

*Supra*, Claim [17(a)]-[17(b)], Claim [22(a)]-[22(c)].

***]1(c)] wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area.***

*Supra*, Claim 17(d) (describing that the pink wrap-around connection as seen in modified Figure 7 of *Grummer*, reproduced below, constitutes a connection external to the sensing area connecting discontinuous portions of row electrodes at opposing ends or alternatively as seen in the rotated modified Figure 7, similarly reproduced below, the green wrap-around connection discloses the claimed "connections made outside of the sensing area"):




***iv. Claim 2***

***2. The position sensor of 1, wherein the row wrap-around connections comprise a conductive trace deposited on the substrate.***

*Grummer* in view of *Tagg* discloses a capacitive touch switch array that functions with a processor to determine the coordinate position of an object in a sensing area. *Supra*, Claim [17(a)], [17(f)].

*Tagg* in view of the general knowledge of a PHOSITA discloses wrap-around connections which comprise a conductive trace deposited on the substrate. For example, *Tagg* explains that its conductive wires 309 connect at a terminal end of row sensing electrodes 312 and column sensing electrodes 313. *Tagg* (Ex. 1005), [0201]. These conductive wires are depicted below in Figure 23:




*Id.* at Fig 23. *Tagg* explains that its "wires 309" may be "formed from conductive silver track." *Id*. at [0201]. It would have been well within the general knowledge of a PHOSITA to deposit *Tagg's* conductive traces onto the substrate itself. *Najafi Decl.* (Ex. 1003), ¶¶ 71-72 (explaining that U.S. Patent Pub. No. 2005/0083307 to Aufderheide et al. ("*Aufderheide*") (Ex. 1015) at [0045] teaches the well-known process of depositing silver conductive ink on ITO to form conductive traces connecting electrodes); *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020) (general knowledge).

***v. Claim 3***

***3. The position sensor of 1, wherein the row wrap-around connections comprise free wires connected to the respective row sensing electrodes.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 1. *Supra*, Claim [17(a)]; [17(f)]; Claim 1. Moreover, *Tagg* discloses row wrap-around connections which connect respective row sensing electrodes. *Supra*, Claim 2. Just as in claim 2, it would have been well within the general knowledge of a PHOSITA to employ free-wire wrap-around connections, rather than conductive traces. *Najafi Decl.* (Ex. 1003), ¶¶ 73-74 (citing to U.S. Patent No. 5,844,506 to Binstead ("*Binstead*") (Ex. 1016)[6] at 7:40-44, noting wrap-around conductor elements "could be formed from fine conducting wires which would preferably be insulated by, for example, an enamel coating," thus allowing the wires to touch at intersections).

***vi. Claim 4***

***4. The position sensor of 1, wherein the column sensing electrodes of a column of sensing cells at an edge of the sensing area are electrically coupled to one another by column wrap-around connections made outside of the sensing area.***

As described above, a PHOSITA, based on *Grummer's* descriptions of the Figure 7 and Figures 8A-8B embodiments, would have recognized an improved

---

[6] *Binstead* was cited on the face of the '502 Patent but was not substantively considered by the Examiner during prosecution. Accordingly, § 325(d)'s goal of not reconsidering the same art and arguments is not implicated.

structure for a capacitive sensing device includes a one-sided architecture without internal cross overs within sensing area. *Supra*, claim 17(d) (describing the combination with *Tagg* to incorporate *Tagg's* wrap-around connections into *Grummer's* system connecting broken segments of row electrodes). The modification of *Grummer's* electrode configuration described above is reproduced below:




*Id*. at Fig. 7 (modified and annotated). In pink, wrap-around connections (pursuant to the teachings of *Tagg*) connect left side row electrodes to right side row electrodes in rows two, three, and four. *Supra*, claim 17(d). Further, column sensing electrodes in both columns lying at the edge of the sensing area (i.e., columns one and four) are

electrically coupled to one another by wrap-around connections made outside of the sensing area. These column wrap-around connections are annotated in green below:




*Id*. at Fig. 7 (modified and annotated).

