# Exhibit 5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

NEODRON, LTD. ) Docket No. A 19-CA-819 ADA
)
vs. ) Austin, Texas
)
DELL TECHNOLOGIES, INC. ) June 30, 2019

TRANSCRIPT OF VIDEOCONFERENCE MARKMAN HEARING
BEFORE THE HONORABLE ALAN D. ALBRIGHT

APPEARANCES:

For the Plaintiff: Mr. Reza Mirzaie
Mr. Philip X. Wang
Russ, August & Kabat
12424 Wilshire Boulevard,
12th Floor
Los Angeles, California 90025

For Dell Technologies: Mr. James M. Heintz
DLA Piper, LLP
One Fountain Square
11911 Freedom Drive, Suite 500
Reston, Virginia 20190

Mr. Michael J. Newton
Mr. Brady R. Cox
Alston & Bird, LLP
Chase Tower
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201

Mr. John M. Guaragna
DLA Piper, LLP
401 Congress Avenue, Suite 2500
Austin, Texas 78701

**(Appearances Continued:)**

| | |
|---|---|
| For Dell Technologies: | Mr. Sean C. Cunningham<br>DLA Piper, LLP<br>401 B Street, Suite 1700<br>San Diego, California 92101 |
| For Amazon.Com, Inc: | Mr. Christopher J. Kendall<br>Mr. Nathan B. Sabri<br>Ms. Stefani E. Shanberg<br>Morris & Foerster, LLP<br>425 Market Street<br>San Francisco, California 94105 |
| For Samsung Electronics: | Mr. Darin W. Snyder<br>O'Melveny & Myers, LLP<br>Two Embarcadero Center,<br>28th Floor<br>San Francisco, California 94111 |
| Court Reporter: | Ms. Lily Iva Reznik, CRR, RMR<br>501 West 5th Street, Suite 4153<br>Austin, Texas 78701<br>(512)391-8792 |

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

13:30:23 THE CLERK: Markman hearing in Civil Action 1:19-CV-819, styled, Neodron, Limited vs. Dell Technologies, Incorporated.

13:30:33 THE COURT: Hold on just one second. Okay. I had to make sure Josh was here and ready to go. So I apologize.

13:30:44 If I could have announcements from counsel and then, we'll get started.

13:30:54 MR. GUARAGNA: Your Honor, I can speak on behalf of defendants. It's John Guaragna from DLA Piper representing HP and Microsoft. I'm not going to be arguing today, your Honor, but if there's time at the close of the hearing, there's a question about the post-Markman schedule or trial I was hoping to raise with the Court. But otherwise, I was going to introduce -- have my colleagues from DLA Piper who are going to be speaking introduce themselves, starting with Sean.

13:31:18 THE COURT: Okay.

13:31:18 MR. CUNNINGHAM: Good afternoon, your Honor.

13:31:21 Sean Cunningham from DLA Piper. I also represent Microsoft and HP. And I did want to let your Honor know that I've got client representatives on the line from both companies. We have Lucky Vidmar and Dan Foster from Microsoft, and Tony Baca from HP. And I'll be presenting --

13:31:41 THE COURT: Well -- go ahead, please.
13:31:43 MR. CUNNINGHAM: No. I was just going to say,
13:31:45 I'll be presenting one of the terms on the 502 patent.
13:31:47 THE COURT: Well, let me first thank them for
13:31:50 attending. I always appreciate that. Let me make sure.
13:31:50 Lily, are you able to hear me? I've turned my
13:31:50 court microphone off.
13:32:00 COURT REPORTER: Yes, I can still hear you.
13:32:00 THE COURT: Okay. Mr. Cunningham, it's such a
13:32:03 pleasure. I haven't seen you in years. Good to see you
13:32:05 again. And your clients should know they couldn't have
13:32:07 done any better than to have you with them today. So glad
13:32:12 that you're aboard.
13:32:13 MR. CUNNINGHAM: And, your Honor, that statement
13:32:14 got transcribed. Yes.
13:32:16 THE COURT: I hope so.
13:32:19 And so, who else do I have? I see my friend, Mr.
13:32:22 Snyder. Who else is on the call?
13:32:26 MR. SNYDER: Good afternoon, your Honor.
13:32:28 Darin Snyder of O'Melveny & Myers on behalf of
13:32:32 Samsung. I'll be handling the argument for the disputed
13:32:34 terms related to the 286 patent and the 747 patent.
13:32:37 THE COURT: Okay. And counsel for plaintiff.
13:32:42 MR. MIRZAIE: Good afternoon, your Honor.
13:32:43 This is Reza Mirzaie representing Plaintiff

13:32:46 Neodron. With me on this Zoom link is my colleague,
13:32:49 Philip Wang, and we're ready to proceed. I'd like to also
13:32:54 mention, though, we also have a client representative on
13:32:56 the Zoom link: his name is Richard Tashijian.
13:32:59 THE COURT: Welcome, all clients or inhouse
13:33:03 counsel. I always think it's terrific when they take the
13:33:05 time -- when you take the time to attend. Give me just
13:33:09 one second, folks --
13:33:09 MR. KENDALL: Your Honor --
13:33:20 THE COURT: Oh, yes.
13:33:20 MR. KENDALL: I just wanted to jump in here
13:33:21 during the pause and say that this is Jamie Kendall on
13:33:24 behalf of Amazon, an associate of Morris & Foerster. And
13:33:27 I'm joined by my colleague, Stefani Shanberg and Nate
13:33:30 Sabri, as well as our client representative, Scott
13:33:33 Sanford's here, corporate counsel at Amazon. I'll be --
13:33:37 THE COURT: Go ahead. Okay. Very good. They
13:33:38 couldn't have hired a better law firm. Some of my
13:33:42 favorite people. Give me one second. I need to ask --
13:33:46 MR. HEINTZ: Your Honor --
13:33:46 THE COURT: Yeah. Oh, hi.
13:33:47 MR. HEINTZ: Sorry, your Honor. Jim Heintz here,
13:33:48 also from DLA Piper. I'll be handling and representing HP
13:33:51 and Microsoft. I'll be handling the other term on the 502
13:33:53 patent we're going to discuss today.

13:33:55 THE COURT: Okay. Anyone else before I try and talk to Josh?

13:33:58 MR. NEWTON: Your Honor, this is Mike Newton from Alston & Bird. I have Brady Cox from Alston, as well. And we have our client representative from Dell, Lauren Hoffer, who is senior litigation counsel.

13:34:07 THE COURT: Welcome to all of you and I appreciate y'all doing this by Zoom. It will help me a great deal. So give me one second here. I need to ask my law clerk a question, then I'll be right back.

13:35:41 Thank you all so much for giving me that chance to chat.

13:35:44 Is there anything we need to take up before we start with the claim terms? If so, whoever wants to bring it up is free to, and then, we'll start with the claim terms. Okay.

13:35:55 The first claim term we're going to take up is "wherein the plurality of drive electrodes are substantially area-filling within the sensing region relative to the plurality of sense electrodes." The Court has given a preliminary construction of not indefinite, plain and ordinary meaning, "where the drive electrodes are substantially area-filling and where the drive electrodes are more area-filling than the sense electrodes."

Who will I hear from first on this?
MR. MIRZAIE: Your Honor, speaking on behalf of plaintiff, this is Reza Mirzaie. I'm happy to take it in any order the Court would like or the defendants would like. If the defendants would like to start, I'm happy to do it that way.
THE COURT: Unless the plaintiff has some concern with our proposal, I would prefer to hear from defendants first. If you do, I'm happy to hear from you.
MR. MIRZAIE: And we do not. We read the claim the same way and we stipulate to the Court's preliminary proposal.
THE COURT: Okay. Then I'll hear -- who will I hear from on behalf of the defendants?
MR. KENDALL: This is Jamie Kendall at Morris & Foerster for Amazon.
THE COURT: Okay. Mr. Kendall.
MR. KENDALL: And I will proceed to share the screen. Just making sure that that visual is coming through for your Honor.
THE COURT: Yes, sir, it is.
MR. KENDALL: Excellent.
May it please the Court, I'll be discussing the two disputed terms of the 784 patent, which is asserted against Amazon alone. As your Honor knows, Amazon

challenges claims 1 through 3 as indefinite, and these are the only claims of the 784 patent.

Now, Neodron is acting like the claims still say the driver electrodes must substantially, entirely cover the first layer on their own. The claims do not say that. Neodron is acting like the claims still recite benefits of the invention regarding some benchmark for electrode invisibility or electromagnetic noise reduction, and they do not say that, either. Neodron's flawed presumptions are really exactly what's going on here. Rather than interpret the claim, the plain language of the claim, Neodron is trying to rewrite it using the specification and expert testimony.

And its attempt to rewrite the claim underscores the problem here, your Honor. When this whole limitation was added as amended in the claims to 2012, its meaning was unclear. That limitation requires that the drive electrodes on one side of the substrate are substantially area-filling within the sensing region relative to the sense electrodes on the other side of the substrate. The term is added this way as a complete limitation. We've laid that out in our briefing, citing the prosecution history.

And it should be read as a whole, and it leaves a person of ordinary skill without reasonable certainty.

