**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| NEODRON, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.<br><br>Defendant. | Case No. 6:20-cv-00212-ADA<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF DR. ANDREW WOLFE IN SUPPORT OF APPLE INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

I, Dr. Andrew Wolfe, hereby declare as follows:

## I. INTRODUCTION

1. I am Dr. Andrew Wolfe, I am over 18 years of age, and I am competent to make this declaration. If called to testify as a witness in this matter, I could and would testify truthfully to each of the matters set forth below.

2. I have been retained to serve as an independent technical expert in this matter by Defendant Apple Inc.

3. I am being compensated for my work on this case at my standard consulting rate of $600 per hour. I am also being reimbursed for any out-of-pocket expenses I incur in relation to my work. None of my compensation depends on the outcome of this litigation or on the nature of any particular opinions I provide. My compensation is in no way related to the outcome of this case, and I do not have any other interests in this case or in any of the parties of which I am aware.

4. I have been asked by counsel for Apple to provide my analysis and opinions with respect to several technical questions and issues relating to how a person of ordinary skill in the

relevant art would understand certain words or phrases that appear in the claims of U.S. Patent Nos. 7,821,502 ("**'502 patent**") and 10,146,351 ("**'351 patent**").

5. I have reviewed the '502 and '351 patents and their respective file histories. In reaching my opinions, I relied on my many years of knowledge and experience in the fields of database systems, distributed systems, and network communication principles, protocols, and practices.

## II. EXPERIENCE AND QUALIFICATIONS

6. My professional qualifications, experience, publications and presentations, and a listing of previous cases in which I have provided expert testimony are set forth in my CV, attached as Exhibit A to this declaration.

7. I am the founder and sole employee of Wolfe Consulting. Through Wolfe Consulting, I provide technical and business analysis to businesses on processor technology, computer systems, consumer electronics, software, design tools, data security, cryptography and intellectual property issues. I have more than thirty years' experience developing products, researching, consulting, and teaching in those fields. In that time, I have worked as a computer architect, computer system designer, and as an executive in the PC and electronics business. I have also taught at some of the world's leading institutions in those fields, including Stanford University, Princeton University, Carnegie Mellon University, and Santa Clara University.

8. In 1985, I earned the B.S.E.E. degree in Electrical Engineering and Computer Science from The Johns Hopkins University. In 1987, I received the M.S. degree in Electrical and Computer Engineering from Carnegie Mellon University and in 1992, I received the Ph.D. degree in Computer Engineering from Carnegie Mellon University. My doctoral dissertation proposed a new approach for the architecture of a computer processor.

9. In 1983, I began designing touch sensors, microprocessor-based computer

systems, and I/O (in-put/output) cards for personal computers as a senior design engineer for Touch Technology, Inc. During the course of my design projects with Touch Technology, I designed I/O cards for PC-compatible computer systems, including the IBM PC-AT, to interface with interactive touch-based computer terminals that I designed for use in public information systems. I continued designing and developing related technology as a consultant to the Carroll Touch division of AMP, Inc., where in 1986 I designed one of the first custom touch-screen integrated circuits. I designed the touch/pen input system for the Linus WriteTop, which many believe to be the first commercial tablet computer. The Linus WriteTop included handwriting recognition.

10. From 1986 through 1987, I designed and built a high-performance computer system as a student at Carnegie Mellon University. From 1986 through early 1988, I also developed curriculum, and supervised the teaching laboratory, for processor design courses.

11. In the latter part of 1989, I worked as a senior design engineer for ESL-TRW Advanced Technology Division. While at ESL-TRW, I designed and built a bus interface and memory controller for a workstation-based computer system, and also worked on the design of a multiprocessor system.

12. At the end of 1989, I (along with some partners) reacquired the rights to the technology I had developed at Touch Technology and at AMP, and founded The Graphics Technology Company. Over the next seven years, as an officer and a consultant for The Graphics Technology Company, I managed the company's engineering development activities and personally developed dozens of touch screen sensors, controllers, and interactive touch-based computer systems.

13. I have consulted, formally and informally, for a number of fabless semiconductor

companies. In particular, I have served on the technical advisory boards for two processor design companies: BOPS, Inc., where I chaired the board, and Siroyan Ltd., where I served in a similar role for three networking chip companies—Intellon, Inc., Comsilica, Inc., and Entridia, Inc.—and one 3D game accelerator company, Ageia, Inc.

14. I have also served as a technology advisor to Motorola and to several venture capital funds in the U.S. and Europe. Currently, I am a director of Turtle Beach Corporation, providing guidance in its development of premium audio peripheral devices for a variety of commercial electronic products.

15. From 1991 through 1997, I served on the Faculty of Princeton University as an Assistant Professor of Electrical Engineering. At Princeton, I taught undergraduate and graduate-level courses in Computer Architecture, Advanced Computer Architecture, Display Technology, and Microprocessor Systems, and conducted sponsored research in the area of computer systems and related topics. From 1999 through 2002, I taught the Computer Architecture course to both undergraduate and graduate students at Stanford University multiple times as a Consulting Professor. At Princeton, I received several teaching awards, both from students and from the School of Engineering. I have also taught advanced microprocessor architecture to industry professionals in IEEE and ACM sponsored seminars. I am currently a lecturer at Santa Clara University teaching courses on Computer Organization and Architecture and Mechatronics.

16. From 1997 through 2002, I held a variety of executive positions at a publicly held fabless semi-conductor company originally called S3, Inc. and later called Sonicblue Inc. I held the positions of Chief Technology Officer, Vice President of Systems Integration Products, Senior Vice President of Business Development, and Director of Technology, among others.

During my time at SonicBlue, we launched more than 30 new consumer electronics products.

17. I served as a board member and technical advisor at KBGear Inc. from 1999-2001. KBGear Inc. designed and produced digital cameras and music players.

18. I have published more than fifty peer-reviewed papers in computer architecture and computer systems design. I have also chaired IEEE and ACM conferences in microarchitecture and integrated circuit design. I am a named inventor on at least 56 U.S. patents and 37 foreign patents.

19. I have been the invited keynote speaker at the ACM/IEEE International Symposium on Microarchitecture and at the International Conference on Multimedia. I have also been an invited speaker on various aspects of technology or the PC industry at numerous industry events including the Intel Developer's Forum, Microsoft Windows Hardware Engineering Conference, Microprocessor Forum, Embedded Systems Conference, Comdex, and Consumer Electronics Show as well as at the Harvard Business School and the University of Illinois Law School. I have been interviewed on subjects related to technology and the electronics industry by publications such as the Wall Street Journal, New York Times, LA Times, Time, Newsweek, Forbes, and Fortune as well as CNN, NPR, and the BBC. I have also spoken at dozens of universities including MIT, Stanford, University of Texas, Carnegie Mellon, UCLA, University of Michigan, Rice, and Duke.

## III. RELEVANT LEGAL STANDARDS

20. I am not an attorney. For the purposes of this declaration, Apple counsel has informed me about certain aspects of the law that are relevant to my opinions and asked to apply the law as stated herein. My understanding of the law is summarized below.

21. I understand that claim construction is a matter of law.

22. I understand that in the context of district court case like this one, a claim of a

patent must be construed according to its ordinary and customary meaning as understood by a person of ordinary skill in the art during the relevant time period (*e.g.*, at the time that the patent's application was filed).

23. I understand that the claims of a patent define the limits of the patentees' exclusive rights and that to determine the scope of the claimed invention, courts typically construe (or define) claim terms whose meaning the parties dispute. I understand that claim terms should generally be given their ordinary and customary meaning as understood by a person of ordinary skill in the art during the relevant time period and after reading the patent and its prosecution history.