***Claim 5***

***5. The position sensor of 1, further comprising a plurality of capacitance measurement channels connected to respective ones of the rows and columns of sensing electrodes, wherein each measurement channel is operable to generate a signal indicative of a capacitance between its associated column or row of sensing electrodes and a system ground.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 1. *Supra*, Claim [17(a)]; [17(f)]; Claim 1. Moreover, *Grummer* discloses that each of its rows and columns are connected to unique detection circuits (i.e., measurement channels). *Grummer* (Ex. 1004), 12:37-51 (explaining the connections between the row and

column electrodes and their respective row and column detection circuits). These connections are illustrated below in Fig. 7:




*Id.* at Fig. 7.

Each channel generates a signal representing a change in capacitance to system ground. *Najafi Decl.* (Ex. 1003), ¶¶ 75-76. For example, *Grummer* explains that in operation, in non-actuated state, a single clock voltage source 120 supplies pulses via bus line 121 to the respective row and column sensing electrodes. *Grummer* (Ex. 1004), 12:37-13:10. With reference to the first row and first column, the voltage pulse is input through capacitors 106 and 115 respectively. *Id.* Output capacitors 107 and 116 are connected through capacitors 122 and 124 respectively

to ground, and then to the row and column detection circuits. *Id*. When a touch is registered and a switch cell is actuated, the voltage supplied to each detection circuit is reduced when compared to the voltage through the respective output capacitors and system ground. *Id*. In response, the detection circuits output a signal identifying the coordinate identification of an actuated switch cell. *Id*. at 13:4-10.

#### ***vii. Claim 6***

***6. The position sensor of 5, further comprising a processor operable to determine the position of the object in the sensing area along a first direction by comparing signals from the different columns with each other and along a second direction by comparing signals from the different rows with each other.***

*Supra*, Claim [17(f)] (describing how *Grummer* provides a microprocessor 6 that controls the operation of its capacitive measurement device, including processing multiple outputs from the detection circuits of the respective plurality or rows and columns to determine the "coordinate identification" of an object touching or approaching the input-output display screen, or alternatively, how *Tagg* discloses interpolation algorithms used to identify the X and Y coordinates of a touch on a touch device by scanning multiple rows and/or columns).

#### ***viii. Claim 8***

***8. The position sensor of 5, wherein the capacitance measurement channels are configured to drive a plurality of sensing electrodes substantially synchronously in phase with one another.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 5. *Supra*, Claim 5.

The ’502 Patent explains that to drive signals substantially phase-synchronous with respect to one another, “all the rows and column conductors are driven by a single oscillator.” *’502 Patent* (Ex. 1001), 3:41-47, *see also id.* at 8:16-20 (describing two prior art patents that teach driving all rows and columns simultaneously in a phase synchronous manner).

*Grummer* discloses that a “single clock voltage source is provided for the array” in order to drive all rows and columns synchronously in phase. *Grummer* (Ex. 1004), 6:1-2. This clock voltage source is depicted below in Figure 7, boxed in orange:




*Id*. at Fig. 7 (annotated). *Grummer* explains that this single clock voltage source is connected by bus line 121 to each respective input capacitor for each row and

column. *Id*. at 12:37-55. This clock drives voltage pulses which "are applied to each row and column capacitive voltage divider circuits" such that each of the row and column detection circuits can "provide outputs in sequential manner under the control of the clock pulses. *Id*. at 12:56-13:1.

***ix. Claim 9***

***9. The position sensor of 1, wherein the sensing cells are arranged into three columns.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 1. *Supra*, Claim [17(a)], [17(f)], Claim 1. *Gummer* additionally states that by virtue of its electrode configuration in its Figure 7 embodiment, the "geometry and size of the touch means is made independent of the capacitance requirements." *Grummer* (Ex. 1004), 11:58-61. In this regard, *Grummer* explains that "for ease of illustration only a four by four matrix of switch cells are included in the array of Fig. 7." *Id*. at 12:1-3. Moreover, *Grummer* notes that its touch plates "can be dimensioned essentially without restriction and may be made as small as desirable completely independent of the electrical properties of the circuit." *Id*. at 13:15-18. Accordingly, it would have been obvious to a PHOSITA to implement *Grummer's* switch array in any number of matrix configurations, including an arrangement comprising three columns of switch (i.e., sensing) cells. *Najafi Decl.* (Ex. 1003), ¶ 77 (further explaining that *Grummer* notes its "switch array can readily be made larger for greater utility," quoting *Grummer* (Ex. 1004), 6:5-6, and therefore a PHOSITA would have

appreciated the size of *Grummer's* electrode array is variable, such that it would have been obvious to construct an arrangement with three columns and that such a configuration would function similarly to its four-by-four array).