13:38:48 Does this new limitation raise the threshold for the drive
13:38:52 electrodes, lower it, or mean something else? Neodron's
13:38:55 solution is to jump right to the specification, but claim
13:38:58 construction and indefiniteness both start with the
13:39:01 claims.
13:39:04 Now, rather than grapple with the question about
13:39:07 the meaning of the claims as written, Neodron tries to
13:39:09 simply also read back in the limitation that was dropped
13:39:11 during prosecution. This is what it calls the absolute
13:39:13 limitation.
13:39:14 THE COURT: I'm sorry to interrupt you, but I
13:39:16 want you to know, if you are moving forward on slides,
13:39:20 nothing on the slides is moving forward for me, and if you
13:39:24 haven't, that's fine. I just wanted you to know, I'm
13:39:27 still seeing the numbers 784 patent. That's what I see.
13:39:31 MR. KENDALL: Thank you so much, your Honor.
13:39:33 I'll be changing slides in just a moment, but I
13:39:35 appreciate --
13:39:35 THE COURT: Okay.
13:39:36 MR. KENDALL: -- just let me know if there are
13:39:37 any technical problems as the slides progress.
13:39:41 THE COURT: Okay.
13:39:41 MR. KENDALL: To cut right to it, the parties
13:39:44 agree that the two disputed terms in the 784 patent rise
13:39:47 and fall together. For both terms, Neodron has offered no

13:39:51 formal alternative construction. It does not argue lexicography. It does not argue disavowal. Thus, Neodron should be bound by the plain language of the claim.

The Court concurrently adopted the nonformal position that Neodron presses in the briefing. So I'd like to start there. What Neodron has actually done here is not interpret the plain language of the claim, and there are problems with that. Neodron fractures the single limitation into two separate requirements. It labels them an absolute limitation and then, separately, a relative limitation. That absolute limitation would require that the drive electrodes substantially fill the sensing region on their own, without reference to the sense electrodes. And Neodron's attempt to shoehorn in this absolute limitation injects problems that I'd like to discuss.

And I'd like to start, if permissible with your Honor, with the second term because I think that most succinctly highlights the problem.

THE COURT: Okay.

MR. KENDALL: The flaws in Neodron's position are most immediately apparent when applied to the second term. If one plugs in Neodron's two-part rewriting of the claim complete -- sorry. If one plugs in Neodron's two-part rewriting of the claim term, your Honor, it reads out the

last seven words of the limitation altogether. Those words, as you can see, are "relative to the plurality of sense electrodes." Let me go to the version of their construction here that breaks apart the claim.

The second term requires that a combination of A, a plurality of sense electrodes, and B, isolated conductive elements, is substantially area-filling within the sensing region relative to A, that same term, "the sense electrodes." So to simplify, A plus B together must be substantially area-filling relative to A alone. Neodron rewrites the claim to now have two distinct requirements. First, the combination of A plus B must substantially fill the sensing region on its own and, second, the combination must also be more area-filling relative to A.

Now, if the combination of A plus B fill the sensing region on its own, then they are always going to fill more area than A; therefore, the second requirement has no purpose. It is a truism. A plus B will always be more area-filling than A alone. So that second part of the claim, that second phrase, the seven words that I think are really primarily in dispute here are read completely out of the claim, and this highlights the problem here.

It highlights the issues with trying to construe

this claim. And that's really the nature of our theory all along. There are multiple possible sets to pursue, but each set has significant flaws, and it leaves one of ordinary skill without reasonable certainty as to how to understand the scope of the invention.

Now, quickly jumping to -- sorry. Jumped ahead a little bit. Quickly jumping to the first term now, when the plurality of drive electrodes are substantially area-filling --

THE COURT: Let me -- if I can interrupt you. Let me ask you a question since you jumped to the second claim term, which is fine.

But why is it that -- I get the A plus B will always be greater than A, and maybe you're about to get this and if you do, I apologize for interrupting, but why is that wrong here? For example, I'm looking at figure 8 and I'm looking at -- which shows, let's see, in the elements in one layer, the yellow lines are being sense electrodes. The purple boxes are the isolated conductive elements.

Why is it that A plus B being greater than A is a problem? Or why is this claim indefinite because of that?

MR. KENDALL: That's a good question, your Honor, and I want to address the figures up front, and it has to do, as well, with the prosecution history. But if we just

13:43:53 look at the embodiments, this embodiment goes to a claim that doesn't take into consideration second part of the phrase. And really, it's a whole claim term right together that the sense electrodes and the isolated conductive elements on one side must be substantially area-filling relative to that element, the sense electrodes.

So there's a relative comparison going on, and the problem is that basically the claim leaves one unclear whether or not figure 8A is somehow representative of all the items that would meet this claim term because figure 8A, as well as every other embodiment in the specification, goes to a term that was previously in the claims, and that was that the two elements together must substantially, entirely cover the second layer.

But that term was stricken out of the claims and replaced with this "relative to" requirement in which the sense electrodes -- the combination of the sense electrodes and the isolated conductive elements need only be substantially area-filling relative to the sense electrodes. So we don't know now if it must fill the entire area as it did in the original 2009 claim or whether or not it is now some lesser threshold.

And the specification provides no guidance on that.

13:45:19 THE COURT: Okay. Let me put you on hold for one second. I'm sorry. You can continue.

13:46:12 MR. KENDALL: And so, I guess the takeaway there, your Honor, is just that during the prosecution of these claims, in 2012, they were amended, and they changed from an absolute requirement where the drive -- excuse me, where the sense electrodes and the isolated conductive elements together must substantially entirely cover the sensing region on their own, without reference to the sensing electrodes on their own; and now it has become a relative comparison between the combination and just the sense electrodes on their own.

13:46:45 And all the embodiments you're going to hear about and that you see and cited in Neodron's brief concern the former. They concern the 2009 version of the claim where you have an absolutely filled area, and that's just not what the claim language now requires. Or at least as written, it's unclear what it now requires, and that's why we believe it is indefinite.

13:47:03 And now, I'll just quickly turn to the first term, which is "wherein the plurality of drive electrodes are substantially area-filling within the sensing region relative to the plurality of sense electrodes."

13:47:16 THE COURT: Okay.

13:47:17 MR. KENDALL: The dispute here boils down to the

13:47:20 same threshold question: Do the words in the asserted
13:47:23 claim matter to indefiniteness, or can a litigant rewrite
13:47:26 them during litigation? On the one hand, Neodron says we
13:47:30 should respect the plain text of claims; on the other,
13:47:33 however, Neodron completely rewrites the claim language
13:47:36 through its briefing. And this just leads us to ask the
13:47:39 question: If the claim language is clear, why does
13:47:39 Neodron need to rewrite it? If the texts of claims 1
13:47:43 through 3 inform a person of ordinary skill about the
13:47:45 scope of the invention with reasonable certainty, as
13:47:48 Nautilus requires, then why must those words be completely
13:47:50 redrafted?
13:47:51 And across the three rounds of briefing, the
13:47:54 reason becomes clear. Again, Neodron's entire argument
13:47:57 that the claims are definite depends on reading in this
13:48:00 absolute limitation to fix the claims. Here, the absolute
13:48:04 limitation would rewrite the claim to definitively require
13:48:08 that the drive electrodes must first substantially fill
13:48:11 the sensing region on their own, without reference to the
13:48:13 sense electrodes. And we believe that's inconsistent with
13:48:16 the -- really incompatible with the language of the claim
13:48:21 as issued by the PTO.
13:48:24 The language of the claim states that the drive
13:48:26 electrodes are substantially area-filling within the
13:48:28 sensing region relative to the plurality of sense

13:48:31 electrodes. That cannot mean without reference to the sense electrodes, first and foremost, and again, it's inconsistent with the prosecution history. And Neodron fails to grapple with this problem arising from the prosecution history, which is sort of analogous to prosecution history disavowal where it's trying to come back and reclaim claim scope. Here, it's done away with a limitation that would have clearly claimed an absolute limitation where the drive electrodes must fill the entire first layer, and it's stricken that from the claims. The parties agree that it was in the original 2009 claim and that the patentee knew exactly how to claim this absolute limitation, but it struck that out, leaving one of ordinary skill uncertain as to what the claims now mean.

13:49:19 In 2012, it added this phrase in full to claims 1 through 3, and we're left wondering whether again this now maintains or raises the threshold to the drive electrodes, lowers the threshold so that they only need to be substantially area-filling within the sensing region relative to the plurality of sense electrodes, or means something else.

13:49:45 And so, it at this point, again, we can look to the specification, but the specification only concerns embodiments going towards that original 2009 claim where the drive electrodes flood, or blanket, or substantially

13:50:01 fill the area on their own, but not substantially fill the area relative to the sense electrodes. We still don't know what that means and, again, whether that raises the threshold, lowers the threshold to the drive electrodes, or means something else. And for those reasons, we believe that this claim -- that claims 1 through 3 are indefinite.

13:50:23 THE COURT: Give me one second here, please. Let me go ahead and have you -- I want to make sure of what I wanted you to address. If you would also address, because I assume the plaintiff is going to talk about this in rebuttal, figure 13 and, also, column 8, section -- I'm sorry, column 8, lines 4 through 9, and their impact.

13:52:22 MR. KENDALL: I just want to make sure I have that right, your Honor. Column 8.

13:52:25 THE COURT: Yes, sir.

13:52:26 MR. KENDALL: Could you repeat the line numbers, please?

13:52:28 THE COURT: Yes, of course. Lines 4 to 9, the full paragraph that begins "two-dimensional touch screens."

13:52:40 MR. KENDALL: Certainly, your Honor.