24. I understand that claims must be construed in light of and consistent with the patent's intrinsic evidence, which includes the claims themselves, the written disclosure and figures in the specification, and the patent's prosecution history, including the prior art that was considered by the United States Patent and Trademark Office ("**PTO**").

25. I understand that the language of the claims helps guide the construction of claim terms, and that the context in which a term is used in the claims can be highly instructive.

26. I understand that the specification of the patent is the best guide to the meaning of a disputed claim term, that embodiments disclosed in the specification help teach and enable those of skill in the art to make and use the invention, and that such embodiments are helpful to understanding the meaning of claim terms. I understand that, in most cases, preferred embodiments and examples appearing in the specification should not be read into the claims.

27. I understand that a patentee may act as his or her own lexicographer to define his or her own terms in the specification (and give a claim term a different meaning than it would otherwise possess) or may disclaim or disavow claim scope. I understand that where a term does

not have a plain and ordinary meaning to a person of ordinary skill in the art, then the term is construed only as broadly as it is described in the patent. I understand that a patentee can provide an express definition of a term without a plain and ordinary meaning to a person of ordinary skill in the art, or the patentee can define the term by implication by using the term in a manner consistent with only a single meaning.

28. I understand that a limitation is subject to 35 U.S.C.§ 112 ¶ 6 (*i.e.* is a means-plus-function limitation) if satisfies the following three-prong analysis: (1) the claim limitation uses the term "means" or "step" or a term used as a substitute for "means" or "step" that is a generic placeholder (sometimes called a nonce term) for performing the claimed function; (2) the term "means," "step," or the generic placeholder is modified by functional language, typically, but not always linked by the transition word "for" (e.g., "means for") or another linking word or phrase, such as "configured to" or "so that"; and (3) the term "means," "step," or the generic placeholder is not modified by sufficient structure, material, or acts for performing the claimed function. I also understand that a term is a generic placeholder (or nonce term) if it is a generic term that a person of ordinary skill in the art would not recognize as the name of structure.

29. I also understand that if a limitation satisfies that three-pronged analysis, then the court must construe the functional language and corresponding structure. I understand that the corresponding structure must be disclosed in the specification itself and that such disclosure must clearly link or associate the disclosed structure to the functional language. I understand that for computer- or processor-implemented limitations, the specification must disclose an algorithm for performing the functional language.

30. I understand that the specification may also resolve any ambiguity where the ordinary and customary meaning of a claim term lacks sufficient clarity to permit the scope of

the claim to be ascertained from the claim words alone.

31. I understand that the prosecution history is another important source of evidence in the claim construction analysis, and that the prosecution history is the entire record of the proceedings before the PTO (including post-grant proceedings), and includes the communications between the patentee and the PTO regarding the patent application. I understand that the prosecution history can inform the meaning of the claim language by demonstrating how the patentee and the PTO understood the invention and whether the patentee limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be. I understand that a patentee may also define a term during the prosecution of the patent. I understand that the patentee is precluded from recapturing through claim construction specific meanings or claim scope clearly and unambiguously disclaimed or disavowed during prosecution.

32. I understand that extrinsic evidence may also be considered when construing claims. Extrinsic evidence is any evidence that is extrinsic to the patent itself and its prosecution history. Examples of extrinsic evidence are technical dictionaries, treatises, and expert testimony. I understand that extrinsic evidence is less significant than the intrinsic record in determining the meaning of claim language.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

33. In my opinion a person of ordinary skill in the art at the time of the applications of the ’502 and ’351 patents (“**POSITA**”) would have had a bachelor’s degree in electrical engineering, computer science, physics, or the equivalent, plus at least two years of experience in the field of touch sensors or a related field, where additional education could substitute for work experience and vice versa. As of July 2005, I was at least a person of ordinary skill in the art with respect to the ’502 patent; and, as of December 2010, I was at least a person of ordinary

skill in the art with respect to the '351 patent.

## V. OPINIONS ON THE DISPUTED TERMS OF U.S. PATENT NO. 7,821,502

### A. "sensing cells" (claims 1-2, 4-8, 11-14, 16)

| Apple's Construction | Neodron's Construction |
|---|---|
| "the area whose boundaries are fixed by the portions of a column sensing electrode and a row sensing electrode at the intersection of a row and column in the array that forms the sensing area" | Plain and ordinary meaning, which is "sensing cells" |

34. The term "sensing cells" did not have a plain and ordinary meaning to a POSITA when the application that issued as the '502 patent was filed and prosecuted, and a POSITA would not have attributed any particular meaning to the term. I looked in at least 17 technical and non-technical references and none of those references include a definition of "sensing cells." Those references are:

- The New IEEE Standard Dictionary of Electrical and Electronics Terms (1993);
- Hutchison Dictionary of Science (1997);
- McGraw Hill Dictionary of Computing and Communication (6th Ed., 2003);
- McGraw Hill Electronics Dictionary (6th ed. 1997);
- McGraw Hill Dictionary of Electrical and Computer Engineering (2003);
- The Usborne Illustrated Dictionary of Science (1993);
- IBM Dictionary of Computing (10th Ed., 1994);
- The Authoritative Dictionary of IEEE Standards Terms (7th Ed., 2000);
- Barron's Dictionary of Computer and Internet Terms, (8th Ed., 2003);
- Microsoft Computer Dictionary (5th Ed., 2002);
- Merriam-Webster's Collegiate Dictionary (11th Ed., 2003);

- Webster's New Universal Unabridged Dictionary (2003);
- Dictionary of Multimedia (1st Ed., 1995);
- American Heritage Science Dictionary, (2005);
- Oxford Dictionary of Computer Science, (7th Ed., 2016);
- Comprehensive Dictionary of Electrical Engineering (1999); and,
- Modern Dictionary of Electronics (7th Ed. 1999).

35. Because "sensing cells" has no plain and ordinary meaning, a POSITA would look to the patent itself to determine the meaning of this term. The '502 patent does not explicitly define a sensing cell, but does imply a definition.

36. A POSITA would understand that claim 1 recites "each sensing cell including a column sensing electrode and a row sensing electrode" and further recites that "the electrodes define an array of sensing cells arranged in columns and rows." '502 patent at claim 1. The specification discloses that a sensing cell may be have different shapes including a square, a rectangle or other shapes such as a trapezoid. '502 patent at 7:50-54. Each of those shapes is a polygon with four straight edges (*e.g.*, a quadrilateral).

37. A POSITA would understand from Figs. 3 and 8 and the respective descriptions of sensing cells 28 (Fig. 3) and sensing cells 84 and 86 (Fig. 8) that the sensing cells do not extend beyond the portions of the row and column sensing electrodes that fix the boundaries of the sensing cell:




’502 Fig. 3




’502 Fig. 8

’502 patent at Figs. 3 and 8; *see also* at 5:58-6:22, 7:47-58 (sensing cells 28); and, 10:57-11:14 (sensing cells 84 and 86). A POSITA would understand the explicit teaching that “[t]he important aspect is that in a cell, there exists a portion of a row electrode and a portion of a column electrode.” ’502 patent at 11:12-14. A POSITA would also understand that the width of a column sensing electrode determines the width of the sensing cells that include a portion of that column sensing electrode; and, likewise, that the height of a row sensing electrode will determine the height of the sensing cells that include a portion of that row sensing electrode. *Id*.

38. For example, in the context of Fig. 8, a POSITA would understand that a portion of a row sensing electrode fixes the upper and lower boundaries of every sensing cell as indicated by the dotted lines (including sensing cells 84 and 86 I discussed above); and, likewise, that a portion of a column sensing electrode fixes the left and right boundaries of those sensing cells. A POSITA would recognize that the ’502 patent does not disclose any sensing cell boundary that extends beyond an outermost edge of an electrode in that cell, including those in Figs. 3 and 8.