### *x. Claim 10*

***10. The position sensor of 1, wherein the sensing cells are arranged into four columns.***

*Supra*, Claim [17(a)]-[17(b)] (discussing Figure 7's embodiment having four columns of sensing cells).

### *xi. Claim 11*

***11. The position sensor of 1, wherein the column sensing electrode and the row sensing electrode in each sensing cell are interleaved with one another.***

*Grummer*, or alternatively *Grummer* in view of *Tagg*, discloses the position sensor of claim 1. *Supra*, Claim [17(a)], [17(f)], Claim 1. Moreover, *Grummer's* sensing row electrodes are interleaved with its sensing column electrodes. Figure 7, depicted below, shows blue row electrodes interleaved with red column electrodes:




*Najafi Decl.* (Ex. 1003), ¶¶ 78-79 (discussing the '502 Patent's teaching that even the electrodes in its Fig. 8 embodiment "may also be considered to be interleaved"). Indeed, a PHOSITA would have understood that *Grummer's* electrode arrangement constitutes an "interleaved" pattern of row and column electrodes, consistent with the '502 Patent's description of "interleaving"). *Id*. (citing '502 Patent (Ex. 1001), 11:11-13 ("The important aspect is that in a cell, there exists a portion of a row electrode and a portion of a column electrode") (emphasis added).

***xii. Claim 12***

***12. The position sensor of 1, wherein the substrate is formed from a transparent material.***

*Supra*, Claim [17(a)] (describing *Grummer's* discussion of depositing its column and row electrodes on a transparent substrate, such as glass).

***xiii. Claim 13***

***13. The position sensor of 1, wherein the electrodes are formed from a transparent electrically conductive material.***

*Supra*, Claim [17(a)] (describing *Grummer's* discussion of depositing a "pattern" of transparent "conductive material," such as indium tin oxide—the same conductive material described by the '502 Patent (*'502 Patent* (Ex. 1001) at 3:65-67)—on its glass substrate).

***xiv. Claim 14***

***14. The position sensor of 13, further comprising a graphical display wherein the electrodes in the sensing area are disposed over the graphical display to provide a touch screen.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 13. *Supra*, Claim 13. Moreover, *Grummer* discloses that its electrodes in the sensing area are disposed over a touch screen graphical display. For example, *Grummer* states that its "capacitive touch panel comprising an array of touch sensitive switch cells" is "particularly suited for use with data processing equipment and electronic displays." *Grummer* (Ex. 1004), Abstract; *see also id*. at 2:64-68 ("Another object of the invention is to provide a novel and improved capacitive touch switch array…that can be made as a totally or substantially transparent structure for providing a direct interaction with electronic displays"). Figure 1 is a perspective view of a capacitive touch panel overlaying an electric display:




*Id*. at Fig. 1, *see also id*. at 5:24-28.

***xv. Claim 16***

***16. A device comprising the position sensor of 1.***

*Supra*, Claim 14 (depicting the touch screen device comprising the position sensor of claim 1).

***xvi. Claim 18***

***18. The method of 17, wherein the processor is operable to compensate for position distortion introduced by the physical geometry of the patterned conductive, material.***

*Grummer* in view of *Tagg* discloses the method of claim 17. *Supra*, Claim 17. As explained above, *Grummer* provides a microprocessor 6 that controls the operation of its capacitive measurement device. This microprocessor is illustrated below in Figure 2 (boxed in red):




*Id.* at Fig. 2 (annotated). Although *Grummer* does not expressly disclose interpolation algorithms as part of its coordinate identification process, *Tagg* does, and it would have been obvious to modify *Grummer's* microprocessor to employ *Tagg's* interpolation coordinate identification algorithms as discussed in the preceding section. *Supra*, Claim 17[f] (discussing the motivation to modify *Grummer's* coordinate identification with well-known interpolation algorithms is express in *Tagg*, where improvement in signal processing allow for "more reliable touch detection," such as "interpolation methods;" interpolation determines position information to a "much finer resolution;" and interpolation calculations are immune to noise, smooth random error; and are more accurate because they are conducted in real-time).