13:52:41 So I believe that both figure 13 and this discussion of what I believe is -- yeah. One of the embodiments of the invention, refers to an area of claim

13:52:59 design that leads to almost invisible electrode pattern.
13:53:06 And this goes back to the concept that Neodron is trying
13:53:09 to read in benefits to the claim that simply aren't there.
13:53:14 In fact, those benefits are not only absent from the
13:53:18 claim, but they were part of the original prosecution
13:53:20 history.
13:53:20 Again, this idea that the claims would have drive
13:53:26 electrodes that had small enough gaps to the point where
13:53:29 the drive electrodes would be almost invisible or
13:53:32 invisible appeared in original claim 4 and, again, was
13:53:38 stricken such that it's clear that the patentee knew how
13:53:42 to claim a drive electrode pattern that should meet that
13:53:48 benefit, or it should use its area to achieve that
13:53:50 benefit; but it struck that from the claim and when a
13:53:53 person of ordinary skill reads the prosecution history,
13:53:55 they are left wondering now whether this claim that just
13:53:58 recites a requirement for physical area for the drive
13:54:01 electrodes and the physical area need only be -- it need
13:54:04 not be entirely area-filling, it need only be that the
13:54:07 drive electrodes are substantially area-filling relative
13:54:10 to the sense electrodes. It could be less than the entire
13:54:12 area so long as the drive electrodes are substantially
13:54:15 area-filling with reference to the sense electrodes on the
13:54:19 second side.
13:54:20 It's clear that these benefits are no -- are not

present in the claim or are not clearly present enough in the claim to save this term. And I think the same response is applicable to figure 13 or, again, we see a flooded drive electrode pattern that no longer tracks what the claim language, which only requires something along the lines of drive electrodes substantially fill the sensing region only relative to the sense electrodes. Not entirely, but relative to the sense electrodes.

THE COURT: Well, they substantially fill the entire area. There are -- I'm looking at figure 13 and essentially on the -- in the big square on the left, you have what looks like the grid there. Josh made a colorized copy for me, but you have that which is -- shows that the -- that section or the drive electrodes, they substantially fill the entire area with tiny or thin white gaps, and that would describe one element.

And you also have that the red bars -- or, I'm sorry, that the amount of the interior square takes up more space than the yellow lines, which are the sense electrodes -- I mean, the lines are going -- again, mine's colorized, but the lines are going vertically and that would describe another element.

So in terms of teaching this patent and keeping it from being indefinite, again, I'm having a hard time following you. It seems to me, you're saying that the

claim language doesn't match up with what's in the specification, but I don't see why that makes it indefinite. Maybe I'm just not following you.

MR. KENDALL: The last part of what you said is entirely right, your Honor. We believe that the claim language is significantly different from what is disclosed in the specification to the point where there is no real guidance as to what this term now means. Formally it recited drive electrodes that would substantially fill the area on their own.

So the way Neodron reads this is, they break out that phrase, "substantially area-filling," as if it's written on its own, and then, there's a separate and conjunctive requirement, you also have something like narrow sense electrodes. That's not the way the claim was amended, that's not the way it's written.

And so, we find that we're unclear as to what the claim language itself, which is what must inform one of ordinary skill with reasonable certainty about scope of the invention. That's the standard in Nautilus. We think that the claim language here is too far away from the specification to provide enough guidance as to what the term now means. It's not written the way that Neodron rewrites it to match up with figure 13. It was originally perhaps written that way in that amended -- in the

original claim in 2009, but it changed in 2012, and we're unclear as to what the scope of the term is now.

THE COURT: Did any other counsel for defendants want to make any arguments with respect to these two claim terms?

MR. KENDALL: And to remind the Court, this is asserted against Amazon only.

THE COURT: Okay. Okay. So I won't comment on whether or not you are correct or not with respect to the argument you just made. It may be the subject of a later motion that you might file with respect to validity. I don't know. That will be up to you.

But as far as the claim terms being indefinite, I don't think that your arguments get you there. And the Court is going to with respect to both the claim term -- the first claim term, which is "wherein the plurality of drive electrodes are substantially area-filling within the sensing region relative to the plurality of sense electrodes," and the second one, which is, "together, the plurality of sense electrodes and the plurality of isolated conductive elements are substantially area-filling within the sensing region relative to the plurality of sense electrodes," the Court is going to find that neither of those is indefinite, and the Court's going to adopt the preliminary construction that it provided

13:58:54 yesterday.

13:58:56 With regard to the 502 patent, the first claim we will take up is "a substrate having a surface with an arrangement of electrodes mounted thereon." Who's going to be taking that up? Well, let me -- let me say, here, we have -- Josh and I talked a good bit about this. As I understand it, the plaintiff's proposal was plain and ordinary meaning, no construction necessary, colon, a substrate having a surface with an arrangement of electrodes mounted thereon. And essentially the defendants' proposed construction was to a substrate having a side, rather than surface, with an arrangement of electrodes mounted thereon.

13:59:52 So that is the fuss that we need to take up. Why don't I hear from the plaintiff first with respect to theirs, and then, I'll hear from the defense counsel.

14:00:06 MR. MIRZAIE: Thank you, your Honor. And if I could share the screen. Can folks see my slide deck?

14:00:44 THE COURT: I cannot.

14:00:48 MR. CUNNINGHAM: No, Reza.

14:01:03 MR. MIRZAIE: Well, I'll just go with reference to the slide -- to the slide deck that we sent earlier.

14:01:10 So on this disputed term, your Honor, we do stipulate to the Court's construction. We think that -- and now I'm referencing slide 22.

14:01:25 THE COURT: Okay. And let me interrupt you for one second. I apologize.

14:01:28 The preliminary construction was plain and ordinary meaning, but the -- what we adopted was not what -- specifically what either party had suggested. The preliminary construction that the Court had proposed was plain and ordinary meaning, "but wherein a surface of the substrate is a subset of the surface area of the substrate and not the entire surface area of the substrate." And plaintiff's position is that they agree with the preliminary construction?

14:02:00 MR. MIRZAIE: Correct.

14:02:01 THE COURT: Okay. Then why don't I hear from defense counsel, and I'll give you a chance to argue in rebuttal if I need to hear that.

14:02:08 So who would be speaking on behalf of defendants on this?

14:02:11 MR. CUNNINGHAM: Sean Cunningham will, your Honor.

14:02:15 THE COURT: Mr. Cunningham, the floor is yours.

14:02:17 MR. CUNNINGHAM: Thank you, your Honor.

14:02:18 So we appreciate the preliminary construction, and I think it gets us about 93 percent of the way to where we need to be.

14:02:30 THE COURT: Not 94? Not 95?

14:02:33 MR. CUNNINGHAM: No. I think it's 93 and I'd
14:02:34 like to talk about the other seven percent.
14:02:37 So the way we read your preliminary construction,
14:02:39 your Honor, it -- first of all, it recognizes that the
14:02:42 word "surface" has multiple plain and ordinary meanings,
14:02:45 which is the point we were trying to make throughout the
14:02:47 briefing. But second, it also, in our view, recognizes
14:02:52 that the position that we thought Neodron was taking that
14:02:56 surface could be the entire outside of our piece of bread
14:03:00 that is the substrate is also not correct because you've
14:03:06 clarified that it's only a subset of the surface area of
14:03:10 the substrate, which we appreciate.
14:03:12 As I thought about it, the one clarification that
14:03:16 I'd like to ask for is -- what I'm looking forward to is
14:03:22 an expert saying, okay, so we have this subset
14:03:25 construction, and I'm going to say that the subset starts
14:03:29 on the upper surface of this substrate and rolls around
14:03:33 the side, and the rest of the subset is on the bottom side
14:03:37 of the substrate.
14:03:38 And so, we -- through mangling of the claim
14:03:43 construction, we kind of get back to the same dispute
14:03:45 we're having now, which is, effectively, we've got a piece
14:03:49 of bread and if the butter is the row and column
14:03:55 electrodes, all of that butter's gotta be on the top or
14:03:57 it's gotta be on the bottom, but it can't be on both.

And so, if your Honor's intent in creating this subset construction was to eliminate that kind of multi-surface equals substrate argument, then I think we're fine. We're the rest of the way there. If that is, in fact, an argument that Neodron is going to make, and I don't have any idea whether they will or not, I think we're going to have a dispute down the road that I'd like to -- that I'd like to try and avoid and I expect your Honor would, too.

So we can either collectively decide that that was not the Court's intent to have this multi-surface subset argument or we can propose what I would consider to be a relatively minor tweak to the preliminary construction.

THE COURT: Okay. Any other defendants on this? Okay. Let me hear from the plaintiff.

MR. MIRZAIE: Thank you, your Honor.

So the tweak that defendants' counsel is seeking is really just taking us back to their proposed construction, which the Court rejected and that is for "side." To replace the clear claim language "surface" with the word "side." And with reference to our slide 23, you know, by adopting the ordinary meaning and, in this case, the Court actually further clarified that meaning. This term now is fully resolved.

14:05:37 With reference to my colleague's 93 percent
14:05:42 comment, you know, we think that it's a hundred percent
14:05:44 resolved certainly, and the Federal Circuit case we have
14:05:47 on slide 23, Finjan, and many others confirm that. But to
14:05:53 the extent that there's any issues hanging out there with
14:05:57 the Court's very clear and specific construction that it
14:06:01 added, anything remaining by way of disputes on
14:06:06 infringement or validity are factual questions for the
14:06:09 experts that my colleague referenced.

14:06:11 What the Court did in its claim construction is
14:06:14 to construe the term and resolve the legal dispute. Now
14:06:18 the experts can have, you know, a dispute about whether
14:06:20 the prior art meets the claim term or whether the
14:06:25 infringing -- devices meet the claim term, and that's a
14:06:28 jury question, not a question of claim construction.