39. This is consistent with the specification, which makes it clear that a sensing cell can sense objects that are outside of the sensing cell or in proximity of the cell. For example, consider Figs. 5A and 5B, which illustrate an interpolation process based on sensing cells sensing an object outside of it:



’502 Fig. 5A



’502 Fig. 5B

The specification at column 9, lines 10-54, discusses an interpolation process by which the position of a finger that touches the touch sensor of Fig. 3 at a point in column x2 and row y3 can be determined to be at location (x,y) = (1.8, 2.8). ’502 patent at 9:47-48. As seen in Fig. 5A, although the finger touches the touch sensor in column x2, the finger is also sensed in columns x1, x3 and x4 as indicated by the capacitance values along the Cx axis in Fig. 5A. Similarly, although the finger touches the touchscreen in row Y3, the finger is also sensed in rows Y1, Y2, Y4 and Y5 as indicated by the capacitance values along the Cy axis in Fig. 5B.[1] This means that the sensing cell 28, which is in column x3 and row Y1, senses the finger that touches the display in column x2 and row Y3. However, the boundary of sensing cell 28 does not extend to the point in column x2 and row Y3 where the finger touches. For another example, the specification discloses that sensing cells can sense object in proximity of the cell (e.g., above it). ’502 patent at 8:21-29, 9:1-9, and 11:56-12:3.

[1] A POSITA would understand that Fig. 5B incorrectly labels the ROW axis with x1-x5 instead of Y1-Y6 based on the cited discussion of Figs. 5A and 5B and by the “$y_p$” indication along that axis.

### B. "sensing area" (claims 1-2, 4-8, 11-14, 16)

| Apple's Construction | Neodron's Construction |
|---|---|
| "an area whose boundaries are fixed by the outermost edges of the sensing cells of the position sensor" | "an area defined by the sensing cells" |

40. The term "sensing area" also did not have a plain and ordinary meaning to a POSITA when the application that issued as the '502 patent was filed and prosecuted, and a POSITA would not have attributed any particular meaning to the term. I looked in the same 17 technical and non-technical references discussed above in connection with the "sensing cell" limitation, and none of those references include a definition of "sensing area." Again, those references are:

- The New IEEE Standard Dictionary of Electrical and Electronics Terms (1993);
- Hutchison Dictionary of Science (1997);
- McGraw Hill Dictionary of Computing and Communication (6th Ed., 2003);
- McGraw Hill Electronics Dictionary (6th ed. 1997);
- McGraw Hill Dictionary of Electrical and Computer Engineering (2003);
- The Usborne Illustrated Dictionary of Science (1993);
- IBM Dictionary of Computing (10th Ed., 1994);
- The Authoritative Dictionary of IEEE Standards Terms (7th Ed., 2000);
- Barron's Dictionary of Computer and Internet Terms, (8th Ed., 2003);
- Microsoft Computer Dictionary (5th Ed., 2002);
- Merriam-Webster's Collegiate Dictionary (11th Ed., 2003);
- Webster's New Universal Unabridged Dictionary (2003);
- Dictionary of Multimedia (1st Ed., 1995);

- American Heritage Science Dictionary, (2005);
- Oxford Dictionary of Computer Science, (7th Ed., 2016);
- Comprehensive Dictionary of Electrical Engineering (1999); and,
- Modern Dictionary of Electronics (7th Ed. 1999).

41. A POSITA would understand that the specification of the ’502 patent is clear that the boundaries of the sensing cells determine or fix the boundaries of the sensing area. As I discussed above with respect to Figs. 5A and 5B, the specification illustrates a sensing cell 28 located at column x3 and row y1 with a boundary indicated by a dashed line in Fig. 3. The specification further discloses that in Fig. 3 the “column sensing electrodes in column x2 are connected to one another by a connection 51, also referred to as a spine” and that “[t]his connection runs the length of the sensing area.” ’502 patent at 6:29-33. The spine 51 is the red-shaded area in the annotated version of Fig. 3 below:




A POSITA would understand that the top of the spine 51 stops exactly at the upper boundary of the sensing cell 28, and that because the specification teaches that the spine 51 runs the length of

the sensing area, this means that the upper boundary of the sensing cell is located at the top edge of sensing area. A POSITA would understand the bottom boundary of the sensing cell at column x3 and row Y5 would similarly coincide with the bottom of spine 51. Thus, the specification teaches that the upper and lower boundaries of the sensing area are located at (i.e., are fixed by) the upper and lower boundaries of the sensing cells at the top and bottom of the sensing area.

42. A POSITA would also understand that the right and left edges of the sensing area are fixed by the right-most and left-most boundaries of the sensing cells on the right and left sides of the sensing area. For example, a POSITA would recognize that, in discussing the embodiment of Fig. 8, the specification refers to "***sensing cells*** in columns at the ***edge of the sensing area*** (i.e. columns x1 and x3, e.g., sensing cell 86 . . . ." '502 patent at 11:1-2 (emphasis added). The boundaries sensing cells such as sensing cell 86 are indicated by dotted lines as shown in the portion of Fig. 8 below:




A POSITA would understand that the specification discloses that right boundary of sensing cell 86 in column x3 is at the right edge of the sensing area. Likewise, the left edge of the sensing cell at in the upper left-hand corner (the sensing cell at column x1, row y1) is at left edge of the

sensing area. These disclosures are also in according with the recitation in claim 1 "sensing cells arranged in columns and rows to form a capacitive sensing area." '502 patent at claim 1. In contrast to these embodiments, there is no disclosure of any embodiment in the '502 patent where the sensing area extends beyond the boundaries of the sensing cells in that sensing area.

43. In light of these disclosures in the specification and in the absence of any disclosure in the specification of a sensing area that extends beyond the sensing cells in it, a POSITA would understand "define" to mean "to determine or fix the boundaries or extent of" just as defendants argued in the Dell Case. I note that Neodron's claim construction expert in the Dell Case, Mr. Richard Flasck, agrees with that definition. In that case, Mr. Flasck repeatedly used "define" in the same way, and repeatedly indicated that the sensing area does not extend beyond the outermost boundaries of the sensing cells that make up the sensing area. For example, in paragraph 54 of his declaration (Ex. 2), Mr. Flasck states, it is those 'sensing cells' that define the disputed 'sensing area' …" At paragraph 57 of Ex. 2, he states "the claims consistently refer to the ***'sensing cells' that exist at and defines [sic] the boundary or 'edge' of a sensing area.*** " (emphasis added). At paragraph 58 of Ex. 2, he states, "[i]n other words, the sensing cells ***define the 'edge' of the sensing area …"***) (emphasis added). A POSITA would understand that because the sensing cells exist at the edge of the sensing area, it follows that the sensing area does not extend beyond the boundaries of sensing cells.