*Tagg's* disclosed interpolation techniques serve to compensate for position distortion caused by the physical geometry of the conductive electrodes. *Najafi Decl.* (Ex. 1003), ¶¶ 80-82. For example, *Tagg* explains that for single surface geometrical arrays of electrodes, "interpolation of touch position for capacitive sensor pads can

be improved by calibration, by normalising/equalizing the capacitance detected from each sensor pad and/or by utilising a (third) dimension angled (e.g., perpendicular) to the area containing the sensor pads." *Tagg* (Ex. 1005), [0096]. *Tagg* explains that its "calibration" may be conducted by a digital "look-up" table corresponding to a graph by using a standard fingertip. *Id.* at [0100], [0101] (discussing a "relinearisation [sic] mapping" that "can be stored as a lookup table in a digital memory, e.g. an EPROM…after calibration with a test 'finger'"). *Tagg's* disclosed look-up table calibration to compensate for position distortion mirrors the '502 Patent's disclosure of distortion correction techniques. *'502 Patent* (Ex. 1001), 9:55-10:14 (describing the "actual report position" of user may be corrected "using a correction algorithm or lookup table so the final reported position is corrected").

***xvii. Claim 20***

***20. The method of 17, wherein the processor is operable to calculate an interpolation of the signals across rows and an interpolation of the signals across columns.***

*Supra*, Claim 17(f) (explaining that the modified system of *Grummer* and *Tagg* discloses interpolation algorithms for interpreting the position of a touch based on signals received from the capacitive array indicative of the user's touch).

***xviii. Claim 21***

***21. The method of 17, wherein the capacitive sensing channels employ driving signals which are substantially phase-synchronous with respect to one another.***

*Supra*, Claim 8.

***xix. Claim 23***

***23. The position sensor of 22, wherein the conductive electrodes are transparent and further comprising a graphical display wherein the conductive electrodes in the sensing area are disposed over the graphical display to provide a touch screen.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 22. *Supra*, Claim 22. *Grummer* further discloses that the conductive electrodes are transparent, formed of transparent ITO material. *Supra*, Claim 13. Moreover, *Grummer* discloses that its conductive electrodes are disposed over a touch screen graphical display. *Supra*, Claim 14.

### B. Ground 2: *Grummer* in View of *Tagg* in Further View of *Gillespie* Renders Obvious Claims 7, 15, 18-19, and 24

**Overview of *Gillespie***

*Gillespie* issued on March 9, 1999 and qualifies as prior art to the '502 Patent at least under 35 U.S.C. § 102(b) (pre-AIA). Further, *Gillespie* was not cited or considered during the '502 Patent's prosecution.

*Gillespie* is generally directed to a two-dimensional capacitive position sensing system for determining the X/Y coordinates of a user's touch on a capacitive touch sensor-pad. *Gillespie* (Ex. 1006), Abstract, 4:46-51, 5:58-63. Figure 1 below illustrates a simplified block diagram of the capacitive position sensing system for accurately determining the position of a finger 8 on sensor pad 10:



FIG. 1

*Id*. at Fig. 1. The sensor pad in *Gillespie* is implemented as arrays of sense electrodes arranged in rows and columns, "wherein all row electrodes are sensed simultaneously, and all column electrodes are sensed simultaneously and wherein the information defining the location of a finger or other conductive object is processed in digital form." *Id*. at 4:66-5:3. This array of electrodes is illustrated in Fig. 2C:



FIG. 2C

*Id*. at Fig. 2C.