14:06:31 THE COURT: So you give me 100 and Mr. Cunningham
14:06:36 gives me a 93. So either way, I'm doing pretty good here
14:06:39 today.

14:06:40 I interrupted you. Did you have anything you
14:06:43 wanted to add besides that?

14:06:45 MR. MIRZAIE: Well, just that, you know, the
14:06:47 proposed tweak that Mr. Cunningham would like to add just
14:06:51 takes us back to kind of square one, which is the proposal
14:06:54 that this court rightly rejected. And that tweak really
14:06:57 is for the term "side" in our slide 26, makes clear, as

our briefs did, that that runs the risk of confusion because the patent uses that term in a different way.

THE COURT: Got it.

Mr. Cunningham, anything else?

MR. CUNNINGHAM: Your Honor, I hadn't suggested my tweak yet, and so, I think counsel's getting a little ahead of me. But the wording that I would use to avoid this, what I'll call, the multi-surface subset -- and by the way, your Honor, I agree with counsel that we can have factual disputes about infringement and validity, and we certainly will. What I don't want to have is a dispute about what your Honor's claim construction means and doesn't mean. That's what I'm trying to avoid here.

And so, my tweak would be something along the lines of using your preliminary construction to say, "wherein a surface of the substrate is a subset of the surface area of the substrate and not the entire surface area," and here's where I'm going to add words, "or opposing surfaces," those three words, "of the substrate."

So if we add those three words, of opp -- "or opposing surfaces," then it eliminates a dispute about the subset of your construction being on multiple surfaces, which obviously would go against the claim language, every disclosure in the patent, and the distinctions over the prior art that the patentees made in the specification.

14:08:24 THE COURT: Let me hear from plaintiff's counsel.
14:08:29 MR. MIRZAIE: Yes, your Honor.
14:08:30 That's the first time we're hearing of the tweak, 14:08:32 and that's okay. But I think what we just heard is 14:08:36 defense counsel used their preferred interpretation of 14:08:41 "side," which this court rightly rejected, and said that 14:08:46 what they'd like to do is to exclude opposing surfaces, 14:08:51 but that's premised on surface essentially meaning a side. 14:08:55 And so, we think that that just takes us back to square 14:08:59 one.
14:09:00 They had their term "side" rejected by the Court. 14:09:04 And the Court further clarified there is no need for any 14:09:06 further clarity. The simple claim --
14:09:09 THE COURT: Well, here's my problem, though. 14:09:11 When I read this, when I read this and looked at the 14:09:15 patent, I'm -- I am sympathetic with what Mr. Cunningham 14:09:20 is suggesting, which is, there is a point where surface 14:09:24 area has to end. What that point is is something I think 14:09:30 your expert and his expert can fight over.
14:09:34 But I don't believe as I understand what the 14:09:39 words "or opposing surfaces" mean would be included in the 14:09:44 patent with regard to what the initial surface is. And 14:09:47 so, tell me why "or opposing sur" -- I get, in my mind at 14:09:55 least, the surface that where the surface ends. By 14:09:58 surface, a substrate having a surface with an arrangement.

I get there is a point where the surface will end, and the experts will fight about that, but I don't believe it can be on the opposing -- it could be on the opposing side. I think that would not -- that would be -- that would not be part of the surface.

So do you have a better way of saying that than "or opposing surfaces"?

MR. MIRZAIE: So on that issue, we agree there is -- there must be a point in which the surface area has to end, your Honor, but what we think is that your court's preliminary construction creates that endpoint. The preliminary construction says that it cannot be the entire surface area of the substrate. And so, that is exactly the main argument that the defense counsel -- that the defense had in their briefing, and the Court's construction sort of overcame that main argument.

So now that there is an endpoint and what's left is a battle of the experts, if you will.

THE COURT: Well, do you disagree that there are opposing surfaces?

MR. MIRZAIE: So I think the struggle I'm having with this new construction, your Honor, is that the -- it's a three-dimensional object. So picture --

THE COURT: Right.

MR. MIRZAIE: -- three-dimensional rectangular

14:11:18 type of box, if you will, and so, is it, you know, two
14:11:21 sides of -- one of the, you know, points of the -- one of
14:11:29 the two-dimensional rectangles of the boxes, is it upper
14:11:36 side of the box, and then, the lower sort of
14:11:40 two-dimensional rectangle of the box? So that's the, you
14:11:44 know, issue we're having.

14:11:45 If there's a back-and-forth on this, then, you
14:11:51 know, perhaps we could reach a resolution. But I think it
14:11:53 -- you know, I think at bottom, it is a fact question
14:11:55 we're making, and that's why we think that the Court's
14:11:59 construction resolve these.

14:12:02 THE COURT: Mr. Cunningham.

14:12:03 MR. CUNNINGHAM: Your Honor, your -- you've got
14:12:06 it -- you've got it, the issue correctly analyzed, and
14:12:10 that is, you know, at bottom, we're talking about a piece
14:12:13 of glass, right? This is a substrate, it's a relatively
14:12:17 flat thing.

14:12:17 So I keep going back to my bread-and-butter
14:12:21 analogy, but the claimed arrangement of electrodes,
14:12:25 whether it's -- and your subset construction, I think,
14:12:30 gets us most of the way there, as I've said. But the
14:12:32 claimed arrangement of electrodes, whatever that subset
14:12:37 is, it's gotta be on one of the surfaces or the other, or
14:12:41 potentially both. But all of the electrodes have to be on
14:12:44 a surface. And we're not going to see an argument

14:12:47 where an --
14:12:48 THE COURT: Mr. Cunningham --
14:12:49 MR. CUNNINGHAM: Yes.
14:12:50 THE COURT: While I so enjoy getting to hear you
14:12:52 talk, I hate to cut you off.
14:12:54 MR. CUNNINGHAM: That's all right.
14:12:55 THE COURT: But I actually agree with you. And I
14:12:58 found occasionally, people talk me out of what I'm
14:13:01 thinking of doing when they don't want to.
14:13:03 So the Court is going to enter the following
14:13:06 construction for this claim term. The Court is going to
14:13:10 order that for "a substrate having a surface with an
14:13:14 arrangement of electrodes mounted thereon," the claim
14:13:17 construction is plain and ordinary meaning, "but wherein a
14:13:20 surface of the substrate is a subset of the surface area
14:13:24 of the substrate and not the entire surface area or
14:13:28 opposing surface -- "surfaces," with an S, "of the
14:13:32 substrate" will be the final claim construction.
14:13:36 The next claim term up is "sensing area." Give
14:13:41 me one second to get organized on that one. Okay.
14:13:53 Mr. Cunningham, are you up on this one, as well?
14:13:56 MR. CUNNINGHAM: I am not, your Honor. Mr.
14:13:57 Heintz is going to handle.
14:13:58 THE COURT: Okay. Give me one second, though.
14:15:39 Thank you for that pause. I'm happy to hear from counsel.

14:15:42 MR. HEINTZ: Thank you, your Honor. This is Jim Heintz again from DLA Piper.

14:15:45 And with respect to the sensing term -- "sensor area" term, your Honor, defendants just wish to confirm their understanding of the Court's preliminary construction.

14:15:54 THE COURT: Okay.

14:15:55 MR. HEINTZ: I'm going to share our screen now. And, your Honor, on slide 7 of defendants' presentation. Sorry, your Honor. With respect to slide 7, what we've done is, we've taken the Court's preliminary construction and inserted into the language of claim 1 at the top. And our understanding of that construction, your Honor, is that it leads to a simply understood syllogism. The claim already requires that the electrodes define an array of sensing cells. And then, the Court's construction requires that the sensing cells define the sensing area. This means, your Honor, that essentially the electrodes define the sensing area.

14:16:58 Because that syllogism as represented on the slide with the sensing area represented as the red number C. So the defendants' understanding of the Court's construction is that in light of the other limitations, the sensing area cannot extend beyond the sensing cells, which are defined by the sensing electrodes.

14:17:22 And, your Honor, we think that understanding is consistent with other limitations of the claim. I've moved to slight 8 now, and we show a portion of the claim that requires wraparound connections made outside of the sensing area. Now, on slide 8, on the upper part, we show an excerpt from figure 3 that we've annotated. Figure 3 has a sensing cell and that's reference numeral 28, and that's indicated by the black dash line. And I'll just use my cursor to show the outline of the sensing cell 28.

14:18:02 So, your Honor, if the sensing area were allowed to extend beyond where these sensing cells are, for instance, if the sensing area were allowed to extend to the green dash line beyond all of the sensing cells, there would be a problem with claim 1 because, in that case, your Honor, the wraparound connection that connects to the row-sensing electrode would be both inside and outside the sensing area. But that's not what the claim requires. The claim requires that those wraparound connections be made outside the sensing area.

14:18:41 And so, for that additional reason, defendants understand the Court's preliminary construction when read with the remaining elements of claim 1 to require that the sensing area cannot extend beyond the sensing cells, which, again, are defined by the sensing electrodes.

14:18:59 And so, your Honor, defendants respectfully

request confirmation that this understanding is consistent with the Court's preliminary construction.

THE COURT: I think it's not. I don't think we restrict the sensing area to what you have shown here, I guess, as 30, and we think that it would extend up beyond that into the area that you have on -- what slide is this? It's blocked out on my deal.

MR. HEINTZ: It's slide 8, your Honor.

THE COURT: Okay. So just so if everyone's -- if we have to tether this back to the Markman hearing, I'm looking at slide 8 and the figure here -- remind me which figure this is. I've got it on my cheat sheet here, as well.