## VI. OPINIONS ON THE DISPUTED TERMS OF U.S. PATENT NO. 10,146,351

### A. "a bias resistance element connected in parallel with the first variable resistance element" (claim 3) and "a bias resistance element connected in parallel with the second variable resistance element" (claim 6)

| Apple's Construction | Neodron's Construction |
|---|---|
| "a non-variable resistance element connected in parallel with the first variable resistance element that provides a current path to the input of the integrator if the first variable resistance element has a | Plain and ordinary meaning, which is "bias resistance element |

| | |
|---|---|
| very high value" (claim 3), and<br><br>"a non-variable resistance element connected in parallel with the second variable resistance element that provides a current path to the input of the integrator if the second variable resistance element has a very high value" (claim 6) | connected in parallel with the first variable resistance element." |

44. A POSITA would understand that Apple's construction of the "bias resistance element" limitation correctly reflects how the term "bias resistor" is used throughout the entire specification and that use is consistent with only a single meaning, namely Apple's proposed construction. In all disclosed embodiments, a "bias resistor" is connected between either a fixed voltage supply rail (Fig. 3) or a voltage driver (Figs. 4 and 5) and the limit resistor (if any) in parallel with the resistive force sensitive element, and the bias resistor "provides a DC current path if the resistance of the resistive force sensitive element 30 rises to a very high value." '351 patent at 5:11-18 (in the context of Fig. 3); see also 6:44-46 (in the context of Fig. 4) and 7:22-29 (in the context of Fig. 5). Further, the '351 patent discloses that such a bias resistor need not be used in an embodiment if the resistive force sensitive element's resistance "is sufficiently low that a DC current path through the resistive force sensitive element exists." '351 patent at 7:65-8:2. Thus, a POSITA would understand that this claim phrase requires an element that guarantees a current path to the input of the integrator, to account for the possibility that no current could pass through the variable resistance element. This is accurately reflected in Apple's construction, which requires the resistance element be "non-variable" and that it provide a current path to the input of the integrator.

### B. "a limiting resistance element connected in series with the first variable resistance element" (claim 4) and "a limiting resistance element connected in series with the second variable resistance element" (claim 7)

| Apple's Construction | Neodron's Construction |
|---|---|
| "a non-variable resistance element connected in series with the | Plain and ordinary |

| | |
|---|---|
| first variable resistance element that limits the maximum current flow through the first variable resistance element to the input of the integrator circuit" (claim 4), and<br><br>"a non-variable resistance element connected in series with the second variable resistance element that limits the maximum current flow through the second variable resistance element to the input of the integrator circuit" (claim 7) | meaning, which is "a limiting resistance element connected in series with the first variable resistance element." |

45. Like the "bias resistance element" limitation, a POSITA would understand Apple's construction of the "limiting resistance element" limitation correctly reflects how the patentee uses the term "limit resistor" throughout the entire specification and because the patentee's use is consistent with only a single meaning, namely Apple's proposed construction. In all of the disclosed embodiments, a "limit resistor" "is connected in series with the resistive force sensitive element 30, between the fixed voltage supply rail 27, and the current integrator input 21" and "limits the maximum current flow through the resistive force sensitive element 30 to the current integrator input 21." '351 patent at 4:65-5:6 and 5:11-13 (in the context of Fig. 3); see also 6:40-46 (in the context of Fig. 4) and 7:22-29 (in the context of Fig. 5). Further, a POSITA would recognize that the '351 patent also discloses that such a limit resistor need not be used in an embodiment "if the characteristics of the resistive force sensitive element 30 are such that the resistance of the resistive force sensitive element is sufficiently high that the maximum current flow through the resistive force sensitive element is acceptable to the current integrator 22" or "if the current integrators 22 include an integral limit resistor." '351 patent at 7:55-63. The word "limit" does not appear in any other relevant context. Thus, a POSITA would understand that this claim phrase requires an element that guarantees a maximum current flow to through the first variable resistance element and to the input of the integrator circuit. This is accurately reflected in Apple's construction, which requires the resistance element be "non-variable" and that it limit the maximum amount of current.

### C. "circuitry operable to determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel" (claims 1-10)

| Apple's Construction | Neodron's Construction |
|---|---|
| Plain and ordinary meaning, which is "electrical hardware, not software, to determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel"<br><br>Alternatively: "circuitry" is a nonce word subject to § 112 ¶ 6.<br><br>Function: determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel.<br><br>Structure: (a) simple threshold on the output of the integrator, (b) control unit 20 performing the algorithm at 5:20-33, (c) control unit 20 performing the algorithm at 6:48-55, or (d) control unit 20 performing the algorithm at 7:30-39 and equivalents thereof | Plain and ordinary meaning, which is "circuitry operable to determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel."<br><br>Alternatively, if this term is subject to § 112 ¶ 6.<br><br>Function: determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel.<br><br>Structure: (a) simple threshold at the output of the integrator; (b) control unit 20; (c) circuit 32; (d) circuit 33; or (e) circuit 34, and equivalents thereof |

#### 1. A POSITA Would Understand "Circuitry" to Mean "Electronic Hardware, Not Software"

46. The ordinary meaning of the term "circuitry" in the context of the '351 patent is electrical hardware, not software. A POSITA would recognize that the specification refers to "circuitry" consistent with this meaning where it states "electronic conditioning circuitry such as bias networks, amplifiers, analogue to digital converts, and the like." '351 patent at 4:42-44. Similarly, a POSITA would also recognize that the specification is referring to electrical hardware, not software, when it refers to each of Figures 3-5 as "a circuit diagram" and that each of those figures diagram electronic hardware, e.g., variable and fixed resistors, not software. '351 patent at Figs. 3-5, 7:61-63 ("Further, limit resistors 26 may not be used in the illustrated circuits if the current integrators 22 include an integral limit resistor."). A POSITA would also

recognize that the specification describes electrical hardware, not software, when it refers to discrete "current integrator circuits" within control unit 20 as "circuitry" that can be repurposed for use in force sensing. *See, e.g.*, '351 patent at Abstract, 4:32-40. The configuration of the "circuitry" allows it to be "referenced to the voltage supply rail 27," and perform "ratiometric" measurements to account for "unintended fluctuations" in the supply rail voltage. A POSITA would understand that the '351 patent is discussing electrical hardware, not software, when it describes "circuitry" in terms of its physical configurations (e.g., physically "referenced to the voltage supply rail 27") functions ("ratiometric measurements") and sources of noise ("unintended fluctuations" in supply rail voltage). '351 patent at 4:55-64. These types of issues are not relevant to software, which merely operates on information.

47. The specification separately recites "components and/or circuitry" making clear that "circuitry" does not refer to just any "component" of a device. '351 patent at 2:17-22. A POSITA would understand the specification was directed to electrical hardware, not software, because it never mentions software at all. While the specification states in passing that controller 20 can include a processor 23, ('351 patent at 3:67), the specification never describes or links any function to that processor. A POSITA would thus understand that the isolated reference to a processor serves only to highlight the lack of any mention of software in the specification and the fact that "circuitry" is used throughout the specification according to its ordinary meaning to refer only to electrical hardware.

48. A POSITA would also recognize that the file history also supports Apple's construction. For example, during the prosecution of related U.S. Patent Application No. 12/959,166, in response to an objection by the Examiner, the Application argued "[t]he term 'circuitry' would be clear to one of ordinary skill in the art." Ex. 6 (Amendment dated Feb. 19,

2013) at 8. A POSITA wound understand that argument confirms that "circuitry" means electrical hardware, not a nonce word that might include software.