In embodiments of the invention, the X and Y sense electrodes are controlled by a single sensor processor integrated circuit chip with any number of X and Y inputs. *Id*. at 12:13-16. The X and Y electrode nodes are driven and sensed in parallel utilizing charge-transfer techniques in order to generate a profile of the finger in proximity to each node. *Id*. at 11:58-64 (noting a centroid of a user's touch across the columns and rows is also determined). This is accomplished by simultaneously moving all X lines while holding Y lines at a constant voltage, and then repeating the process moving the Y lines and holding the X lines at a constant voltage. *Id*. at 11:67-12:9. *Gillespie's* duel-axis sensing (simultaneous X and Y sensing) allows the "sensing cycle to be extremely short, thus allowing fast response while still maintaining immunity to very high levels of electrical interference." *Id*. at 5:35-51.

Because *Gillespie*, like the '502 Patent, discloses a capacitive sensor for detecting touch-sensitive input for interaction with a touch operated device, *Gillespie* is in the same field of endeavor as the '502 Patent. *Compare id.* at Abstract, 4:46-51 5:58-63 *with '502 Patent* (Ex. 1001), 1:5-17, 3:65-4:2. Accordingly, *Gillespie* is analogous art to the '502 Patent. *Najafi Decl.* (Ex. 1003), ¶¶ 29-31, 83-85.

**Motivation to Combine *Grummer, Tagg, and Gillespie***

Motivation to modify the sequential measurement sensing techniques of *Grummer*, and/or the combined system of *Grummer* and *Tagg* with *Gillespie's* simultaneous charge-transfer measurement techniques and associated signal processing is express in *Gillespie*. *Najafi Decl.* (Ex. 1003), ¶¶ 86-89. For example, *Gillespie* teaches that its array-based touch screen technology takes advantage of advances in circuitry integration permitting the proposed parallel-sensing (on both axes), allowing the "sensing cycle to be extremely short, thus allowing fast response while still maintaining immunity to very high levels of electrical interference." *Gillespie* (Ex. 1006), 5:35-51, 7:18-23. A PHOSITA would have appreciated that implementing *Gillespie's* charge-transfer measurement techniques and associated signal processing in *Grummer* would have realized *Grummer's* goal to reduce the number of connections to peripheral circuitry while improving the overall responsiveness and efficiency of determining X/Y coordinates of a user's finger. *Najafi Decl*. (Ex. 1003), ¶¶ 88 (citing *Grummer* (Ex. 1004), 2:59-63).

Further, a PHOSITA would have recognized that the modified *Grummer* and *Tagg* sequential capacitive measurement system relies on first, the attenuation effect of a finger to modulate the drive signal and second, interpolation to select the two largest adjacent signals to determine a finger location, where this second interpolation step "placed rigorous design requirements on their sensing pad." *Najafi*

*Decl.* (Ex. 1003), ¶¶ 86-89 (quoting *Gillespie* (Ex. 1006), 3:50-52). *Gillespie* discusses that simultaneous measurement systems obviate the need for complicated interpolation where both driving and sensing are accomplished on the same line, providing symmetric and equivalent rows and columns. *Id*. (citing *Gillespie* at 3:50-60). This in turn allows independent calibration of all signal paths, making "board layout simpler and less constraining, and allows for more unique sensor topologies." *Id*.

Moreover, *Gillespie* explains that the "sequential scanning approach…[was] more susceptible to noise" because noise levels "could change between successive measurements, thus changing the measured signal and the assumptions used in interpolation routines." *Id*. (citing *Gillespie* at 4:1-5). Therefore, modification to a simultaneous measurement system simplifies signal processing and enhances noise filtering. *Id*. A PHOSITA would further have expected successful results in making such a modification. *Id*. Indeed, the *Gillespie* components for detecting X/Y position of a user's finger (arithmetic unit 16, X input processing 12, and Y processing 14) could be easily incorporated into *Grummer's* similar X/Y sensing electrode system employing microprocessor 6 for control of the measurement process. *Id*. Moreover, *Grummer* explains that its system may employ any well-known capacitive scanning approach. *Grummer* (Ex. 1004), 7:5-11 ("although a sequential scanning operation is employed…the invention contemplates addressing of the detection circuits in any

well known manner for generating outputs in accordance with the state of the detection circuits addressed”).