MR. HEINTZ: Yeah. This is figure 3, your Honor, of the --

THE COURT: Okay. Figure 3. And so, on this, yeah, I am looking at the cells that are defined in 30, I guess is the best way of saying it. Twenty-eight, 32, I guess they're all examples. But we do believe the sensing area would extend beyond those cells.

Now, what impact that has on how you all deal with the validity or anything else with regard to claim 1, so it's clear, we do think that area is included in the sensing area.

MR. HEINTZ: So to be clear, your Honor, your

Honor is saying that the green dash line or the blue dash line or the red dash line can all be representations of the sensing area under the Court's preliminary construction?

THE COURT: One sec. I don't think that's quite right. No. And I misspoke when I said yellow. It's just the green line that you have here.

MR. HEINTZ: So the sensing area can be the green line, but cannot be the blue or red dash line?

THE COURT: Correct.

MR. HEINTZ: Can the Court offer any guidance as to how far out the green line can extend while still being inside the sensing area under the Court's construction?

THE COURT: No. The answer's no.

You know, talking to my law clerk, we believe that one -- a person of skill in the art would be able, when they touch it, to accurately detect the appropriate amount. But all I can say, at this moment, is that the green area is in and the yellow area is out of the sensing area.

MR. HEINTZ: By yellow area, your Honor, you mean the yellow highlighted conductor?

THE COURT: Correct.

MR. HEINTZ: Okay. And I'm sorry. I just want to make sure I understand completely.

If you can see my cursor, the yellow connection extends inside the green line. Is that also outside the sensing area under the Court's construction?

THE COURT: No.

Anything within the green line will be inside the sensing area.

MR. HEINTZ: Okay. Thank you, your Honor. I understand.

THE COURT: No.

I want -- look, the last thing I want is for your experts to have a fight because I didn't make something clear. And, frankly, as far as I'm concerned, once you start exchanging expert reports, you know, if this is -- if you see that you're having a fight that is really a fight over what the construction is, rather than what the experts oughta be saying, you know, bring it to my attention then, rather than filing 73 Daubert motions down the road.

You know, I wish I could help out more than I'm helping, but I don't want the fight to be over the wording. I want it to be over -- because you can't cross-examine each other at trial on that. But the best I could do is within the green line on slide 8, which is from figure 3 of the 502 patent, the Court finds that is within the sensing area.

14:23:43 MR. HEINTZ: Okay. Thank you, your Honor.

14:23:45 THE COURT: And let me hear -- I'll hear from other defense counsel in a second, but let me hear first from plaintiff's counsel, if you had anything you wanted to get in while I'm making these proclamations.

14:23:58 MR. MIRZAIE: No, your Honor.

14:23:59 We -- Mr. Heintz, if you could put it back to slide 7, if you don't mind. We just wanted to say that obviously we agree with the Court's construction as we've stipulated to before. But I think the issue here is that defendants are further construing the construction of the word "define" to mean cannot extend beyond. And as we pointed out in our briefing, including the reply brief at page 9, that is a narrow -- overly narrow definition of the word "define."

14:24:38 Defendants' own dictionary show that it could encompass more than that, including to take the form of. And so -- but based on that narrow definition of the word "define," it's clear from this slide that the way that the defendants wanted to read the construction was to create, as my colleague said, a syllogism which proves that not only one term I believe would be read out of the claim and rendered superfluous, but it looks like two claims, based on this slide, would be rendered superfluous. And that just can't happen under Pause Technologies in the Federal

14:25:17 Circuit.

14:25:17 And, you know, on the -- the rest of the issue, I think, as the Court suggested a moment ago, what -- the Court has provided an abundance of clarity in terms of its construction and rejecting defendants' construction and adopting plaintiff's construction. But even, you know, during this hearing, the Court's providing further clarity, and the thing is just, you know, an issue of POSITAs and battling out with the battle of the experts.

14:25:48 THE COURT: Okay. And for the court reporter, POSITA is P-O-S-I-T-A. She probably knew that, but just in case.

14:25:56 Is there anything else that defense counsel would like to add?

14:26:04 MR. HEINTZ: Yes, your Honor.

14:26:05 One question. During your explanation of the sensing areas, you mentioned that perhaps a motion would be in order if there's some disagreement over what the Court's construction means. And I sit here today, I'm anticipating there will be fights over whether -- where the border is between the red line and the green line.

14:26:26 Would the Court entertain a motion if, in fact, that gets to be an issue that's contested between the parties? I'm sorry, your Honor, I cannot hear you.

14:26:40 THE COURT: Sorry about that. Thank you for

letting me know.

What I would encourage you all to do on this one issue with regard to sensing area, if you realize that what you're fighting over on infringement, for example, is plaintiffs saying there is infringement because of X and your expert agrees factually that that's how it functions, but you're saying there's not infringement because that is not included in the sensing area, you guys can't cross-examine the experts over that because they're just going to say nuh-uh.

And so, if you all get to that point, what I'm encouraging you to do is contact the Court, and if I have to do an additional Markman, once you guys have focused on what it is, I will allow you guys -- I've gotta quit saying that. I will allow the attorneys to explain to me what position you are each taking factually with respect to sensing area. And to the extent I've got to construe what sensing area -- I'm not going to construe the facts, but once -- if you can put it into context for me what the fight is over what sensing area means in a discrete, one side says it's A and one side says B, I will make that legal decision for you right at that point, if that's the fight over sensing area.

MR. HEINTZ: Thank you, your Honor.

THE COURT: You're welcome.

14:28:13 You don't need to file motions. You need to contact me and I may want you to -- I may want you to submit a letter, or something. And what would be most helpful to me in this situation is if -- we've got -- I think we've got a great asset here in figure 3. If figure 3, for example, were to be the example and you could say the fight is over whether or not this is or is not in the sensing area as a matter of law, or is that not a sensing area, I think that's something it will be perfect for the Court to construe and not -- but it might be informative for the experts, for example, to say, you know, if there's a touch there, is there a way for it to be sensed and is the -- is it measurable once that happens? That -- you know, but I'll take it all up then and I'll help you out however I can.

MR. HEINTZ: Thank you, your Honor.

THE COURT: My understanding is the next claim term, "wherein row sensing" -- I'm not going to read the whole thing but begins with "wherein row sensing electrodes," that there is no longer a dispute; is that correct?

MR. MIRZAIE: That's plaintiff's understanding, as well, your Honor. Yes.

MR. CUNNINGHAM: Yes, your Honor. We've accepted the preliminary construction on that term.

14:29:36 THE COURT: I got a hundred.
14:29:40 MR. CUNNINGHAM: You got a hundred on that one.
14:29:41 THE COURT: Okay. Very good.
14:29:42 My Yelp interviews could use a little help.
14:29:47 MR. CUNNINGHAM: They're skyrocketing.
14:29:49 THE COURT: Very good. I need you to be in more hearings, Mr. Cunningham. I'm doing great.
14:29:54 The next claim term is "sensor" with an O, "sensor values." And the Court's -- the Court's proposed construction is plain and ordinary meaning, "wherein the plain and ordinary meaning is sensor," with an O, "signal value." And let me see. Give me one second, let me check with Josh. I'll hear from whichever defense counsel wants to take this up first.
14:30:32 MR. SNYDER: Good afternoon, your Honor.
14:30:34 Darin Snyder of O'Melveny on behalf of Samsung and for purposes of this term, on behalf of defendants.
14:30:40 THE COURT: I've been waiting all day for you to get your turn. I guess I should be glad it was almost at the very end. We've saved the best for almost last. So.
14:30:50 MR. SNYDER: Thank you, your Honor. I hope to be brief and compelling.
14:30:57 Permit me to share my screen.
14:30:59 THE COURT: Okay.
14:31:01 MR. SNYDER: If I've done that correctly, you

should now see a slide labelled 286 patent, quote, sensor value.

THE COURT: And that's slide 2. I'm with you.

MR. SNYDER: Yes. Thank you, your Honor.

On this slide, which sets forth the Court's tentative construction, which matches Neodron's proposed construction of "sensor signal value."

THE COURT: Okay.

MR. SNYDER: We understand that the Court rejected defendants' proposed construction of "value indicating the strength of the sensor signal," but based on the claim language and the specification, in addition to the extrinsic evidence, we think it is compelling and compelled that signal value -- or sensor signal value has to refer to some quantitative measurement, something that can be counted. And we have proposed and informed plaintiffs of our proposal that it should, instead, be "magnitude of a sensor signal."

Now, I want to be clear. There isn't any particular magic to the word "magnitude" other than it is something that can be counted. It is a countable value. And as I want to show in the claim language and the specification, as well as the other intrinsic and extrinsic evidence, it is absolutely required that the sensor signal value be a countable type thing. It cannot

14:32:26 be a subjective attribute.

14:32:30 Neodron suggests that there is some kind of 14:32:32 informational attribute that would qualify as a value; and 14:32:35 we think that it is quite clear that that is quite 14:32:38 impossible under the claim language and the specification 14:32:41 and that, instead, sensor value should be construed as 14:32:44 magnitude of a sensor signal.

14:32:47 This issue that we're raising is not one that is 14:32:50 purely hypothetical. This is -- we think problem is made 14:32:57 clear in Neodron's own briefing where it suggested that a 14:33:01 sensor signal value could encompass abstract informational 14:33:06 attribute. What they said in their reply, which is at 14:33:09 docket 74, on page 2 -- and I'm on slide 3 -- is that the 14:33:13 strength of a signal is not the only attribute of a 14:33:16 sensor, just as the signal strength is not the only 14:33:19 attribute of a cellular phone connection.