49. Technical and non-technical dictionaries that would have been relevant to a POSITA support my opinion that the ordinary meaning of "circuitry" is electrical hardware, not software. *See, e.g.*, Ex. 7 (*Engineering Circuit Analysis* (7th Ed., 2007)) at pp. 9-23 (describing "Basic Components and Electric Circuits," e.g., at pp. 21-22 defining a "network" as an "interconnection of two or more simple circuit elements"; defining a "circuit" as a network with "at least one closed path"; defining active and passive networks; and defining a "circuit element"); Ex. 8 (*Engineering Circuit Analysis* (4th Ed., 1986)) at pp. 17-21 (disclosing substantially the same as in the 7th edition); Ex. 9 (*The IEEE Standard Dictionary of Electrical and Electronics Terms* (6th Ed. 1996)) at pp. 156-58 (not defining "circuitry" but defining "circuit" as "(**7**)(**A**) An arrangement of interconnected components that has at least one input and one output terminal, and whose purpose is to produce at the output terminals a signal that is a function of the signal at the input terminals. at the output terminals a signal that is a function of the signal at the input terminals. *Synonyms*: network; physical circuit. (**B**) An arrangement of interconnected electronic components that can perform specific functions upon application of proper voltages and signals."); Ex. 10 (*Dictionary of Computing* (6th Ed., 2010-11)) at p. 63 (no definition of "circuitry" but defining "circuit" as "a connection between the electronic components that perform a function"); Ex. 11 (*Introduction to Electric Circuits* (8th Ed., 2010)) at pp. 1-4 (*e.g.*, at p. 2: defining "electric circuit" as "an interconnection of electrical elements linked together in a closed path so that electric current may flow continuously"); Ex. 12 (*Linear Circuits* (1960)) at pp. 2-4 (describing the stimulus and response relationship of a circuit or network); and, Ex. 13 (*Circuits* (2010)) at pp. 1-3 (*e.g.* at p. 3, defining "Circuit" based on

Webster's English Dictionary); Ex. 14 (*New Oxford American Dictionary* (3rd Ed., 2010) at pp. 314-15 (defining "circuity," e.g., "a circuit or system of circuits performing a particular function in an electronic device"; and, "circuit," e.g., "**3** a complete and closed path around which a circulating electric current can flow. ■ a system of electrical conductors and components forming such a path") and Ex. 15 (*Merriam-Webster's Collegiate Dictionary* (11th Ed., 2009)) at p. 224 (defining "circuitry" as "**1 :** the detailed plan or arrangement of an electric circuit **2 :** the components of an electric circuit" and "circuit" as "**4 a :** the complete path of an electric current including usu. the source of electric energy **b :** an assemblage of electronic elements"). These definitions accurately reflect the plain and ordinary meaning of "circuitry" in the art, and a POSTIA would understand them to mean electrical hardware, not software.

**2. "Circuity" as a Nonce Word Subject to Section 112 ¶ 6**

50. A POSITA would not have understood "circuitry" to encompass "software" unless "circuitry" is merely a generic placeholder for any component that performs a recited function. In that case, a POSITA would understand "circuitry operable to" as insufficient structure to perform the recited function. I have been asked to identify what structure in the specification is disclosed and linked to the recited function "determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel."

51. A POSITA would recognize that the specification discloses that the claimed function can be performed using "a simple threshold on the output of the integrator," and that the specification clearly links a simple threshold to the claimed function by explaining that it could be used for applications where "the force applied may not need to be accurately calculated." '351 patent at 5:33-37. A POSITA would understand that because the integrator is integrating the current from the QTC resistor, which current is directly proportional to the applied force, a simple threshold of the amount of integrated current would provide a rough estimate of applied

force and "provide information to the host system." '351 patent at 5:33-37. This information could be used, for example, for a host to determine (albeit imprecisely) whether sufficient force has been applied to justify activating a function.

52. A POSITA would also recognize that the specification discloses that control unit 20 performing one of the algorithms at 5:20-33, 6:48-55, or 7:30-39 performs this function. In the specification, the integrator circuit inside the control unit 20 measures the parameter (current) flowing through the QTC material. *See, e.g.*, '351 patent at 4:33-5:21. Because the integrator circuit is internal to control unit 20 and there is no disclosed way to communicate the measured parameter to any external component, a POSITA would understand that something else inside control unit 20 must perform the disclosed algorithms. But a POSITA would also understand that, other than the voltage output, threshold circuit, integrator circuit, and processor 23, the rest of control unit 20 is merely a generic black box. Thus, a POSITA would not understand control unit 20 to be sufficient for performing the claimed function. Moreover, the specification never expressly discloses or links control unit 20 itself to performing the claimed function. The only reason a POSITA would consider control unit 20 to be included as part of the corresponding structure is on the basis of the algorithms themselves. To the extent the algorithms are not included as corresponding structure, a POSITA would not consider control unit 20 to be corresponding structure. Thus, a POSITA would understand the corresponding structure to be the combination of the control unit 20 and at least one of the three disclosed algorithms for determining force based on the measured parameter.

53. A POSITA would recognize the specification discloses and links a first algorithm for the embodiment shown in Figure 3, which includes a first step of calculating the resistance of the QTC material from the measured current, and then a second step of calculating the force

applied to the QTC material from that resistance. '351 patent at 5:20-33. The specification explains the equation at column 5, lines 20-22, that is used to calculate the resistance from the measured current. '351 patent at 5:20-33. And a POSITA would know how to calculate the applied force from the resistance of the QTC material, because a POSITA would know that the resistance of QTC material is inversely proportional to the applied force. A POSITA would recognize the specification discloses and links a second algorithm for the embodiment shown in Figure 4, which is the similar to the first algorithm, but uses a differential measurement. '351 patent at 6:48-55. Finally, a POSITA would recognize the specification discloses and links a third algorithm for the embodiment shown in Figure 5, which is similar to the second algorithm, but determines the force applied to three different QTC force sensors, one at a time. '351 patent at 7:30-39. The description of these algorithms would have been sufficient for a POSITA to implement them.

54. A POSITA would understand that "control unit 20" alone is not corresponding structure because it is not disclosed, linked, or sufficient to perform the claimed function without the corresponding algorithms as discussed above.

55. A POSITA would understand that circuits 32, 33 and 34 are not corresponding structure to the claimed function. Circuits 32, 33, and 34 are the circuits disclosed in Figures 3-5, respectively, that are "useable together with" and "communicate with" the control unit 20. '351 patent at 2:6-7 ("FIG. 3 is a circuit diagram of a first example of a force sensor useable together with the controller of a touch sensor."), 2:8-12 (same for Figures 4 and 5), 4:47-8 ("The circuit 32 is in communication with an input of a current integrator 22 of the control unit 20."), 5:58-59 (same for circuit 33), 6:57-59 (same for circuit 34). The specification does not disclose that any of circuits 32, 33, or 34 perform the claimed function or link them to that function. In

fact, a POSITA would understand that those circuits could not perform the claimed function. The specification discloses that circuits 32, 33 and 34 are driven by a voltage and the resulting current is measured by the integrator circuit. *See, e.g.*, '351 patent at 5:62-6:12, 8:55-57 (claim 1). A POSITA would understand that circuits 32, 33 and 34 have no access to the measured parameter and, thus, could not determine a force based on the measured parameter as claimed.

**D. "wherein the circuitry is operable to determine an amount of force applied to the sensing area using a differential measurement" (claim 9)**

| Apple's Construction | Neodron's Construction |
|---|---|
| Plain and ordinary meaning, which is "wherein the electrical hardware, not software, to determine an amount of force applied to the sensing area using a differential measurement"<br><br>Alternatively: "circuitry" is a nonce word and subject to § 112 ¶ 6.<br><br>Function: determine an amount of force applied to the sensing area using a differential measurement<br><br>Structure: (a) control unit 20 performing the algorithm at 6:48-55 or (b) control unit 20 performing the algorithm at 7:30-39 and equivalents thereof | Plain and ordinary meaning, which is "wherein the circuitry is operable to determine an amount of force applied to the sensing area using a differential measurement."<br><br>Alternatively, if this term is subject to § 112 ¶ 6.<br><br>Function: determine, based on the measured parameter, an amount of force applied to a sensing area of the touch sensing panel.<br><br>Structure: (a) control unit 20; (b) circuit 33; or (c) circuit 34, and equivalents thereof |

56. My opinions regarding the plain and ordinary meaning of "circuitry" in claim 1 apply equally to "the circuitry" in claim 9. A POSITA would recognize that "circuitry" in claim 1 provides the antecedent basis for "the circuitry" in claim 9. '351 patent at 8:60 (claim 1 reciting "circuitry operable to"), 9:19-20 (claim 9, reciting "the circuitry operable to"); Ex. 16 (Response dated May 15, 2018 at 6) (arguing that "circuitry" in pending claim 28 (issued claim 1) provides the antecedent basis for "the circuitry" in pending claim 36 (issued claim 9) in order to overcome a rejection under Section 112).