***xx. Claim 7***

***7. The position sensor of 5, wherein the capacitance measurement channels comprise a charge transfer circuit.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 5. *Supra*, Claim 5. Further, *Grummer* discloses that each of its rows and columns are connected to unique detection circuits (i.e., measurement channels). *Grummer* (Ex. 1004), 12:37-51 (explaining the connections between the row and column electrodes and their respective row and column detection circuits). These connections are illustrated below in Fig. 7:



*Id.* at Fig. 7. A PHOSITA would have understood that *Grummer's* switch cells would be actuated in response to a stored charge from a user when touching the electrodes in the array. *Najafi Decl.* (Ex. 1003), ¶ 86.

*Gillespie* discloses a similar capacitive measurement system that employs charge transfer techniques to measure changes in capacitance at each row and column. *Gillespie* (Ex. 1006), 12:52-62. *Gillespie* states that the capacitance at each touch sensor array node is "measured simultaneously using charge integrator circuits" which serve to "inject charge" into input capacitors and to develop a voltage proportional to a capacitance sensed on a corresponding matrix line. *Id.*; *see also id.* at 14:53-60 (noting voltage is inversely proportional to capacitance). A PHOSITA would have been motivated to employ, and would have had a reasonable success in employing, *Gillespie's* simultaneous capacitive measurement process including its charge transfer techniques for reasons identified above. *Najafi Decl.* (Ex. 1003), ¶¶ 86-89.

#### ***xxi. Claim 15***

***15. The position sensor of 1, further comprising an insulating panel wherein the electrodes in the sensing area are disposed beneath the insulating panel to provide a keypad.***

*Grummer* in view of *Tagg* discloses the position sensor of claim 1. *Supra*, Claim 5. Moreover, *Grummer* provides embodiments where its capacitive electrode array is disposed under an electronic display to provide a touch panel (i.e., keypad)

functioning as an input-output interface with data processing equipment. *Supra*, Claim 14. *Grummer* further explains that its "capacitive touch panel also can be made in an opaque form, not coupled to a display, and still possess significant[] utility as the input interface for data processing equipment." *Grummer* (Ex. 1004), 5:36-40, 15:29-36. Similarly, *Tagg* discloses that its invention is suitable for various applications, such as "[c]apacitive pads connected to a controller by a wire," "keypads," and "touch screen(s)." *Tagg* (Ex. 1005), [0135]-[0138] (emphasis added).

Alternatively, *Gillespie* discloses that an "insulating layer 36" which may be "disposed over the sense pads 34 on top surface 28 to insulate a human finger or other object therefrom." *Gillespie* (Ex. 1005), 10:66-11:1. This insulating layer 36 is depicted below at the topmost surface of Fig. 2D:




FIG. 2D

*Gillespie* explains that its insulating layer is preferably a thin layer of mylar, operable to keep a capacitive coupling large while providing "protective and ergonomic characteristics." *Id.* at 11:1-6. Moreover, *Gillespie* explains that the sensor material

underlying this insulating layer "can be anything that allows creation of a conductive X/Y matric of pads." *Id*. at 9:35-42. This includes standard PC boards, flexible PC boards, etc. *Id*. In this regard, *Gillespie* discloses embodiments where its sensor material forms a touch screen in combination with knobs or buttons to provide user input. *Id*. at 51:48-56. A PHOSITA would have understood that *Grummer's* electrode configuration would function consistently with *Gillespie's* insulating layer forming a touch panel keypad. *Najafi Decl*. (Ex. 1003), ¶¶ 90-92.

Additionally, it would have been obvious to a PHOSITA to implement a "keypad" using *Gillespie's* electrode configuration under insulating layer 36. *Id*. A PHOSITA would have appreciated that it was well-known in the art to create discrete sensing pads formed from column and row electrodes, arranged as keys on a sensing surface operable for actuation by a user's touch. *Id*. Such well-known keypad arrangements were commonly employed in simple electronic devices, particularly house appliances such as the washing machine disclosed in *Grummer*, to create a less-expensive touch panel. *Id*.