14:33:22 For instance, you can have a strong signal 14:33:24 strength when having a cellular phone call, but the signal 14:33:28 strength tells you nothing about the content of the 14:33:30 cellular signal, e.g., whether the cellular signal is 14:33:34 transmitting the word "hello" or the word "good-bye." We 14:33:39 appreciate that the Court has rejected the defendants' 14:33:42 suggestion of the term "strength." But even if "strength" 14:33:44 is not adopted by the Court, we do need further clarity 14:33:48 about the meaning of the term "value" to make clear that

14:33:51 the term "value" has to be some kind of measurable or countable quality. It cannot be something subjective like the content of a call or some attribute like color or acceptability.

14:34:04 This understanding is compelled by the claim language and by the specification. On slide 4, we've set forth four examples of claims where it is clear that a countable quantity must be the value, and that is made clear because the claims consistently refer to comparing these values so that you could determine which one is greater or lesser than another.

14:34:31 For instance, in claim 1, it refers to a sensor value of an inactive key that surpasses a sensor value of an active key by a select amount. In other words, a countable quantity. Later in that same claim, it refers to increasing sensor values, which would also require that it be some kind of measurable or countable quality.

14:34:53 Claim 10 is the method claim that corresponds to claim 1 and has the same terms, a sensor value of an inactive key of the key panel that surpasses a sensor value of an active key by a select amount, and again refers to increasing sensor values. Claim 5 is a similar claim, but goes in a different direction, referring to a sensor value that falls below a hysteresis value.

14:35:19 Similarly claim 9 refers to a sensor value that

14:35:22 surpasses a sensor value by a select amount and also 14:35:26 refers to decreasing sensor value. All the things which 14:35:29 require that the values be countable-type measurable 14:35:32 quantities, not something that is abstract or subjective.

14:35:37 This is also consistent with the specification's 14:35:40 description of the claim terms. As you can see on slide 5 14:35:45 where we've set forth the language of claim 1, on the 14:35:49 left-hand side, as it compares figures 1B and 1C. Claim 1 14:35:54 refers to detecting a sensor value of an inactive key that 14:35:57 surpasses a sensor value of an active key by a select 14:36:01 amount. This is illustrated in figures 1B and 1C where it 14:36:06 shows the signal strength of the signals for each of the 14:36:09 keys, and it describes how the sensor value of key 2 14:36:13 surpasses the sensor value of key 1, which is shown as 14:36:17 signal magnitudes measured as signal strength. These all 14:36:20 have to be measurable quantities. They cannot be abstract 14:36:25 notions such as the happiness of the signal or the color 14:36:29 of the signal.

14:36:30 This is consistent with all of the descriptions 14:36:32 of the claims in the specification and there are several 14:36:36 of them. On claim -- on slide 6, I've set forth a few. 14:36:40 For example, from the abstract where it refers to 14:36:43 measuring a signal strength or comparing the measured 14:36:46 signal strengths to find a maximum so that you can 14:36:49 identify the key with the maximum signal strength.

14:36:52 Or in the patent, column 2, lines 8 through 12, 14:36:56 where it refers to measuring a signal strength, comparing 14:36:58 the measured signal strengths to find the maximum and 14:37:01 determining the key with the maximum signal strength. 14:37:06 Similarly in column 5, at line 35 to 40, it refers to 14:37:10 identifying the signal strengths and identifying the 14:37:13 signal which has to be the largest. We've included 14:37:15 further examples on slide 7, where in the patent, column 14:37:21 7, lines 53 to 59, it compares signal threshold values and 14:37:26 then, later on, refers to comparing other values.

14:37:29 On column 5, lines 49 to 57, it talks about 14:37:34 adding an incremental value to the signal, multiplying the 14:37:37 signal strength, subtracting in incremental value, 14:37:41 multiplying the signal strength. Column 8, at lines 8 to 14:37:45 11, it refers to measuring a signal level. And the final 14:37:49 example on this slide, slide 8 from column -- I'm sorry, 14:37:51 from column 8, lines 24 to 27, it refers to a signal 14:37:55 change remaining above a hysteresis level.

14:37:59 In every one of those examples and, in fact, in 14:38:01 every example in the specification consistent with the 14:38:05 claim terms, the value is some kind of measurable quantity 14:38:09 that can be compared against another. It can be 14:38:12 increased, it can be decreased, it can be multiplied, it 14:38:15 can be compared to another, but it can't be some 14:38:18 subjective quality. In no instances is that true.

14:38:22 This is also consistent with the way the PTAB described the patent and the term "sensor value" in its Institution Decision, which is included in the record at docket 71-3. On page 5, it describes the sensor value and the purpose of the patent as selecting one key among several keys. It talks about identifying the key with the maximum signal strength and maintaining that selection until either the first-determined key drops below some threshold level or a second key signal strength exceeds the first key signal strength. Then the quote goes on, in every instance, talking about a measurable quantity that can be compared against another.

14:39:03 On slide 9, we've summarized some additional, very important extrinsic evidence that confirms this understanding and, in particular, the McGraw-Hill Dictionary of Scientific and Technical Terms, which describes value as the magnitude of a quantity. This is consistent with the expert declaration we submitted from Dr. Aris Silzars, who said that a POSITA would understand sensor value to be the magnitude or strength of the value measured by the sensor, i.e., that sensor value means the strength of the sensor signal.

14:39:39 In every instance, every bit of intrinsic and extrinsic evidence is consistent --

14:39:43 THE COURT: Mr. Snyder.

MR. SNYDER: Yes.

THE COURT: Let me ask you this. If I were to add the word -- and I'm going to hear from plaintiff's counsel. If I were to add the words for sensor value, the words "a measurable" in front of "sensor signal value," how -- what would you think of that?

MR. SNYDER: I would want to get the input of my defendant colleagues, your Honor. I think that that might be adequate. I wouldn't want to invite any dispute about whether some subjective things can be measurable. But I think as long as it's understood that measurable is something that is countable.

THE COURT: We had the same -- as Josh and I were talking, we had the same concern. But I can't figure out -- I can't think of a better word than "measurable."

MR. CUNNINGHAM: Your Honor, perhaps quantifiable?

THE COURT: I thought of quantifiable and that got shot down over here, I'll be honest. That was -- I thought quantifiable and that didn't fly. But a measurable sensor signal value, our sense is, covers -- and then, I'm going to get the plaintiff in here in a second, but covers, we think, everything that this patent intended to cover with regard to signal value.

So that's probably -- let me -- you guys, let me

allow the defendants to think about this, and let me hear from the plaintiff about whether you agree with or oppose the addition of the words "a measurable" in front of my claim construction, and then, I'll come back to Mr. Snyder. So.

MR. MIRZAIE: Thank you, your Honor.

So we don't think it's necessary. We don't have any -- I'm not sure if -- you know, why I have any disagreement with that, but it's not necessary to import that language into the claim because the claim already has the language that my colleague pointed out, which is a select amount. A select amount.

So the Court rightly rejected, as did the ITC judge resolving a very similar dispute, using the same patent specification. The defendants attempt to import this concept of amplitude or magnitude in limiting the term in that way, and the term requires no further construction.

On my colleague's question about whether it's countable or not, as I stated, the claim term itself also requires something that was not in dispute, at least not, you know -- and I still don't think -- right after the claim terms that is in dispute, there is a select amount. They haven't identified what the claims should mean sufficiently, and there's no need to import anything else

or add more language.

On the issue of subject, your Honor, Neodron certainly is not reading the claim term in any kind of subjective way. We're not suggesting that it's --

THE COURT: You don't need to take that up. I'm good.

MR. MIRZAIE: Using an analogy in the reply, you know, it definitely does not touch on that. So the additional language and the -- all of the claim term is objectively clear, and there's no need for anything further.

So defendants' latest construction this morning of the term "magnitude," your Honor, I think what we just saw is just a rehash of the same exact arguments that were in the briefs for the rejected claim construction.

THE COURT: I'm not going to go with their claim term. I'm not going to go with their proposal. All I care about is how you feel about a measurable sensor signal value, and it seems to me like you're giving me like a C grade, like a 75, but I'm still passing, to use Mr. Cunningham's analogy.

So let me hear from Mr. Snyder what you think about for the claim term "sensor values." The Court is likely to give the claim construction "a measurable sensor signal value." And do you have anything else to add, Mr.

Snyder?

MR. SNYDER: I don't have anything else to add, your Honor. I think that would be an improvement with the Court's understanding as described in this hearing that that is something that is countable or something that is numerical that would be adequate and, we believe, consistent with the intrinsic and extrinsic evidence.

THE COURT: Okay. Then let's move on to "measure a parameter of the first variable resistance electrode."

But before we do that, let me go ahead and do this. If someone, any of you will make sure to send us after you get -- what I would like to do -- I'm just going to impose on Mr. Guaragna that he can send anything else he wants. Once you get the transcript of this hearing, go through it, put down what you believe I said are the claim constructions, send it to all counsel. I'm not asking you to reargue anything or whether it's right or wrong. I just want to make sure, after a hearing where we've had some back-and-forth, that everyone is in agreement as to what the record is as to what I said, rather than me reading it all into the record.

If it turns out there is any dispute over what you think I -- if plaintiff thinks I said one thing and Mr. Snyder thinks I said something different, let me know immediately and we'll get that corrected. But I want to

make sure as soon as you can -- I'm assuming you're all leaving here thinking you know what it means, but I want to make sure that we -- everyone is in agreement with what I've ruled.