57. A POSITA would understand that the corresponding structure for "the circuitry" in claim 9 is limited to the control unit 20 performing the algorithm at either 6:48-55 or 7:30-39. These are the only corresponding structures that satisfy the additional limitation in claim 9 of "using a differential measurement." *See* '351 patent at 6:48-55 ("differential current measurement"), 7:32 (same).

58. A POSITA would understand that control unit 20 by itself, and circuits 33 and 34 are not corresponding structure to the claimed function for the reasons I discussed above with respect to claim 1.

Signed October 23, 2020:

Dr. Andrew Wolfe

# EXHIBIT A

# Andrew Wolfe Ph.D.

20 S. Santa Cruz Ave. Suite 101
Los Gatos, CA 95030
(408) 402-5872 (office) (408) 394-1096 (mobile)
Email: awolfe@awolfe.org

**Education:**

Ph.D. in Computer Engineering, Carnegie Mellon University, 1992
Visiting Graduate Student, Center for Reliable Computing, Stanford University, 1988-1989
M.S. in Electrical and Computer Engineering, Carnegie Mellon University, 1987
B.S.E.E. in Electrical Engineering and Computer Science, The Johns Hopkins University, 1985

**Recent Employment:**

Consultant, [October 2002-present]
**Wolfe Consulting**

Consultant on processor technology, computer systems, consumer electronics, software, design tools, and intellectual property issues. Testifying and consulting expert for IP and other technology-related litigation matters.

Sample clients include:

| | | |
|---|---|---|
| AMD | Nvidia | Samsung |
| IBM | Motorola | HTC |
| SMIC | AMKOR | Huawei |
| Dell | Honeywell | Western Digital |
| Nintendo | Kingston | Sonos |
| Moneygram | Arraycomm | Insilica |
| Synaptics | Activision | Sawstop |
| Mysticom | P.A.R.C. | Quester Ventures |

Lecturer, [September 2013-present]
**Santa Clara University**

Teaching graduate and undergraduate courses on embedded computing, mechatronics and computer architecture.

Chief Technical Officer, [1999-2002]; Sr. VP of Business Development, [2001-2002]; VP, Systems Integration, S3 Fellow , [1998 – 1999]; Director of Technology, S3 Fellow , [1997 - 1998]
**SONIC|blue, Inc**, Santa Clara, CA (formerly S3 Inc.)

**Strategic Business Development:**
Developed and implemented strategy to reposition S3 from PC graphics into the leading networked consumer electronics company.

- Acquired Diamond Multimedia and coordinated integration of communications, Rio digital music, and workstation graphics divisions into S3.
- Identified and negotiated acquisitions to grow digital media businesses including Empeg, ReplayTV, and Sensory Science.
- Identified and negotiated strategic investments including Comsilica, Intellon, KBGear Interactive, Entridia, DataPlay and others.
- Developed strategy for integrated graphics/core-logic products and established a joint venture with Via Technologies to design and market these products.
- Negotiated divestiture of graphics chip business to Via and the workstation graphics division to ATI.

**Product Planning and Development:**
- Drove roadmap development within SONICblue product divisions.
- Managed Business Development for all product lines.
- Led New Product Development and Corporate Vision processes.
- Acting co-General Manager of Rio digital music business in 2nd half of 2001. Responsible for all areas of product development, business development, and cost management.
- Managed development of the Savage/MX and Savage/IX mobile 3D graphics accelerators and Savage/NB system logic products.

**Public Relations, Public Policy and Investor Relations:**
- Present company products and strategy at industry events such as CES, Comdex, and Microprocessor Forum.
- Discuss new products and initiatives with the press.
- Promote issues of interest to SONICblue to industry groups and in Washington.
- Brief analysts, and investors on company progress. Participate in quarterly conference calls.

**IP Management and Licensing:**
- Negotiated and managed partnership agreements including a critical cross-licensing agreement with Intel.
- Renegotiated technology-licensing agreements with IBM for workstation graphics products.
- Evaluated outside technology opportunities, managed video research and development, and managed corporate IP strategy with legal staff including patent filings, cross licensing, and litigation.

Consulting Professor , [1999-2002]
**Stanford University**, Stanford, CA

Teaching computer architecture and microprocessor design.

Assistant Professor [1991 - 1997]
**Princeton University**, Princeton, NJ

Teaching and research in the Electrical Engineering department. Research in embedded computing systems, multimedia, video signal processors, compiler optimization, and high performance computer architecture. Principal investigator or project manager for ~$6M in funded research.

Visiting Assistant Professor , [1992]
**Carnegie Mellon University**, Pittsburgh, PA

Research and preparation of teaching materials on advanced microprocessor designs including new superscalar and superpipelined processor architectures.

Founder and Vice President and Consultant, [1989 - 1995]
**The Graphics Technology Company, Inc.**, Austin, TX

Founded company to develop touch-sensitive components and systems for the first generation of PDA devices and interactive public systems. Obtained financing from Gunze Corp., Osaka, Japan. Company is now part of 3M.

Senior Electrical Engineer, [1989]
**ESL - TRW, Advanced Technology Division**, Sunnyvale, CA

Designed the architecture for an Intel i860-based multiple-processor digital signal processing system for advanced military applications. Designed several FPGA interface chips for VME-bus systems.

Design Consultant, [1986 -1987]
**Carroll Touch Division, AMP Inc.**, Round Rock, TX

Developed several new technologies for touch-screen systems. Designed the first ASIC produced for AMP, a mixed-signal interface chip for controlling touch-screen sensors. Developed the system electronics, system firmware, and customer utility software for numerous products including those based on the new ASIC.

Senior Design Engineer, [1983 -1985]
**Touch Technology Inc.**, Annapolis, MD

**Advisory Boards:**

Director, Turtle Beach Corporation (NASDAQ:HEAR) (formerly Parametric Sound Corporation), KBGear Interactive, Inc., Comsilica, Inc., Rioport.com, various S3 subsidiaries.

Technical Advisory Boards, Ageia, Inc., Intellon, Inc., Comsilica, Inc., Entridia, Inc., Siroyan, Ltd., BOPS, Inc, Quester Venture Funds

Carnegie Mellon University Silicon Valley Advisory Board; Johns Hopkins University Tech Transfer Advisory Board

**Awards:**

Micro Test-of-Time Award (in recognition of one of the ten most influential papers of the first 25 years of the symposium), 2014
Business 2.0 "20 Young Executives You Need to Know", 2002
Walter C. Johnson Prize for Teaching Excellence, 1997.
Princeton University Engineering Council Excellence in Teaching Award, Spring 1996
AT&T/Lucent Foundation Research Award, 1996.
Walter C. Johnson Prize for Teaching Excellence, 1995
IEEE Certificate of Appreciation, 1995, 2001.
AT&T Foundation Research Award, 1993.
Semiconductor Research Corporation Fellow, 1986 - 1991.
Burroughs Corporation Fellowship in Engineering, 1985 - 1986.

**Professional Activities:**

Program Chair: Micro-24, 1991, Hot Chips 13, 2001.

General Chair: Micro-26, 1993, Micro-33, 2000.