***xxii. Claim 19***

***19. The method of 17, wherein the processor is operable to calculate a centroid of the signals across rows and a centroid of the signals across columns.***

*Grummer* in view of *Tagg* discloses the method of claim 17. *Supra*, Claim 17.

*Gillespie* discloses that its processor, employing arithmetic unit 16, calculates the centroid of signals across rows and columns by using the weighted average of

capacitances measured on the individual sensing lines of the touch sensor array. *Gillespie* (Ex. 1006), 19:40-22:15 The voltages on all X lines of the sensor matrix are simultaneously moved in a positive direction, while the voltages of the Y lines are moved in a negative direction. *Id*. This provides a profile of the proximity of a finger to the sensor in each dimension. *Id*. These profiles then generate a digital value, using the weighted average of capacitances, representing the centroid for the X and Y position of the user. *Id*. A PHOSITA would have been motivated to use *Gillespie's* centroid calculation in *Grummer* and *Tagg's* capacitive measurement system in order to overcome the inherent disadvantages expressly noted in *Gillespie* to prior art approaches that scan individual inputs. *Najafi Decl*. (Ex. 1003), ¶¶ 93-94 (citing *Gillespie* (Ex. 1006), 13:8-18 and noting that prior art approaches were sensitive to high frequency and large amplitude node which may distort the finger profile due to change in noise level, whereas simultaneous measurements which provide the centroid of a touch profile overcome these disadvantages). A PHOSITA would have appreciated a reasonable expectation of success in making this modification for the reasons discussed above. *Id*.

#### ***xxiii. Claim 24***

***24. The position sensor of 22, further comprising an insulating panel wherein the conductive electrodes in the sensing area are disposed beneath the insulating panel to provide a keypad.***

*Supra*, Claim 15.

## V. CONCLUSION

For the forgoing reasons, Petitioner respectfully requests *inter partes* review of claims 1-24 of the ’502 Patent.

Respectfully submitted,

By: */s/ Adam P. Seitz*
Adam P. Seitz, Reg. No. 52,206
Paul R. Hart, Reg. No. 59,646

*COUNSEL FOR PETITIONER*

# VI. MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

## A. Real Party-In-Interest

Petitioner is the real parties-in-interest. 37 C.F.R. § 42.8(b)(1).

## B. Related Matters

Pursuant to 37 C.F.R. § 42.8(b)(2), Petitioner is aware of the following pending patent infringement lawsuits or related matters involving the ’502 Patent:

- Neodron, Inc. v. Apple Inc., 6-20-cv-00212 (W.D. Tex. 2020)
- Lenovo (United States) Inc. et al. v. Neodron Ltd., IPR2020-00688 (PTAB 2020)
- Neodron Ltd. v. Lenovo Group Limited, 3-19-cv-05644 (N.D. Cal. 2019)
- Neodron Ltd. v. Dell Technologies, Inc., 1-19-cv-00819 (W.D. Tex. 2019)
- Neodron Ltd. v. HP Inc., 1-19-cv-00873 (W.D. Tex. 2019)
- Neodron Ltd. v. Amazon.Com, Inc., 6-19-cv-00395 (W.D. Tex. 2019)
- Neodron Ltd. v. Samsung Electronics Co., Ltd. et al., 1-19-cv-00903 (W.D. Tex. 2019)
- Neodron Ltd., v. Samsung Display Co., Ltd., 6:20-cv-00623 (W.D. Tex. 2020)

## C. Lead and Back-Up Counsel

Petitioner provides the following designation and service information for lead and back-up counsel. 37 C.F.R. § 42.8(b)(3) and (b)(4).

| **Lead Counsel** | **Back-Up Counsel** |
|---|---|
| Adam P. Seitz (Reg. No. 52,206)<br>Adam.Seitz@eriseip.com<br><br>Postal and Hand-Delivery Address:<br>ERISE IP, P.A.<br>7015 College Blvd., Ste. 700<br>Overland Park, Kansas 66211<br>Telephone: (913) 777-5600<br>Fax: (913) 777-5601 | Paul R. Hart (Reg. No. 59,646)<br>Paul.Hart@eriseip.com<br><br>Postal and Hand-Delivery Address:<br>ERISE IP, P.A.<br>5299 DTC Blvd., Ste. 1340<br>Greenwood Village, Colorado 80111<br>Telephone: (913) 777-5600<br>Fax: (913) 777-5601 |