So the final claim term is "to measure a parameter of the first variable resistance electrode."

Mr. Snyder, I think it was you.

MR. SNYDER: Yes, your Honor. It is me. And this patent is asserted only against Samsung, so I will address this argument.

The Court included a note in its preliminary construction to saying that if the parties believe that the definition of "parameters" should explicitly include other items, please be prepared to raise that during the hearing.

And I think we understood what the Court meant, but rather than explicitly include other items, we believe that the Court's construction should be limited to a value determined by the resistance. Because a person of ordinary skill would understand parameter in the context of this claim to mean only a value determined by the resistance because of the context in which that term is used in the claim and in every -- in the specification, including every embodiment in that specification.

But before I go on, your Honor, can you confirm

14:47:14 that you can see my screen? It should have slide 2, claim term "to measure a parameter of the first variable resistance electrode."

THE COURT: Yes, I can.

MR. SNYDER: Great. Thank you, your Honor.

So turning to slide 3, let me use one of the two claims that include this language as an example. And I believe that looking at this claim language, it's clear that in light of the claim language and the agreed construction, it is effectively a logical syllogism that the parameter has to be the output of the first variable resistance electrode and, therefore, a value determined by resistance.

The parties agree that the first variable resistance electrode is a, quote, first electrode in which the resistance of the material varies in relation to applied force. Now, the disputed term requires an integrator circuit. An integrator circuit, and that is a term from the claim, to, quote, measure a parameter of the first variable resistance electrode.

And a later limitation in that claim requires that, quote, one or more processors are configured to determine based on the measured parameter an amount of force applied. In other words, you have to determine the amount of force applied, and this is based on an output of

14:48:42 the first variable resistance electrode, which is a device
14:48:49 where the resistance of the material varies in relation to
14:48:51 the applied force.
14:48:53 So the only way that it's possible to determine
14:48:55 the amount of force applied is to measure a parameter
14:49:00 determined by the resistance of the variable resistance
14:49:03 electrode. There is no other way to read that claim
14:49:06 language and to read the term "parameter" in the context
14:49:09 of that claim.
14:49:11 Looking at slide 4, we can see that the
14:49:15 implementation or embodiment in the patent is consistent
14:49:18 with this understanding. On slide 4, we've included an
14:49:22 annotated version of figure 3 from the patent. There is
14:49:26 an item on the left-hand side colored in blue, R sub Q,
14:49:31 which is numbered 30, that is the variable resistance
14:49:35 electrode. And recall that the parties agree that the
14:49:37 term "variable resistance electrode" is resistance of the
14:49:40 material varies in relation to the applied force. The
14:49:45 output of that variable resistance electrode is in the red
14:49:48 line, and it then leads to item 20, and the input is I sub
14:49:54 N 21, which is the input of the current integrator.
14:49:58 Current integrator input. And the purpose of that current
14:50:01 integrator input is to measure a parameter of the first
14:50:04 variable resistance electrode. And remember that first
14:50:06 variable resistance electrode is made of a material that

whose resistance varies in relation to the applied force.

This understanding is consistent with every single embodiment in the specification where it specifies that current and resistance are the things that vary as a function of the output of this variable resistance electrode.

And on slide 5, we've set forth the text of column 5, lines 26 to 36, where it says, in this example, each of the values in this equation other than I sub N and R sub Q are fixed. However, the current I sub N is a function of change in the force sensitive resistance R sub Q. Accordingly, the resistance value R sub Q of the resistive force sensitive element can be determined from the value of the accumulated charge obtained by the integration of I sub N over a fixed time as measured at the current integrator input 22. That's the item that we saw in figure 3. The value of the applied force can, in turn, be determined from the resistance value RQ of the resistive force sensitive element.

Now, it does say at the beginning of that quote that in this example, there are two other embodiments in the specification. They are found in -- but there is similar text about each of those, column 6, lines 51 to 58, and column 7, at lines 32 to 41, which describe exactly the same situation where resistance is the varying

quality of the output of the variable resistance electrode which -- and that is the value that is then determined by the current integrator.

This understanding is even consistent with the way Neodron described the patent, as you can see on slide 6. In its opening brief in these claim construction proceedings, docket 63 at pages 4 through 5, it described the 747 thusly. It said, quote, the 747 patent is directed to a resistive force sensor by describing a, quote, resistive force sensitive element, end quote, that can, quote, be used to measure the amount of force applied to the panel. This corresponds to the, quote, variable resistance electrode, quote, recited in the claims. A resistive force sensor measures force by measuring changes in resistance of material. This works because the resistance of the material depends on the amount of force applied. If enough force is applied, the resistance decreases. If little or no force is applied, the resistance stays, remains the same.

This is also consistent with Neodron's statements to the Patent and Trademark Office, as we can see on slide 7. In this owner's preliminary response, which is in the docket at 62-2, it said that the 747 patent and claims are directed to resistive force sensors and it -- and this is important. It distinguished those from piezoelectrics and

14:53:17 capacitive force sensors saying, quote, it is important to
14:53:21 contrast that with piezoelectric and capacitive force
14:53:24 sensors. It then went on to have a quote very similar to
14:53:27 its beginning language in the brief that I just read. In
14:53:30 each one of these instances, we're talking about resistive
14:53:33 forces.

14:53:35 Now, in its reply brief, Neodron alleges, for the
14:53:39 very first time, that a parameter very broadly defined can
14:53:43 be any set of physical properties whose values determine
14:53:46 the characteristics or behavior of something. And then,
14:53:49 it says, a value may suggest measuring a number, not
14:53:52 necessarily a variable or physical property.

14:53:55 And perhaps there might be some validity to that
14:53:59 very broad understanding of the word "parameter" if it was
14:54:02 completely devoid of any context, but in this case, it
14:54:05 does have context. It's a word used in these claims of
14:54:08 the 747 patent. And in the claims of these patents, you
14:54:12 have to look at the intrinsic and extrinsic evidence, not
14:54:15 any of which Neodron cites. In the context of this claim,
14:54:20 the parameter must be something of the first variable
14:54:23 resistance electrode, and that first variable resistance
14:54:26 electrode is the first electrode in which the resistance
14:54:30 of the material varies in relation to the applied force.

14:54:34 Based on that, we think that this term needs to
14:54:37 be limited to the value determined by the resistance,

instead of just using resistance as an example, and we urge the Court to modify its construction to make that clear.

THE COURT: If I could hear a response from plaintiff, please.

MR. WANG: Good afternoon, your Honor.

This is Philip Wang on behalf of Neodron. It's the first I'm speaking today.

THE COURT: Welcome back. Good to see you again.

MR. WANG: It's good to see you, your Honor.

So I would like to begin by sharing my screen. I hope that it works. Can you see my screen, your Honor?

THE COURT: Yes, sir.

MR. WANG: Very good.

So on this first slide, we have the parties' competing proposals, and we like your proposal, your Honor. We would give it a five-star Yelp review. And what your Honor found was that the term "parameter," which is really the term in dispute between the parties, includes, but is not limited to, Samsung's proposal, which is a value determined by the resistance. We also paid heed to your Honor's guidance, which is to -- for the parties to come up with additional things that would be included in the claim meaning of parameter.

The comments I heard from Mr. Snyder seem to be

the opposite, which is that not only did he not add anything that's included, he wants to exclude everything, except for Samsung's proposal. And apart from being a modification, it's the exact same construction that your Honor already considered and rejected.

The reason that no further construction is necessary is because we threw down the gauntlet, and we repeatedly asked Samsung to identify what is it that we're pointing to as a parameter that you contend must be excluded from the plain meaning or from the claim term "parameter"? What is it that we're doing that requires court resolution?

And through three rounds of briefing, six briefs, the most that they could come up with is a single sentence in the reply brief where they say that we're attempting to read the claim or the patent on non-resistive force sensors. And this is on page 11 of their reply brief.

Now, what's striking about this sentence is, one, it's not supported by any evidence. There were no exhibits, no attachments to what our contentions say. So it's really there's no basis for the Court to make that finding or give weight to what they're saying, number one. Number two, even if the claim is limited to resistive force sensors, it's pretty clearly that comes from other terms and other claim limitations, not the word

14:57:25 "parameter" in isolation.

14:57:27 And number three, as Mr. Snyder pointed out, 14:57:30 we've said in the IPR responses and in the briefing that 14:57:36 the claim is not resistive force sensors. So what is the 14:57:39 mischief that Samsung is concerned about that requires the 14:57:44 Court to do this exclusion and to import the exclusion 14:57:49 into the word "parameter"?

14:57:52 On the very next slide, I have Samsung slide 3, 14:57:58 and it was very striking to me because they have all of 14:58:01 these different claim limitations, and the way that I 14:58:05 interpret it is that whatever limitations they're arguing 14:58:10 about or that they are convinced are part of the claim 14:58:13 don't come from the word "parameter." They come from all 14:58:15 of these other limitations that are already in the claim.

14:58:20 And then, they also say at the very end, their 14:58:23 punch line, they say it would not be possible for the 14:58:26 parameter to be anything else. Okay. So if that's true, 14:58:32 then, again, what are they concerned about? The word is 14:58:34 "parameter" and it will mean what it means. If what 14:58:38 they're saying is correct, it would not be possible for it 14:58:40 to be anything else. Why does the Court need to rewrite 14:58:44 that word "parameter" to mean something else if we're 14:58:47 defining the principles of physics or logic? So I think 14:58:52 that this slide is very telling and it undercuts their 14:58:57 argument.