Associate Editor: IEEE Computer Architecture Letters; ACM Transactions in Embedded Computing Systems

Speaker at CES, WinHec, Comdex, Intel Dev. Forum, Digital Media Summit, Microprocessor Forum, etc.

Keynote speaker at Micro-34, ICME 2002

IEEE B. Ramakrishna Rau Award committee – 2012-2016

IEEE Computer Society Awards Committee – 2015

CES Awards Judge – 2016

Entrepreneurship Mentor – Draper University

**Over 50 refereed publications.**

**Publications since January 2006:**

Wolfe, A., "Retrospective on Code Compression and a Fresh Approach to Embedded Systems", IEEE MICRO, July/Aug. 2016, Invited paper.

**Patents:**

U.S. Pat. 5,041,701 – *Edge Linearization Device for a Contact Input System*, Aug. 20, 1991.
U.S. Pat. 5,438,168 – *Touch Panel*, Aug. 1, 1995.
U.S. Pat. 5,736,688 – *Curvilinear Linearization Device for Touch Systems*, Apr. 7, 1998.
U.S. Pat. 6,037,930 – *Multimodal touch sensitive peripheral device*, March 14, 2000.
U.S. Pat. 6,408,421 – *High-speed asynchronous decoder circuit for variable-length coded data*, June 18, 2002.
U.S. Pat. 6,865,668 – *Variable-length, high-speed, asynchronous decoder circuit*, March 8, 2005
U.S. Pat. 7,079,133 – *Superscalar 3D Graphics Engine*, July 18, 2006
EP 1 661 131 B1 – *PORTABLE ENTERTAINMENT APPARATUS*, Jan. 21, 2009
U.S. Pat. 7,555,006 – *Method and system for adaptive transcoding and transrating in a video network*, June 30, 2009
U.S. Pat. 7,996,595 – *Interrupt Arbitration for Multiprocessors*, Aug. 9, 2011
EP 2 241 979 B1 – *Interrupt Arbitration for Multiprocessors*, Oct. 10, 2011
U.S. Pat. 8,131,970 – *Compiler Based Cache Allocation*, March 6, 2012
U.S. Pat. 8,180,963 – *Hierarchical read-combining local memories*, May 15, 2012
U.S. Pat. 8,193,941 – *Snoring Treatment*, June 5, 2012
U.S. Pat. 8,203,541 – *OLED display and sensor*, June 19, 2012
U.S. Pat. 8,243,045 – *Touch-sensitive display device and method*, August 14, 2012
U.S. Pat. 8,244,982 – *Allocating processor cores with cache memory associativity*, August 14, 2012
U.S. Pat. 8,260,996 – *Interrupt Optimization for Multiprocessors*, Sept. 4, 2012
101185761 (KR) – *Noise Cancellation for Phone Conversation*, Sept. 19, 2012
101200740 (KR) – *OLED display and sensor*, November 7, 2012
101200741 (KR) – T*ouch-sensitive display device and method*, November 7, 2012
U.S. Pat. 8,321,614 – *Dynamic scheduling interrupt controller for multiprocessors*, Nov. 27, 2012
U.S. Pat. 8,352,679 – *Selectively securing data and/or erasing secure data caches responsive to security compromising conditions*, Jan. 8, 2013
U.S. Pat. 8,355,541 – *Texture Sensing*, Jan. 15, 2013
U.S. Pat. 8,370,307 – *Cloud Data Backup Storage Manager*, Feb. 5, 2013
U.S. Pat. 8,398,451 – *Tactile Input Interaction*, March. 19, 2013
JP 5241032 B2 – *Routing Across Multicore Network Using Real World or Modeled Data*, April 13, 2013
ZL201010124820.3 – *Interrupt Optimization for Multiprocessors*, April 17, 2013
U.S. Pat. 8,428,438 – *Apparatus for Viewing Television with Pause Capability*, April 23, 2013
JP 5266197 B2 – *Data Centers Task Mapping*, May 10, 2013
U.S. Pat. 8,508,498 – *Direction and Force Sensing Input Device*, August 13, 2013
U.S. Pat. 8,547,457 – *Camera Flash Mitigation*, October 1, 2013
U.S. Pat. 8,549,339 – *Processor core communication in multi-core processor*, October 1, 2013
101319048 (KR) – *Camera Flash Mitigation*, October 10, 2013
U.S. Pat. 8,628,478 – *Microphone for remote health sensing*, January 14, 2014
101362017 (KR) – *Thread Shift: Allocating Threads to Cores*, Feb. 5, 2014
101361928 (KR) – *Cache Prefill on Thread Migration*, Feb. 5, 2014
101361945 (KR) – *Mapping Of Computer Threads onto Heterogeneous Resources*, Feb. 5, 2014
JP 5487307 B2 – *Mapping Of Computer Threads onto Heterogeneous Resources*, Feb. 28, 2014
JP 5484580 B2 – *Task Scheduling Based on Financial Impact*, Feb. 28, 2014
JP 5487306 B2 – *Cache Prefill on Thread Migration*, Feb. 28, 2014
101372623 (KR) – *Power Management for Processor*, March. 4, 2014
101373925 (KR) – *Allocating Processor Cores with Cache Memory Associativity*, March 6, 2014
U.S. Pat. 8,676,668 – *Method for the determination of a time, location, and quantity of goods to be made available based on mapped population activity*, March 18, 2014
U.S. Pat. 8,687,533 – *Energy Reservation in Power Limited Networks*, April 1, 2014
101388735 (KR) – *Routing Across Multicore Networks Using Real World or Modeled Data*, April 17, 2014
U.S. Pat. 8,725,697 – *Cloud Data Backup Storage*, May 13, 2014
U.S. Pat. 8,726,043 – *Securing Backing Storage Data Passed Through a Network*, May 13, 2014
ZL201010124826.0 – *Dynamic scheduling interrupt controller for multiprocessors*, May 14, 2014
JP 5547820 B2 – *Processor core communication in multi-core processor*, May 23, 2014
U.S. Pat. 8,738,949 – *Power Management for Processor*, May 27, 2014