**APPENDIX OF EXHIBITS**

| | |
|---|---|
| **Exhibit 1001** | U.S. Patent No. 7,821,502 (the "*'502 Patent*") |
| **Exhibit 1002** | The '502 Patent File History |
| **Exhibit 1003** | Declaration of Dr. Khalil Najafi ("*Najafi Decl.*") |
| **Exhibit 1004** | U.S. Patent. No. 4,233,522 to Grummer et al. ("*Grummer*") |
| **Exhibit 1005** | U.S. Patent Pub. No. 2003/0067451 to Tagg et al. ("*Tagg*") |
| **Exhibit 1006** | U.S. Patent No. 5,880,411 to Gillespie et al. ("*Gillespie*") |
| **Exhibit 1007** | U.S. Patent Pub. No. 2004/0125087 to Taylor et al. ("*Taylor*") |
| **Exhibit 1008** | Modern Dictionary of Electronics ("*Modern Dictionary of Electronics 7th ed.*") |
| **Exhibit 1009** | U.S. Patent No. 7,382,139 to Mackey ("*Mackey*") |
| **Exhibit 1010** | U.S. Patent No. 7,812,268 to Ely ("*Ely*") |
| **Exhibit 1011** | U.S. Patent No. 6,961,049 to Mulligan et al. ("*Mulligan*") |
| **Exhibit 1012** | U.S. Pat. No. 5,730,165 (the "*'165 Patent*") |
| **Exhibit 1013** | U.S. Pat. No. 6,466,036 (the "*'036 Patent*") |
| **Exhibit 1014** | U.S. Pat. No. 6,452,514 (the "*'514 Patent*") |
| **Exhibit 1015** | U.S. Patent Pub. No. 2005/0083307 to Aufderheide et al. ("*Aufderheide*") |
| **Exhibit 1016** | U.S. Patent No. 5,844,506 to Binstead ("*Binstead*") |
| **Exhibit 1017** | U.S. Patent No. 5,463,388 to Boie et al. ("*Boie*") |
| **Exhibit 1018** | Order Setting Marking Hearing 20-cv-00212-ADA Dkt. 25 |
| **Exhibit 1019** | Scheduling Order 20-cv-00212-ADA Dkt. 29 |
| **Exhibit 1020** | Gov. Abbott News Article, July 10, 2020 |

# CERTIFICATION OF WORD COUNT

The undersigned certifies pursuant to 37 C.F.R. §42.24 that the foregoing Petition for *Inter Partes* Review, excluding any table of contents, mandatory notices under 37 C.F.R. §42.8, certificates of service or word count, or appendix of exhibits, contains 13,542 words according to the word-processing program used to prepare this document (Microsoft Word).

Dated: July 29, 2020

By: *_/s/ Adam P. Seitz_*
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*

**CERTIFICATE OF SERVICE ON PATENT OWNER**
**UNDER 37 C.F.R. § 42.105**

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105, the undersigned certifies that on July 29, 2020, a complete and entire copy of this Petition for *Inter Partes* Review including exhibits was provided via Federal Express to the Patent Owner by serving the correspondence address of record for the '502 Patent as listed on PAIR:

Baker Botts L.L.P./Atmel Corporation
2001 Ross Avenue, Suite 900
Dallas, TX, 75201

Further, a courtesy copy of this Petition for *Inter Partes* Review was sent via email to Patent Owner's litigation counsel:

Kent N. Shum
kshum@raklaw.com

Paul A. Kroeger
pkroeger@raklaw.com

Philip X. Wang
pwang@raklaw.com

Jonathan Ma
jma@raklaw.com

Reza Mirzaie
rmirzaie@raklaw.com

Russ August & Kabat
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025

By: */s/ Adam P. Seitz*
Adam P. Seitz, Reg. No. 52,206

*COUNSEL FOR PETITIONER*