As your Honor knows, there's a heavy presumption that terms carry their plain and ordinary meaning. And you can look up the word "parameter" in any dictionary, in Merriam-Webster Dictionary dot-com, and it does not mean the value of -- or determining the value of resistance.

And on this next slide, slide 54, I think Samsung makes a dangerous and very misleading argument about their construction is the plain and ordinary meaning, and that's simply not true. And I want to avoid a situation where for future disputes before your Honor that every single party says: No. My construction is the plain meaning. No. My construction is the plain meaning. Plain meaning has a very specific definition, which is that it is something that comes from the dictionary or a technical dictionary. And sometimes where if dictionaries give multiple definitions, then it might be appropriate to read the context of the specification or intrinsic evidence to know which plain meaning of the multiple definitions is really appropriate for the patent.

But I have many technical dictionaries in my office, many normal dictionaries, and I submit that not a single one defines parameter as a value determined by resistance. So I think that Samsung's plain meaning argument is really quite misleading and sets a dangerous precedent, or every party will say their construction,

however specific or contrite, is the true meaning -- true plain meaning.

And then, the final point I'll make, your Honor, is that please make no mistake that Samsung's argument, stripped of all disguise, is simply importing limitations from embodiments into the claims. This is prohibited by numerous Federal Circuit cases. I think my favorite one is the Hill-Rom case where it says that even if there's a single embodiment, even if it's all embodiments, unless they're words of expressions and manifest exclusion or restriction, that's not something that we do. And if we compare that to what Samsung said in its reply brief and some of the argument today, they're talking about examples or embodiments from the specification about what it shows. Not what the plain claim meaning of the word "parameter" in isolation is.

And unless your Honor has any questions, that's all I have.

THE COURT: No problem. I think --

MR. SNYDER: Your Honor, may I make two points in response?

THE COURT: Yeah. Absolutely. I was about to invite you to do so. Go ahead.

MR. SNYDER: Well, thank you so much.

First, the term to be construed is not

15:01:50 "parameter." The term to be construed is, quote, to
15:01:55 measure a parameter of the first variable resistance
15:01:58 electrode. Mr. Wang's argument is merely about the term
15:02:03 "parameter" in the abstract. That is not the term to be
15:02:06 construed nor is it free of the context of the claim and
15:02:10 the specification.
15:02:11 This has some very important consequences. If I
15:02:15 can share my screen. If Mr. Wang will turn off his screen
15:02:21 sharing, I think I might be able to turn mine on here. I
15:02:32 believe the Court should be able to see now Neodron's
15:02:36 slide 54, and this is where Mr. Wang criticized us for
15:02:42 contending that we have the -- we are offering the
15:02:45 construction as the plain and ordinary meaning of
15:02:48 parameter.
15:02:49 Unfortunately, Mr. Wang did not read the rest of
15:02:51 that sentence, which appears on this slide. What it says
15:02:55 in full is, Samsung's construction is the plain and
15:02:58 ordinary meaning of parameter in the context of the claims
15:03:01 and intrinsic evidence. In the claims, the parameter is
15:03:05 measured from the first variable resistance electrode, and
15:03:08 then, it goes on.
15:03:10 In the context of this claim being -- this claim
15:03:13 term being construed and in the context of this claim
15:03:17 language, when read in light of the specification, the
15:03:19 intrinsic evidence, it is clear that parameter is limited

15:03:23 to a value determined by the resistance. That's the first
15:03:28 point.

15:03:28 The second point, your Honor, is that the Court
15:03:30 gave a challenge or an invitation, if you will, to the
15:03:33 parties, and the Court said if the parties believe the
15:03:36 definition of parameters should explicitly include other
15:03:40 items, please be prepared to raise that during the
15:03:43 hearing. Every example in the claim language, every
15:03:47 example in the specification is a value that is determined
15:03:50 by the resistance.

15:03:52 And notably, Mr. Wang in his extensive criticism
15:03:56 of our interpretation of the single word "parameter,"
15:04:00 cannot identify a single instance anywhere in the claim
15:04:04 language or in the specification where it's using the term
15:04:07 "parameter" in the context of this patent to be anything
15:04:10 other than a value determined by the resistance.

15:04:13 In this context, the phrase to be construed
15:04:17 should be plain and ordinary meaning wherein parameter is
15:04:20 limited to a value determined by the resistance. Thank
15:04:24 you.

15:04:27 THE COURT: I'll be back with you guys in just a
15:04:30 minute.

15:07:27 Thank you for that. The Court is going to
15:07:29 maintain its preliminary construction. The meaning of "to
15:07:32 measure a parameter of the first variable resistance

electrode" will be plain and ordinary meaning, "wherein parameter includes, but is not limited to, a value determined by the resistance."

I believe that's all the claim terms. If I'm incorrect, someone needs to yell.

And then, I believe, Mr. Guaragna, at the beginning, suggested that we -- he wanted to take up an issue with regard to trial dates. We have -- before we get into that, the Court has taken a look at its calendar and looked at the number of patents involved in this case, and all of that. And I'll hear from Mr. Guaragna and everyone else who wants to be involved. But I believe the Court is going to move the trial back to June 28th of 2021, which is a more standard period of time in the court with respect to having a year after the Markman is decided to give you all an opportunity to prepare for trial.

So, Mr. Guaragna, I'll hear from you, but unless you're very persuasive, the trial will probably go on June 28th of 2021.

MR. GUARAGNA: Thank you, your Honor.

Understood. And you've muted the question that I had, which was to make some preparations for the earlier trial date if we were sticking there. Obviously I haven't had a chance to check all our calendars, but we appreciate the Court recognizing that this case may need a little bit

more time to get to trial. And I think that -- that resolved the question that I had for the Court.

THE COURT: I think it's a six-patent case, right? Six? Josh? Six-patent case. I think doing it more quickly than a year, that wouldn't be fair. So I know you've got nothing but great lawyers on this and lots of them, and I'm sure you can get six patents in a year, but I think that's about the appropriate time.

Mr. Wang, or does anyone want to speak on behalf of the plaintiff, are you available on June 28th?

MR. MIRZAIE: Yes, your Honor. This is Reza Mirzaie on behalf of plaintiff.

June 28th works for us. And just one followup point is that we do intend to, you know, elect certain patents and claims and focus the case, and, you know, our side and the lawyers on the other side have effectively done that very cooperatively in other cases.

THE COURT: Very good.

If you have any problem -- yeah, typically what I anticipate happening now -- and you've got great lawyers on the sides, so I can see why you'll work things out. But just as a general philosophy of the Court, you now have the Markman constructions. And let me stop there on the record, as well.

If you want to really impress a court or a really

15:10:23 brilliant law clerk who works for the Court, the way to do
15:10:26 it is to have this many patents and only bring six or
15:10:31 seven claim terms for the Court to decide that's -- that
15:10:36 tells me immediately that you all are serious, you know
15:10:39 what you're doing. It allows us to really focus on a
15:10:43 small number of claim terms and do a really intense, deep
15:10:47 dive on it.
15:10:47 And so, to the extent there are inhouse counsel
15:10:51 or clients on the phone, this was -- this was really the
15:10:56 very best of what the Court gets in terms of lawyering,
15:11:00 the decisions that were made on which claim terms to take
15:11:03 up and the number.
15:11:05 So you have the claim constructions. At some
15:11:09 point in the near future, the plaintiffs will be expected
15:11:12 to provide their infringement contentions, defendants,
15:11:17 their invalidity contentions, and it's at that point, I
15:11:21 anticipate the plaintiff to reduce number of claims. If
15:11:25 you all can come up with a cooperative number, that's fine
15:11:28 with the Court. If you can't, what won't work for the
15:11:34 Court, given the time structure we have, is for you to
15:11:38 call a month after you couldn't cooperate on the getting
15:11:42 it reduced.
15:11:45 With this cadre of quality lawyers, if you all
15:11:49 can't get it resolved, then it's obviously something that
15:11:51 the Court needs to be involved with, I invite you to

contact me sooner, rather than later, if there's any issue, and I'll take the matter up. I have some general thoughts about how to resolve it, if you all can't resolve it for yourself, so I would do that very quickly.

But I appreciate your comment that you think you'll work things out and I hope you do. But if you can't, please -- you are not saving the Court any trouble by trying to work on it for a month. You save the Court trouble by trying to work on it for a day, and if it doesn't work out, letting me know and letting me resolve it.

Is there anything else I can take up for the plaintiff?

MR. MIRZAIE: No, your Honor. Thank you.

THE COURT: Anything else from any of the defendants? Mr. Cunningham? Mr. Snyder? Anyone who's onboard?

MR. CUNNINGHAM: No, your Honor. Thank you for your time.

MR. SNYDER: Nothing further. Thank you, your Honor.

THE COURT: Thank you all. That was a phenomenal hearing and I appreciate everyone's time today.

Lily, did you get everything?

COURT REPORTER: Yes, sir, I did.

15:12:42 THE COURT: Okay. I'll take that as a "Yes."
15:12:55 You all be safe out there. I thank you for
15:12:58 accommodating my schedule change from last week to this
15:13:01 week, but y'all did a great job. Have a great day. Take
15:13:03 care.

MR. CUNNINGHAM: Thank you, your Honor.

(End of proceedings.)

* * * * * *

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS)

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 7th day of July, 2020.

*/s/Lily I. Reznik*
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 W. 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
SOT Certification No. 4481
Expires: 1-31-21