U.S. Pat. 8,751,854 – *Processor Core Clock Rate Selection*, June 10, 2014
JP 5559891 B2 – *Thermal Management in Multi-Core Processor*, June 13, 2014
101414033 (KR) – *Dynamic Computation Allocation*, June 25, 2014
JP 5571184 B2 – *Dynamic Computation Allocation*, July 4, 2014
101426341 (KR) – *Processor core communication in multi-core processor*, May 23, 2014
U.S. Pat. 8,799,671 – *Techniques for Detecting Encrypted Data*, Aug 5, 2014
101433485 (KR) – *Task Scheduling Based on Financial Impact*, Aug. 18, 2014
U.S. Pat. 8,824,666 – *Noise Cancellation for Phone Conversation*, Sept. 2, 2014
U.S. Pat. 8,836,516 – *Snoring Treatment*, Sept. 16, 2014
U.S. Pat. 8,838,370 – *Traffic flow model to provide traffic flow information*, Sept. 16, 2014
U.S. Pat. 8,838,797 – *Dynamic Computation Allocation*, Sept. 16, 2014
U.S. Pat. 8,854,379 – *Routing Across Multicore Networks Using Real World or Modeled Data*, Oct. 7, 2014
JP 5615361 B2 – *Thread Shift: Allocating Threads to Cores*, Oct. 15, 2014
U.S. Pat. 8,866,621 – *Sudden infant death prevention clothing*, Oct. 21, 2014
U.S. Pat. 8,881,157 – *Allocating threads to cores based on threads falling behind threads*, Nov. 4, 2014
ZL201080024755.5 – *Camera Flash Mitigation*, Nov 5, 2014
U.S. Pat. 8,882,677 – *Microphone for remote health sensing*, Nov. 11, 2014
U.S. Pat. 8,924,743 – *Securing Data Cache through Encryption*, December 30, 2014
U.S. Pat. 8,994,857 – *Camera Flash Mitigation*, March 31, 2015
JP 5699140 B2 – *Camera Flash Mitigation*, April 8, 2015
ZL201080035189.8 – *Thread Shift: Allocating Threads to Cores*, June 10, 2015
ZL201180005030.6 – *Processor core communication in multi-core processor*, June 10, 2015
U.S. Pat. 9,143,814 – *Method and system for adaptive transcoding and transrating in a video network*, Sept 22, 2015
ZL201080035177.5 – *Mapping Of Computer Threads onto Heterogeneous Resources*, Oct. 14, 2015
U.S. Pat. 9,178,694 – *Securing Backing Storage Data Passed Through a Network*, November 3, 2015
U.S. Pat. 9,189,282 – *Thread-to-core mapping based on thread deadline, thread demand, and hardware characteristics data collected by a performance counter*, November 17, 2015
U.S. Pat. 9,189,448 – *Routing image data across on-chip networks*, November 17, 2015
U.S. Pat. 9,208,093 – *Allocation of memory space to individual processor cores*, December 8, 2015
U.S. Pat. 9,239,994 – *Data Centers Task Mapping*, January 19, 2016
ZL201080036611.1 – *Allocating Processor Cores with Cache Memory Associativity*, January 20, 2016
EP2228779 B1 – *Traffic flow model to provide traffic flow information*, Jan. 27, 2016
U.S. Pat. 9,262,628 – *Operating System Sandbox*, February 16, 2016
GB2485682 – *Mapping Of Computer Threads onto Heterogeneous Resources*, Sept. 28, 2016
U.S. Pat. 9,330,137 – *Cloud Data Backup Storage Manager*, May. 3, 2016
ZL201080035185.X – *Cache Prefill on Thread Migration*, Aug. 24, 2016
U.S. Pat. 9,519,305 – *Processor Core Clock Rate Selection*, December 13, 2016
U.S. Pat. 9,569,270 – *Mapping thread phases onto heterogeneous cores based on execution characteristics and cache line eviction count*, February 14, 2017
GB2485683 – *Thread Shift: Allocating Threads to Cores*, Oct. 18, 2017
U.S. Pat. 9,852,435 – *Telemetrics based location and tracking*, December 26, 2017.
U.S. Pat. 9,915,994 – *Power management for processor*, March 13, 2018
U.S. Pat. 9,927,254 – *Traffic flow model to provide traffic flow information*, March 27, 2018
EP2254048 B1 – *Thread Mapping in Multi-Core Processors*, August 29, 2018

**Testimony by deposition or at trial – April 15, 2016 - -present**

| Case | Venue | Case Number |
|---|---|---|
| INTELLECTUAL VENTURES II LLC v JP MORGAN CHASE & CO., et al., | Southern District of NY | 13 Civ. 3777 |
| Certain Table Saws Incorporating Active Injury Mitigation Technology and Components Thereof (Sawstop v Bosch) | ITC | 337-TA-965 |
| INTER PARTES REVIEW OF U.S. PATENT NO. RE43,931 (TCL v Ericsson) | PTO | IPR2015-01602<br>IPR2015-01637<br>IPR2015-01641<br>IPR2015-01646<br>IPR2015-01674<br>IPR2015-01676<br>IPR2015-01761<br>IPR2015-01806 |
| T-Mobile, USA, Inc. v. Huawei Device USA, Inc. and Huawei Technologies Co., Ltd. | W. D. Washington | 14-cv-1351 |
| AVM Technologies, LLC v. Intel Corporation and Related Matters | District of Delaware | 15-33-RGA |
| TCL v. Ericsson, et al. | C.D. California | 8:14-cv-341 |
| Sonos Inc. v D&M Holdings Inc. d/b/a the D&M Group; D&M Holdings U.S. Inc. and Denon Electronics (USA) LLC. | District of Delaware | 14-1330-RGA |
| Waymo v Uber et. al | N. D. CA | 3:17-cv-00939 |
| Certain Graphics Systems,Components Thereof and Consumer Products Containing the Same | ITC | 337-TA-1044 |
| Intellisoft, Ltd. v Acer | Superior Court of California for the County of Santa Clara | l-14-CV-272381 |
| INTER PARTES REVIEW OF U.S. PATENT NO. 7,987,294 (D&M Holdings v Sonos) | PTO | IPR2017-01045 |
| Joe Andrew Salazar v HTC Corporation | E.D. Texas | 2:16-cv-010986-JRG-RSP |
| Hitachi Maxell, Ltd. v. ZTE Corporation and ZTE (USA), Inc. | E.D. Texas | 5:16-cv-00179<br>5:16-cv-00178 |
| D&M Holdings Inc. d/b/a the D&M Group; D&M Holdings U.S. Inc. v. Sonos Inc. | District of Delaware | 16-00141-RGA |
| INTER PARTES REVIEW OF U.S. PATENT NO. 7,663,506 (Mediatek v AMD) | PTAB | IPR2017-00101<br>IPR2017-00102 |
| Papst Licensing GmbH & Co. KG v. Samsung Electronics Co.,Ltd. and Samsung Electronics America, Inc. | E.D. Texas | 6:15-CV-1102 |
| HTC Corporation v. Telefonaktiebolaget LM Ericsson | E.D. Texas | 6: 18-cv-00243-JRG |
| Seven Networks, LLC v ZTE (USA) Inc and ZTE Corporation | N. D. Texas - Dallas | 3:17-CV-1495 |
| AGIS Software Development, LLC v. HTC Corporation | E. D. Texas | 2:17-cv-514 |
| Barbaro Technologies, LLC v. Niantic, Inc | N.D. CA | 3:18-cv-02955-RS |
| Immersion Corp. v. Samsung Electronics America, Inc. et al | E.D. Texas | 2:17-cv-00572 |
| INTER PARTES REVIEW OF U.S. PATENT NO. 7,171,526 (Northstar Innovations – Micron) | PTAB | IPR2018-01004<br>IPR2018-01005 |

| | | |
|---|---|---|
| CISCO SYSTEMS, INC.,<br>vs.<br>UNILOC USA, INC., UNILOC 2017 LLC<br>and UNILOC LICENSING USA LLC | N.D. CA | 3:18-cv-04991-SI |
| INTER PARTES REVIEW OF U.S. PATENT NO. 8,020,014 (Intel/VLSI) | PTAB | IPR2018-01661<br>IPR2018-01312 |
| INTER PARTES REVIEW OF U.S. PATENT NO Patent 9,294,799 (Comcast/Rovi) | PTAB | IPR2019-00299 |
| Inter Partes Review of U.S. Patent No 7720929 (Unified Patents v Datascape) | PTAB | IPR2019-01115 |
| Solas OLED Ltd,, v. Samsung Display Co,, Ltd,, Samsung Electronics Co, Ltd,, and Samsung Electronics America, Inc,, | PTAB | IPR2019-01668 |
| INTER PARTES REVIEW OF U.S. PATENT NO Patent 8,973,069 (Comcast/Rovi) | PTAB | IPR2019-01434 |
| U.S. Patent No. 8,448,215 IPR (Comcast v Rovi) | PTAB | IPR2019-01353 |
| U.S. PATENT NO. 8,847,898 IPR filing (Samsung v Neodron) | PTAB | IPR2020-00234 |
| U.S. PATENT NO. 8,610,009 IPR filing (Samsung v Neodron) | PTAB | IPR2020-00225 |
| U.S. PATENT NO. 10,365,747 IPR filing (Samsung v Neodron) | PTAB | IPR2020-00308 |