# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| NEODRON LTD.,<br><br>Plaintiff,<br><br>v.<br><br>DELL TECHNOLOGIES INC.,<br><br>Defendant. | Case No. 1:19-cv-00819-ADA |
| NEODRON LTD.,<br><br>Plaintiff,<br><br>v.<br><br>HP, INC.,<br><br>Defendant. | Case No. 1:19-cv-00873-ADA |
| NEODRON LTD.,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Case No. 1:19-cv-00874-ADA |
| NEODRON LTD.,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC.,<br><br>Defendant. | Case No. 1:19-cv-00898-ADA |

NEODRON LTD.,

Plaintiff,

v.

SAMSUNG ELECTRONICS CO., LTD. and
SAMSUNG ELECTRONICS AMERICA, INC.,

Defendant.

Case No. 1:19-cv-00903-ADA

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF ON THE DISPUTED TERMS OF THE TOUCH SENSOR PATENTS**

**(U.S. PATENT NOS. 8,946,574; 9,086,770; 9,823,784; 10,088,960; and 7,821,502)**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....1

II. THE DISPUTED TERM OF U.S. PATENT NO. 8,946,574 ("MESH") ....1

III. THE DISPUTED TERM OF U.S. PATENT NO. 9,086,770 ("GENERALLY STRAIGHT LINE") ....5

IV. THE DISPUTED TERMS OF U.S. PATENT NO. 9,823,784 ....5

A. "wherein the plurality of drive electrodes are substantially area filling within the sensing region relative to the plurality of sense electrodes" (claims 1-3) ....5

B. "together, the plurality of sense electrodes and the plurality of isolated conductive elements are substantially area filling within the sensing region relative to the plurality of sense electrodes" (claims 1-3) ....8

V. THE DISPUTED TERM OF U.S. PATENT NO. 10,088,960 ("INTERCONNECTING MESH SEGMENTS") ....8

VI. THE DISPUTED TERMS OF U.S. PATENT NO. 7,821,502 ....11

A. "a substrate having a surface with an arrangement of electrodes mounted thereon" ('502 patent, claims 1-2, 5-8, 11-14, 16). ....12

B. "sensing area" ('502 patent, claims 1-2, 5-8, 11-14, 16). ....15

C. "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area" ('502 patent, claims 1-2, 5-8, 11-14, 16) ....24

VII. CONCLUSION ....30

Case 6:19-cv-00219-ADA Document 16 Filed 01/23/20 Page 4 of 39

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AquaTex Indus. v. Techniche Solutions*,
419 F.3d 1374 (Fed. Cir. 2005)....................3

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010)....................10

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....................7

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016)....................2

*Helmsderfer v. Bobrick Washroom Equipment, Inc.*,
527 F.3d 1379 (Fed. Cir. 2008)....................15

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384,
134 L. Ed. 2d 577 (1996)....................15

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998)....................2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008)....................12

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................29

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................... 3, 13, 14, 15

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004)....................25

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016)....................13

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
308 F.3d 1193 (Fed. Cir. 2002)....................14

Defendants respectfully submit their responsive claim construction brief for the disputed terms of U.S. Patent Nos. 8,946,574; 9,086,770; 9,823,784; 10,088,960; and 7,821,502 (collectively the "touch sensor patents").

## I. INTRODUCTION

Neodron's opening claim construction brief confirms that Neodron largely wants to sit out the claim construction process. For most terms, Neodron continues to argue that no construction is necessary and simply parrots the claim language while refusing to agree with Defendants' plain-meaning constructions, or Neodron plucks out dictionary definitions that are at odds with the intrinsic record. As Defendants predicted, Neodron's goal is flexibility and malleability, as Neodron is faced with stretching its patent claims to try to cover the accused products while simultaneously casting the claims narrowly to avoid spot-on prior art. But at the end of the day, Neodron cannot legitimately dispute that Defendants' constructions, with few exceptions, reflect the plain and ordinary meaning in light of the patent specification and file history. For those exceptions, Defendants have established there is no accepted plain and ordinary meaning, or the applicants acted as their own lexicographer in defining a term. In every instance, Defendants' constructions are the correct ones, while Neodron's reflect its desire to avoid certainty in the claim construction process.

## II. THE DISPUTED TERM OF U.S. PATENT NO. 8,946,574 ("MESH")

The parties agree that the scope of the term "mesh" within the context of the '574 patent claims would not include electrodes made of indium tin oxide ("ITO"). *See* Flasck Decl. ¶ 67 ("[T]he intrinsic record does not support the notion that a metal mesh could be made of the widely used [ITO]. It is also my opinion that a POSITA would also not find that ITO electrodes would not be considered metal mesh electrodes."); *see also* Neodron Br. at 27 ("[A] POSITA would not consider the widely used [ITO] as a metal 'mesh.'"). Indeed, Neodron recognizes the



WEST\290391305.7

'574 patent expressly discloses that mesh electrodes are an alternative to ITO electrodes: "And by using an alternative to the widely used [ITO] electrode designs, namely 'mesh' electrodes, the inventors allowed 'any display below the touch position-sensing panel [] to be visible with little perceptible darkening or other loss of display quality.'" Neodron Br. at 3 (quoting '574 patent, 4:16-19). However, Neodron's construction that "mesh" merely be given its plain and ordinary meaning does not inform the factfinder that materials like ITO are excluded from the claim's scope. Neodron's arguments against Defendants' construction also ignore the specification's repeated disclosures that electrodes made from metal may be formed of "wire" or "wiring."

This underscores the need for construction here. "Since a full and complete understanding of the scope of the claims is requisite to determining whether the patent is infringed, technical terms or words of art or special usages in the claims, if in dispute, are construed or clarified by the court before the construed claims are applied to the accused device." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1998). The term "mesh" is a technical term in the context of electrodes for touch sensors that needs to be construed for the benefit of the jury. In situations like this, where simply instructing the jury to apply the term's plain and ordinary meaning does not "resolve the parties' dispute," the Court is "obligated to provide the jury with a clear understanding of the disputed claim scope." *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016). The Court should therefore construe "mesh" to mean "set of thin wires that surround open spaces in a net or network."

Defendants' construction of "mesh" is consistent with the intrinsic record. "Where, as here, the disputed claim term is technical or a term of art, 'the best source for understanding it is the specification from which it arose, informed, as needed, by the prosecution history.'"

Case 2:19-cv-00218-ADA Document 41-6 Filed 05/01/20 Page 8 of 40

*AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)). The '574 patent discloses the "conductive material" forming the electrodes—the same wording used in the claims—may be made from a metal "used in conductive wiring." *Id.* at 3:28-31; *see also id*. at 11:25-28 (describing the electrodes as being formed of "wiring"); 14:32-35 (disclosing "other metals suitable for use as wire pattern material" can be used to form the electrodes).

Likewise, the specification repeatedly describes the mesh as being formed of "thin" or "narrow" material. *See, e.g.*, *id.* at 1:52-56 (describing the "conductive mesh" as being made of "thin conductors"); 3:31-56 (repeatedly describing the electrodes as being formed of "narrow metal lines" and "narrow conductive lines"), 12:64-67 ("Any of the examples shown in FIGS. 4 to 14 may be used for either one or both the electrode layers that may be implemented using narrow metal conductive lines.").

Further, the '574 patent expressly distinguishes between electrodes made of clear conductive materials like ITO and opaque metals. *See, e.g.*, '574 patent at 1:51-55 ("[w]hile clear conductors such as ITO may be used for electrodes, opaque metal electrodes also may be used," which "may be made of a conductive mesh of thin conductors"). In view of the specification, the claim is clear that clear, conductive materials cannot be used to form a "mesh." Neodron and Mr. Flasck agree that ITO, one type of clear, transparent material, would not be used to make a metal mesh electrode. *See* Neodron Br. 27; Flasck Declaration, ¶ 67. Yet, Mr. Flasck cites portions of the specification using the terms "conductive material" and "thin conductors" to argue that the use of the words "thin wires" in Defendants' construction "suggests that only certain types of materials may be used in a 'mesh.'" Flasck Declaration, ¶ 67; *see also* Neodron Br. 27. This contradiction further evidences the necessity for an explicit construction that will

help the jury understand that materials like ITO are excluded from the claim's scope. Based on its arguments and expert's declaration, Neodron's proposal encompasses all clear conductive materials except ITO. The words "thin wires" are necessary to convey to the factfinder that transparent conductors, such as ITO and others, cannot be used to form a "mesh," consistent with the specification.

Neodron's own cited dictionaries belie its criticism that the terms "net" or "network" "appear[] inconsistent with the plain meaning." Neodron Br. 27. For instance, the Merriam-Webster dictionary Neodron cites uses both "net" and "network" to define a "mesh" in the first entry: "one of the similar spaces in a network" and "the fabric of a net." "Mesh," Merriam-Webster. And the first entry of "mesh" in the Lexico dictionary, "[m]aterial made of a network of wire or thread," closely tracks Defendants' construction. "Mesh," Lexico. These dictionaries and others demonstrate that Defendants' construction is consistent with the plain meaning of "mesh." American Heritage Dictionary at 1101 (defining "mesh" as "[t]he cords, threads, or wires surrounding" "the open spaces in a net or network"); New Oxford Am. Dictionary at 1063 (defining "mesh" as "material made of a network of wire or thread"). Indeed, a "net or network" encompasses the "web-like pattern or interlaced and intricate structures" that Neodron contends is the plain meaning of "mesh." Neodron Br. at 27.

Neodron also attempts to argue that Samsung's decision not to construe "mesh" in U.S. Patent Nos. 9,965,106 and 10,365,747—two patents unrelated to the '574 patent—is evidence that "mesh" should not be construed here. Neodron Br. at 26. This fact is irrelevant. Samsung was not accused of infringing the '574 patent, and the Defendants accused of infringing the '574 patent were not accused of infringing the '106 patent or the '747 patent.

The Court should therefore construe "mesh" as "set of thin wires that surround open spaces in a net or network."

## III. THE DISPUTED TERM OF U.S. PATENT NO. 9,086,770 ("GENERALLY STRAIGHT LINE")

Defendants withdraw their indefiniteness challenge to the term "generally straight line."

## IV. THE DISPUTED TERMS OF U.S. PATENT NO. 9,823,784

### A. "wherein the plurality of drive electrodes are substantially area filling within the sensing region relative to the plurality of sense electrodes" (claims 1-3)

| Defendants' Construction | Neodron's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning; no construction necessary |

Neodron's opening brief confirms why claims 1-3 are invalid. Neodron concedes that the term "relative to" is used "as a comparison." Neodron Op. Br. at 36. Neodron concedes that this comparison must specifically be between the "drive lines" and the "sense lines." *Id.* at 37 (quoting Ex. 26, 5/16/2012 Amendment at 10). But Neodron is unable to provide any framework for identifying what that comparison requires—*i.e.*, when the "drive electrodes" become substantially area filling relative to the sense electrodes as they change in area or what that means beyond being "substantially area filling" on their own.

Neodron cites the patentee's discussion of Hotelling in the prosecution history, but that discussion does nothing to clarify the issue. The patentee's discussion states only the unremarkable proposition that if the drive and sense electrodes have "the same basic arrangement," then the "substantially area-filling . . . relative to" term cannot be satisfied. *Id.* This leaves unanswered the critical question set out in Defendants' opening brief: what does it mean to be "substantially area-filling" ***relative to*** something else? If the drive electrodes cover 40% of the first side compared to sense electrodes that cover only 10% of the second side, those

are different arrangements. But do the drive electrodes "substantially fill the area within the sensing region relative to" the sense electrodes? If not, is the limitation satisfied if the electrodes are 70% compared to 40%? The patent provides no answer.

Neodron's argument that "substantially area filling" in isolation is not indefinite is inapposite. The issue is not what it means to be "substantially area filling." The issue is what it means to be substantially area filling "***relative to***" something else. None of Neodron's brief addresses that issue. Instead, Neodron attempts to divorce the two halves of the term, arguing that "substantially" does not render the term indefinite, and "relative to" is used as a comparison. *See id.* at 36-37.

For the same reason, Neodron's citations to the specification do not clarify what the term means as a whole. *See id.* at 36 (citing '784 patent at 8:5-7 ("The area filling design of the ***driven electrodes*** leads to an almost invisible electrode pattern.") (emphasis added), 12:5-7 ("[T]he ***bars in Layer 1*** [driven electrodes] can be seen to be substantially area filling; almost all of the surface area is flooded with electrode.") (emphasis added)). These discussions of the ***drive electrodes*** provide no meaningful explanation of what it means for the drive electrodes to be substantially area filling "relative to" the ***sense electrodes***.

Neodron's arguments about visibility of the "drive electrodes" also fail to explain what it means for the drive electrodes to be "substantially area filling . . . relative to" the sense electrodes. In Neodron's view, the "purpose" of having the drive electrodes "substantially fill the sensing area is to prevent the electrodes from being visible." *Id.* at 36. But Neodron's citations about visibility concern ***only*** the drive electrodes. '784 patent at 4:34-36; 8:4-7; 12:5-

12; *see also* Defendants' Op. Br. at 12-13.[1] Invisibility is achieved—without the sense electrodes—by "flood[ing]" Layer 1 with drive electrodes. *See* '784 patent at 12:6-7. These passages lend no insight into how the area required for the drive electrodes in Layer 1 substantially fills the area "relative to" the areas covered by the sense electrodes in Layer 2. In the end, these citations are missing the one thing Neodron agrees is required by the claims: a "comparison" with the sense electrodes. Even Neodron's own expert, Mr. Flasck, admits such a comparison is required. Flasck Decl., ¶ 81 ("[A] POSITA would have no difficulty understanding that the term 'relative to' is used in this context in its ordinary sense, *i.e.* as a relative comparison of two things.").

Finally, Neodron's case law addresses the wrong issue. Neodron's cited authority relates to whether a "term of degree" or term such as "substantially" renders a claim indefinite. Defendants have never argued that this term is indefinite because it utilizes a term of degree. But neither can this term ***escape*** indefiniteness merely because it includes the term "substantially." All claim terms—including terms of degree—must reasonably have "objective boundaries," which are missing from the claims here. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree."). As discussed above, the central flaw here comes from the added requirement that substantiality be measured ***relative to*** the sense electrodes, without any guidance as to what that means.

---

[1] Neodron calls out this "area-filling design" as a "particular feature of the patented invention" that it contends "teaches a novel design for a capacitive touch sensor." Neodron Op. Br. at 7-8. But notably, the Examiner rejected the Applicant's attempt to overcome the prior art using this term. *See* Defendants' Op. Br. Ex. D, 4/11/2013 Final Rejection at 2-3.

The record must provide adequate boundaries for a person of ordinary skill to understand the scope of the term "substantially area filling . . . relative to" with reasonable certainty. The intrinsic record of the '784 patent fails to do so. Consequently, claims 1-3 are indefinite.

**B. "together, the plurality of sense electrodes and the plurality of isolated conductive elements are substantially area filling within the sensing region relative to the plurality of sense electrodes" (claims 1-3)**

| Defendants' Construction | Neodron's Construction |
|---|---|
| Indefinite | Plain and ordinary meaning; no construction necessary |

According to Neodron, this limitation is "virtually identical" to the first term and "this claim term was added in the same amendment and for the same purpose." Neodron Op. Br. at 38. As explained in detail in Defendants' brief, this term suffers from flaws specifically brought about by the nature of the comparison it is making (A + B > A), which contradict the Examiner's understanding of the term. *See* Defendants' Op. Br. at 15-17. Because Neodron makes no further attempt to resolve these infirmities, the claims are indefinite for the reasons Defendants have already articulated.

## V. THE DISPUTED TERM OF U.S. PATENT NO. 10,088,960 ("INTERCONNECTING MESH SEGMENTS")

The parties agree about what "interconnecting mesh segments" are not—they do not include "a continuous layer of conductive electrode material." The parties, however, disagree about what "interconnecting mesh segments" are. The specification discloses that interconnecting mesh segments are "interconnected fine lines of highly conducting wire or traces," yet Neodron disagrees with this statement as reflected in Defendants' construction. Instead, Neodron's proposal uses vague language like "conductive electrode material" to create ambiguity as to whether transparent conductors like ITO could form the mesh, despite agreeing with regard to the '574 patent that ITO cannot form a mesh. *See* Neodron Br. 27. Neodron's

circular definition of "interconnecting mesh segments" by reference to a "mesh pattern" and improper importation of the word "pattern" into the claims would not help the jury in any way.

Defendants' construction comes directly from the intrinsic evidence. The claims recite sense and drive electrodes that are made of "a first conductive mesh" and "a second conductive mesh," respectively. Each of the claimed conductive meshes "comprises a plurality of interconnecting mesh segments occupying at least a portion of an area of the" respective electrodes. Thus, the claims require the "plurality of interconnecting mesh segments" to make up the "conductive mesh" of each drive and sense electrode. The specification does not use the term "interconnecting mesh segments" anywhere outside of the claims, but it unequivocally states that in the "'mesh or filligrane' approach," each electrode is formed "out of a plurality of <u>interconnected fine lines of highly conducting wire or traces</u>." '960 patent at 26:37-39 (emphasis added); *see also id.* at 6:24-29 (distinguishing continuous electrodes of "electrically conduction material, such as ITO or a metal" from "a mesh or filigree pattern of interconnected lines of highly conductive material<u> which collectively define each electrode</u>." (emphasis added)). As Dr. Silzars explains, semiconductors like ITO are not "highly conductive." Ex. 1, Silzars Decl. ¶ 57.

Contrary to Neodron's contention, Defendants' construction does not read "mesh" out of the claims. *See* Neodron Br. at 28. The "interconnecting mesh segments" are what form the claimed conductive meshes. Substituting Defendants' construction into the claims, they recite "the [first/second] conductive mesh comprises a plurality of [interconnected fine lines of highly conducting wire or traces, instead of a continuous layer of conductive electrode material,] occupying at least a portion of an area of the [sense/drive] electrodes." Indeed, Neodron's proposal would create redundancy within the claim, essentially stating that the <u>mesh</u> comprises a plurality of lines forming a <u>mesh</u> pattern. Neodron's proposal thus improperly renders the

conductive mesh terms superfluous. *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) ("Claims must be interpreted with an eye toward giving effect to all terms in the claim." (internal quotations omitted)). Moreover, Neodron does not explain to how Defendants' construction reads out "mesh" when the construction includes a verbatim quote from the specification's description of a mesh electrode.

Neodron's and Mr. Flasck's criticism that Defendants' construction could encompass the prior art design in Figure 21 shows their lack of understanding of this claim term. *See* Neodron Br. at 29; Flasck Decl., ¶ 72 ("[I]t would appear that Defendants' proposal for this claim term may result in prior art designs, that a POSITA would not recognize as mesh, to be call[ed] within the scope of the claim limitation."). Defendants agree that Figure 21 does not disclose a mesh. But there is no way "a juror might be confused" about whether Figure 21 meets this limitation under Defendants' construction. Neodron Br. at 29. In describing Figure 21, the '960 patent discloses:

> It will be understood the X and Y electrodes do not literally intersect, but are offset in the vertical or Z direction, orthogonal to the plane of the drawing, being separated by a dielectric layer—typically a substrate panel which bears the X electrodes on one side and the Y electrodes on the other side

'960 patent at 2:59-64 (emphasis added). The '960 patent could not be clearer that the electrodes in Figure 21 are not "interconnected," as required by Defendants' construction. Moreover, nothing in either the '960 patent or U.S. Patent No. 6,452,514 (from which Figure 21 is derived) indicates that the X and Y electrodes in Figure 21 are made of fine lines of highly conducting wire or traces.

Neodron's lack of understanding of this claim term is further evident in its discussion of the background of the '960 patent. Neodron asserts that 20 figures and "nearly 30 columns" of the '960 patent teach "forming the electrodes out of a mesh of conductive wires that visually

resemble a screen-like structure." Neodron Br. at 11. To the contrary, the '960 patent only discloses one figure, namely Figure 17, dedicated to the "mesh" embodiment, which is discussed in two paragraphs. *See, e.g.*, Ex. M (6/5/2018 Notice of Allowance at 2) ("The scope of the claims is specifically limited and narrowly tailored to the specific electrode arrangement as shown in Fig. 17."). Aside from two more paragraphs in the Summary of the Invention, the rest of the disclosure has nothing to do with forming mesh electrodes. *See, e.g.*, '960 patent at 18:10-12 ("The electrodes comprising the electrode pattern [of Figure 12] are of a transparent conductive material, in this case Indium Tin Oxide (ITO)."); 26:8-11 (Figure 12 depicts drive and sense electrodes made of a "continuous layer of electrode material").

The construction of "interconnecting mesh segments" need not reference a "pattern," as Neodron proposes. This term is not found anywhere in the claim. Neodron's inclusion of the word "pattern" transforms the term "mesh" to merely a "mesh pattern." It also contradicts Neodron's position with respect to the '574 patent that "mesh" has a plain meaning to a person of ordinary skill in the art. *See* Neodron Br. at 26. Indeed, the specification explicitly states what a mesh or filigrane pattern is, and it is what Defendant's construction says: "a plurality of interconnected fine lines of highly conducting wire or traces." '960 patent 26:37-39.

The Court should therefore construe the term "interconnecting mesh segments" as "interconnected fine lines of highly conducting wire or traces, instead of a continuous layer of conductive electrode material."

## VI. THE DISPUTED TERMS OF U.S. PATENT NO. 7,821,502

The following three claim terms remain in dispute for the '502 patent.

Case 6:19-cv-00219-ADA Document 56 Filed 05/15/20 Page 16 of 39

### A. "a substrate having a surface with an arrangement of electrodes mounted thereon" ('502 patent, claims 1-2, 5-8, 11-14, 16).

| Defendants' Construction | Neodron's Construction |
|---|---|
| Plain and ordinary meaning in light of the specification, *i.e.* "a substrate having a **side** with an arrangement of electrodes mounted thereon"[2] | Plain and ordinary meaning; no construction necessary: "a substrate having a **surface** with an arrangement of electrodes mounted thereon" |

Despite Neodron's attempts at obfuscation, there is a need for the Court to construe this term because the parties dispute the plain and ordinary meaning of "surface." Defendants contend that "surface" means a side of the substrate, such as the top or bottom side, consistent with its plain meaning and use in the patent. Def. Br. at 24. In contrast, without explicitly stating as much or citing any support in the intrinsic record, Neodron has now made clear that it contends "surface" has a different meaning; that is, the "outside" or "exterior" of the substrate, which would include both the top and bottom of the substrate. Neodron Br. at 16. The Court must resolve this dispute, because it matters a great deal to the scope of the claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.").

Defendants' construction is correct because it is the only plain and ordinary meaning that is consistent with the specification and the file history. As established in Defendants' opening brief, the '502 patent specification uses the term "surface" to mean a side of a substrate rather than the entire outside or exterior of a substrate. Def. Br. at 25-27. For example, the Summary

---

[2] Neodron's opening brief incorrectly omits the "plain and ordinary meaning" portion of Defendants' construction.

of the Invention contrasts the touch device of the '502 patent, which uses only one side of the substrate, from the prior art that used both sides:

> Because the position sensor is based on sensing electrodes on only a single surface, it can be cheaper to manufacture than known double-sided position sensors. This also means the sensing electrodes can be deposited directly onto a surface for which the opposing surface is inaccessible (*e.g.* a display screen).

'502 patent at 3:1-7 (emphases added). Other passages from the specification and file history are in accord. *See id.* at Abstract, 1:34-37, and 2:21-25; '502 file history at Ex. E, 11/24/2009 Appl. Resp. at 6 and Ex. F, 5/19/2010 Appl. Resp. at 6.

Neodron concedes the '502 patent uses "surface" as a synonym for "side" in "*some* portions of the patent specification." Neodron Br. at 17 (emphasis in original). But tellingly, Neodron fails to identify any portion of the specification or file history that uses "surface" in any manner that supports Neodron's "entire outside of the substrate" implicit construction, or in any manner that is inconsistent with Defendants' construction. The reason for Neodron's omission is simple—there is nothing in the intrinsic record that supports Neodron's reading of the claim. Rather, as Defendants have demonstrated, the patent's repeated references to "upper surface," "opposing surface," and "lower surface" are inconsistent with Neodron's position that "surface" means the entire outside of the substrate. Def. Br. at 25-27. Thus, Neodron's implicit interpretation cannot be the plain and ordinary meaning of "surface" as read in light of the intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (dictionary cannot be used to contradict claim meaning that is unambiguous in light of the intrinsic evidence); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 752-53 (Fed. Cir. 2016) (rejecting dictionary definition that is inconsistent with how claim term was used in the specification).

Neodron repeatedly tries to paint Defendants' construction as a "redefinition" of the term "surface." Neodron Br. at 16-17. On the contrary, Defendants' construction is consistent with the definition of "surface" in Webster's Dictionary as "any face of a body or thing; the six surfaces of a cube." Ex. G. Defendants' construction is the <u>only</u> plain and ordinary meaning that is consistent with the specification and file history, while Neodron's definition contradicts the patent and file history. Defendants' construction is therefore correct. *See Phillips*, 415 F.3d at 1324 ("[T]he 'ordinary meaning' of a claim term is its meaning to an ordinary artisan after reading the entire patent.").

Neodron's argument that the Court should not construe this term because "Defendants have never contended that the patentee clearly disclaimed portions of the scope of that plain meaning or acted as a lexicographer to define it in any other way" (Neodron Br. at 17) is a red herring. Defendants do not contend the patentee "disclaimed" claim scope or acted as a "lexicographer"—on the contrary, Defendants contend that the patentee used the term "surface" in its plain and ordinary meaning of "any face of a body or thing." Ex. G. Indeed, declining to construe the term and thereby allowing Neodron to argue a meaning that contradicts the intrinsic record would amount to the legal error that *Phillips* overruled.

As the *Phillips* court held, it is improper to "limit the role of the specification in a claim construction to serving as a check on the dictionary meaning of a claim term <u>if the specification requires the court to conclude that fewer than all the dictionary definitions apply</u>, or if the specification contains a sufficiently specific alternative definition or disavowal." *Phillips*, 415 F.3d at 1320 (emphasis added) (overruling *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)). Contrary to Neodron's dictionary-driven position, the specification is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at

Case 6:19-cv-00219-ADA Document 166 Filed 05/13/20 Page 19 of 39

1315 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-81 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)). Here, the patent specification uses "surface" as a synonym for "side" and in a manner inconsistent with Neodron's "outside" or "exterior" dictionary definitions. Under *Phillips*, the specification therefore requires the Court to conclude that fewer than all the dictionary definitions apply and the dictionary definition relied on by Neodron is inapplicable here.

Neodron's claim that adopting Defendants' construction risks "confusion" (Neodron Br. at 17) is meritless. There is no risk the jury will confuse a side of a substrate with a side of a column-sensing electrode, as Neodron argues, because a column-sensing electrode is two-dimensional and a substrate is three-dimensional. Rather, Neodron's position that "surface" means "outside" of something risks confusion because claim 1 recites "outside" in addition to "surface," and different claim terms are presumed to have different meanings. *See Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1381-82 (Fed. Cir. 2008) (different terms in the same claim are presumed to have different meanings).

Curiously, Neodron implicitly argues that "surface" means the outside of something (Neodron Br. at 16), but then argues that "with regard to the claims, they repeatedly use the phrase '*outside*' in a manner that is not synonymous with surface." *Id.* at 18 (emphasis in original); *see also* Flasck Decl. at ¶ 52. Defendants agree; this is yet another reason the Court should reject Neodron's position. Because the '502 patent and its file history consistently use "surface" in a manner synonymous with "side," the Court should resolve the parties' dispute by adopting Defendants' construction.

**B. "sensing area" ('502 patent, claims 1-2, 5-8, 11-14, 16).**

| Defendants' Construction | Neodron's Construction |
|---|---|
| "an area defined by the sensing **electrodes**" | "an area defined by the sensing **cells**" |

Neodron characterizes the parties' dispute as whether the "sensing cells" or the "sensing electrodes" define the boundary of the "sensing area." Neodron Br. at 19. But the real dispute is whether the sensing area has a clear bound set by the sensing electrodes, or extends beyond the sensing electrodes by some undefined and unspecified amount, as Neodron maintains. This question is plainly resolved by the claim language and confirmed by the specification.

Neodron's construction is designed to be ambiguous to allow it to expand the boundaries of a "sensing area" to an amorphous area beyond the area of the substrate covered by the sensing electrodes so Neodron can try to avoid invalidity. Neodron's arguments , however, are based on flawed factual and legal premises. Contrary to Neodron's construction, the claim language and specification establish that the sensing area does not extend beyond the sensing electrodes. *See* Def. Br. at 28-32. Defendants' construction, therefore, is true to the claim language and the specification.

Starting with the language of claim 1, the term "sensing area" is part of a longer limitation that recites "wherein the electrodes define an array of sensing cells arranged in columns and rows to form a capacitive sensing area of the sensor … ." '502 patent at 12:15-17. Thus, claim 1 recites that the sensing area is formed by the array of sensing cells, but the array of sensing cells (and hence the sensing area) is defined by the sensing electrodes. This necessary logical relationship is confirmed by the specification: "The sensing electrodes 26 define a sensing area within which the position of an object (e.g. a finger or stylus) adjacent the sensor may be determined." *Id.* at 5:44-47 (emphasis added). Accordingly, the claims and specification plainly require the "sensing area" to be "an area defined by the sensing electrodes."

If one combines Neodron's proposal to define "sensing area" as "an area defined by the sensing cells" with the claim language reciting that the "electrodes define an array of sensing

cells," there should be no dispute the sensing area is defined by the sensing electrodes; that is, the outermost edges of the electrodes in the sensing area define the boundary of the sensing area.[3] In other words, the parties should be in agreement about the meaning of this term. Neodron's brief makes clear, however, that this is hardly the case.

Neodron begins its attack on Defendants' straightforward construction by arguing "it is the sensing cells resulting from the intersection of those [sensing] electrodes that define the sensing area." Neodron Br. at 19. Neodron's argument rests on the flawed premise that the electrodes intersect. They do not. As the patent makes clear, while the rows and columns of sensing electrodes intersect, the electrodes themselves do not: "[t]he row sensing electrodes 30 and column sensing electrodes are arranged within each sensing cell to interleave with each other (in this case by squared spiraling around each other), <u>but are not galvanically connected</u>." '502 patent at 2:62-67 and 6:9-13 (emphasis added). It is the sensing electrodes that form a sensing cell, as recited in claim 1, not their nonexistent "intersection," as Neodron argues.

Neodron's argument about claim 4 (Neodron Br. at 19) does not change the result. Claim 4 recites "the column sensing electrodes of a column of sensing cells at an edge of the sensing area." This claim language is entirely consistent with Defendants' construction that the sensing area is defined by the sensing electrodes. In other words, the sensing electrodes defining the edge of the sensing area will also define the sensing cells at that edge.

Neodron's argument that the specification supports its reading of the claims also fails. The assertion based on the passage of the '502 patent at 3:48-51 (Neodron Br. at 19-20) fails because, just as for claim 4, the sensing electrodes cover the same sensing area as the sensing

---

[3] "Define" in this context means "to determine or fix the boundaries or extent of: *to define property with stakes*." Ex. N (Webster's Dictionary).

cells. Arguing otherwise, as Neodron does, ignores that the sensing cells are defined by the sensing electrodes. Neodron's assertion based on the specification at 10:67-11:15 (Neodron Br. at 20) fails for the same reason. Indeed, because that passage states that "the row sensing electrode runs continuously through the sensing cell," the row sensing electrodes in columns x1 and x3 of Figure 8 (to which this passage pertains) must be at the edge of the sensing area.

Neodron's argument falls apart entirely when it points to the passage at column 7, lines 3-10. Neodron Br. at 20. Neodron claims this passage supports its argument that the "sensing electrodes do not have to run to the 'very edge' of the sensing area." Neodron Br. at 20. But the opposite is true; even in this alternate embodiment, sensing electrodes extend to the very edge of, and define, the sensing area. The passage reads as follows:

> It is noted that although one is shown in FIG. 3, a connection outside of the sensing area between the row sensing electrodes at opposing ends of row y1 is not required because the spines connecting between the column sensing electrodes of columns x2 and x3 need not extend to the very edge of the sensing area and a connection running along the top edge of the sensing area could be used to connect between the row sensing electrodes in row y1 (not shown).

In the embodiment of Figure 3 referenced in this passage, the row sensing electrodes in columns x2 and x3 of the top row, which are illustrated in gold in the annotated Figure 3 below, are separated by the column electrode "spines" illustrated in green and red:

Figure 3 (annotated)




Notably, these green and red column electrode spines are described as extending to the "very edge of the sensing area." Consistent with Defendants' construction, the "very edge" of the sensing area corresponds precisely to the outer edges of the electrodes in the Figure 3 embodiment, and not beyond.

In the alternative embodiment described in this passage, to allow the upper row wrap-around connection to be eliminated, the green and red column electrode spines do not extend to the "very edge" at the top of the sensing area (that is, the top edge of the row sensing electrodes in the first row). This allows room for the gold row sensing electrodes in columns x2 and x3 to extend toward each other to form a connection at the very top edge of the sensing area, as shown in the annotated alternative embodiment of Figure 3 below.




Sensing electrodes in this alternate embodiment still extend to the very edge of the sensing area just as in the Figure 3 embodiment, only this time it is the top portion of the gold row sensing electrodes rather than the green and red column sensing electrode spines. Even without this connection, however, the row sensing electrodes in columns x2 and x3 still extend to the very top edge of, and define, the sensing area. Neodron is therefore wrong in claiming that the "sensing electrodes do not have to run to the very edge of the sensing area" in this alternative embodiment. Neodron Br. at 20.

Notably, this is the only example in the specification that Neodron contends supports its construction that the "sensing area" can extend beyond the "sensing electrodes." Thus, Neodron's claim that only "*some* supporting examples" in the specification disclose that the sensing area is defined by the sensing electrodes (Neodron Br. at 20, emphasis in original) is flat wrong. In fact, <u>all</u> examples of sensing areas disclosed in the specification are defined by the

sensing electrodes, and Defendants cite to these examples to demonstrate why Neodron's reading of the claim is inconsistent with the clear description of the invention.

Neodron's construction is also flawed because it conflicts with other limitations of claim 1 and would render the claim indefinite. As discussed below, claim 1 recites "row wrap-around connections made <u>outside</u> of the sensing area." '502 patent at 12:25-26 (emphasis added). If Neodron were correct that the sensing area extends beyond the outer edges of the electrodes (such as indicated by the dashed green line in the annotated excerpt of Figure 3 below), at least a part of the yellow highlighted row wrap-around connection—including the parts that connect to the row electrodes at the ends of the row—would necessarily be <u>inside</u> the sensing area:




The '502 patent nowhere describes wrap-around connections that are partially inside the sensing area. Neodron's construction of "sensing area" therefore conflicts with the "row wrap-around connections made outside of the sensing area" limitation of claim 1 and should be rejected.

Additionally, Neodron's construction would render the claim indefinite because it offers no guidance as to where the boundary of the sensing area should be drawn. Rather than the



WEST\290391305.7

green dashed line in the figure above, the sensing area could also extend to the blue dashed line under Neodron's construction. In that case, not just a portion but rather the entire row wrap-around connection for the top row would be inside the sensing area. The sensing area could even extend as far as the red dashed line in the figure above, in which case all of the wrap-around connections in Figure 3 would be inside the sensing area.

Neodron's arguments in the IPR illustrate the tactics behind, and the problems with, its proposed construction of "sensing area." The IPR petition contends that the prior art Barkan patent (U.S. Patent No. 3,757,322) has a sensing area bounded by the outermost edges of the sensing electrodes as indicated by dashed red lines below:




Ex.-1004, Figure 23 (Annotated)

Ex. H, IPR2020-00282, Paper 2 (Petition) at 26. In its preliminary response, Neodron argued that the yellow highlighted wrap-around connection that connects the green row-sensing electrodes on the top row of annotated Figure 23 is not outside the sensing area because, in Neodron's view, the sensing area extends beyond the area defined by the electrodes to some

point never identified by Neodron. Ex. I, IPR2020-00282, Patent Owner Preliminary Response (Paper 8) at 13. Because Neodron's proposed construction offers no guidance as to where the boundary of a sensing area lies, Neodron will exploit that ambiguity to argue that the sensing area in Barkan extends beyond the sensing electrodes such that it encompasses the yellow highlighted wrap-around connector as shown by the dashed green line in the annotated figure below:




Ex.-1004, Figure 23 (Annotated)

This would allow Neodron to argue that the claims are not invalid, because the yellow highlighted wrap-around connection would be <u>inside</u> the sensing area demarcated by the dashed green line. But a jury would have no way to determine whether the sensing area extends to the green dashed line or, for example, the blue dashed line that is also beyond the sensing electrodes but does not encompass the yellow highlighted wrap-around connection and therefore would demonstrate invalidity (assuming the claim allows a part of the wrap-around connection to be present inside the sensing area as would be necessary under Neodron's implied interpretation).

The jury will be without any guidance as to where the boundary of the sensing area lies under Neodron's construction when it assesses both noninfringement and invalidity. The Court should reject such a malleable construction and instead adopt Defendants' construction, because Defendants' is the only one that comports with the claim language and the specification and gives the jury the clarity it needs to perform its duty.

**C. "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area" ('502 patent, claims 1-2, 5-8, 11-14, 16)**

| Defendants' Construction | Neodron's Construction |
|---|---|
| Plain and ordinary meaning, *i.e.*, "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area" | Plain and ordinary meaning, which is "wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective connections that wrap around and are made outside of the sensing area" |

The parties' opening briefs demonstrate a clear dispute. Defendants contend that the plain meaning of this term requires a row wrap-around connection to wrap around any electrodes in the row between the two electrodes in the sensing cells at opposing ends of the row row (*i.e.*, that the "row wrap-around connections" wrap around the row). Neodron's construction, on the other hand, requires the row wrap-around connection to wrap around the sensing area. Def. Br. at 33; Neodron Br. at 22. The Court should reject Neodron's construction because it (1) improperly converts the claimed "row wrap-around connection" to a "sensing area wrap-around connection," (2) renders other claim limitations superfluous, and (3) is contrary to how the patent describes wrap-around connections.

Nothing in the plain language of claim 1 requires a row wrap-around connection to wrap around the sensing area. The claim recites "row wrap-around connections." '502 patent at 12:25-26 (emphasis added). Neodron cannot rewrite the claim as "sensing cell wrap-around

connection." Rather, the only claimed relationship between the row wrap-around connection and the sensing area is that the row wrap-around connection must be made "outside of the sensing area," which is separately recited in claim 1. It is only by improperly rearranging the words of claim 1 that Neodron is able to arrive at a requirement that the row wrap-around connection must wrap around the sensing area. Neodron's construction is therefore not the plain and ordinary meaning. Neodron offers no good reason (such as lexicography or clear disavowal) for redefining this limitation by reordering the words of the claim, and there are several good reasons not to do that.

First, the plain meaning of a row wrap-around connection is a connection that wraps around a row, not a connection that wraps around a sensing area. Because claim 1 recites that rows are made up of sensing cells that include electrodes and further recites that the row sensing electrodes of sensing cells at opposing ends of a row are coupled to one another by a respective row wrap-around connection, the plain meaning of a row wrap-around connection in claim 1 is a connection that wraps around electrodes between the electrodes in the sensing cells at opposite ends of the row. This understanding of wrap-around connection is consistent with all embodiments of row wrap-around connections in the '502 patent, including those in Figures 3, 7 and 8, and also is consistent with all column wrap-around connections in those figures.

Second, Neodron's proposal would render superfluous the requirement in claim 1 for row wrap-around connections to be "made outside of the sensing area." This is because a row wrap-around connection that wraps around the entire sensing area, as Neodron contends, is necessarily "made outside of the sensing area." Neodron understands that "interpretations that render some portion of the claim language superfluous are disfavored." Neodron Br. at 22, citing *Power*

*Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). Yet Neodron's proposed construction would do just that.

On the other hand, contrary to Neodron's argument (Neodron Br. at 22), Defendants' construction does not render "row wrap-around" superfluous, but rather gives the term its plain and ordinary meaning (i.e., wrapping around the row). Also, unlike Neodron's construction, Defendants' construction does not render superfluous the requirement that a row wrap-around connection be "made outside of the sensing area." This can be seen, for example, with reference to annotated Figure 23 of the Barkan patent shown below, where row wrap-around connections 160 other than the top-most row wrap-around connection highlighted in yellow wrap around the other electrodes in a respective row, but are not made outside of the sensing area as required by claim 1.[4]




Ex.-1004, Figure 23 (Annotated)

[4] Barkan still invalidates claim 1 because that claim only requires that "at least one of the rows" has a wrap-around connection, and the top-most connection of Barkan satisfies this limitation.

Third, the Court should reject Neodron's proposal because it conflicts with the way wrap-around connections are described in the specification. As Defendants have explained (Def. Br. at 33), Figure 3 illustrates a column wrap-around connection 40, which is nearly identical to the row-wrap around connection in the Barkan patent at issue in the pending IPR. The similarities are apparent in the side-by-side annotated figures below, in which the Barkan figure on the right has been rotated 90 degrees to show the comparison with the column wrap-around connection of Figure 3 on the left (the row-wrap around connections of Figure 3 have been obscured to facilitate the comparison):




The orange-highlighted column wrap-around connection 40 of Figure 3 (left) and the yellow-highlighted row wrap-around connection of Barkan (right) are similar in that neither one wraps all the way around to the upper and lower surfaces of electrodes in the row/column, but instead are connected to a position at the center of the electrode in the corresponding row/column. Neodron's argument in the IPR is that the yellow-highlighted connection in Barkan is not a row



WEST\290391305.7

wrap-around connection as required by claim 1 "because it is not wrapping around anything." Ex. I at 7. Although Neodron does not explain what exactly it means when it says the yellow-highlighted connection "is not wrapping around anything," that same argument would apply equally to the orange-highlighted connection of Figure 3. Neodron's proposal, to the extent it means anything, is inconsistent with the patent's description of wrap-around connections.

Neodron's attempt to support its improper redefinition of this limitation by citing the file history also fails. In the excerpts of the file history Neodron cites, the applicant did not distinguish the prior art by arguing that there was no connection that wrapped around the sensing area. Instead, the applicant argued that Figure 4 of the Mabusth prior art "shows only one end of a column of electrode plates 44 coupled to something other than an adjacent electrode plate." Neodron Ex. 29 at 6-7 (emphasis added). This can be seen in in Mabusth's Figure 4 below, in which the electrode at the lower end of the left column is indeed coupled to nothing other than its neighboring electrode immediately above by the green-highlighted connection:




The applicant then argued that “the conductors 46 are positioned completely within the sensing area of the electrode pattern” and “[t]hus, Mabusth does not show or teach electrodes of sensing cells at opposing ends of a row connected using a wrap-around connection, in contrast to the above quoted elements of claim 1.” *Id.* The limitations of claim 1 the applicant quoted to the Examiner recite “wherein row sensing electrodes of sensing cells at opposing ends of at least one of the rows are electrically coupled to one another by respective row wrap-around connections made outside of the sensing area.” *Id.* (emphasis added). Thus, the applicant argued (i) there was no wrap-around connection between the electrodes of sensing cells at opposing ends of row and (ii) “[a]dditionally” there “also” was no teaching “that such connections are made outside of the sensing area,” as required by claim 1. *Id.* (emphasis added). The applicant said nothing

about whether the row wrap-around connection does or does not wrap around the entire sensing area, as Neodron now argues. Indeed, if a row wrap-around connection necessarily wrapped around the sensing area, as Neodron now argues, the applicant would not have made the "additional[]" argument regarding the claim's separately recited requirement that such connections be "outside of the sensing area."

The other portions of the file history Neodron cite are similar. Being most charitable to Neodron, the applicant's argument is at best ambiguous on this point. As Neodron acknowledges, "a statement during patent prosecution does not limit the claims unless the statement is a 'clear and unambiguous disavowal of claim scope.'" Neodron Br. at 15 (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003)). The portions of the file history Neodron cites come nowhere close to a "clear and unambiguous disavowal of claim scope," so the Court should reject Neodron's effort to use the file history to redefine the claims.

In sum, the Court should reject Neodron's attempt to redefine claim 1 by rearranging its words to include a requirement that a row-sensing electrode must wrap around the entire sensing area, which finds no support in the claim language, the specification, or the file history.

## VII. CONCLUSION

For the above reasons, the Court should adopt Defendants constructions, which are rooted in the plain and ordinary meaning and the intrinsic record.

Dated: May 15, 2020

/s/ *John M. Guaragna*

John M. Guaragna
Brian Erickson
DLA PIPER LLP (US)
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
Telephone: (512) 457-7000
Facsimile: (512) 457-7001

Sean C. Cunningham (*pro hac vice*)
Erin P. Gibson (*pro hac vice*)

Case 6:19-cv-00208-ADA Document 46 Filed 01/13/20 Page 35 of 39

Robert Williams (*pro hac vice*)
David R. Knudson (*pro hac vice*)
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701

Erik Fuehrer (*pro hac vice*)
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2214
Telephone: (650) 833-2000
Facsimile: (650) 833-2001

Barry K. Shelton
Texas State Bar No. 24055029
SHELTON COBURN LLP
311 RR 620, Suite 205
Austin, TX 78734-4775
bshelton@sheltoncoburn.com
(512) 263-2165 (Telephone)
(512) 263-2166 (Facsimile)

Counsel for Defendants Microsoft Corporation and HP Inc.

/s/ *Nicholas J. Whilt*
Ryan K. Yagura (Tex. Bar No. 24075933)
ryagura@omm.com
Nicholas J. Whilt (Cal. Bar No. 247738)
nwhilt@omm.com
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407

Marc J. Pensabene (N.Y. Bar No. 2656361)
mpensabene@omm.com
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, NY 10036
Telephone: 212-326-2000

Facsimile: 212-326-2061

John C. Kappos
jkappos@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
Telephone: 949-823-6900
Facsimile: 949-823-6994

Darin Snyder
dsnyder@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: 415-984-8700
Facsimile: 415-984-8701

Attorneys for Defendants Samsung Electronics, Co., Ltd. and Samsung Electronics America, Inc.

By: /s/ *Michael J. Newton*
Michael J. Newton (TX Bar No. 24003844)
Brady Cox (TX Bar No. 24074084)
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201
Phone: (214) 922-3400
Fax: (214) 922-3899
mike.newton@alston.com
brady.cox@alston.com

Charles A. Naggar (admitted pro hac vice)
NY Bar No. 5356449
ALSTON & BIRD LLP
90 Park Avenue, 15th Floor
New York, NY 11230
Phone: (212) 210-9400
Fax: (212) 210-9444
charles.naggar@alston.com

John M. Guaragna (TX Bar No. 24043308)
Brian K. Erickson (TX Bar No. 24012594)

DLA Piper LLP (US)
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
Phone: 512.457.7000
Fax: 512.457.7001
john.guaragna@dlapiper.com
brian.erickson@dlapiper.com

Sean C. Cunningham (admitted pro hac vice)
CA Bar No. 98895
Erin Gibson (admitted pro hac vice)
CA Bar No. 229305
Robert Williams (admitted pro hac vice)
CA Bar No. 246990
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Phone: 619.699.2700
Fax: 619.699.2701
sean.cunningham@dlapiper.com
erin.gibson@dlapiper.com
robert.williams@dlapiper.com

Jeffrey T. Lindgren (admitted pro hac vice)
CA Bar No. 176400
Vasquez Benisek & Lindgren LLP
1550 Parkside Drive, Suite 130
Walnut Creek, CA 94596
925-627-4250
Fax: 925-403-0900
jlindgren@vbllaw.com

Richard C. Vasquez (admitted pro hac vice)
CA Bar No. 127228
Vasquez Benisek & Lindgren LLP
1550 Parkside Drive, Suite 130
Walnut Creek, CA 94596
Phone: 925-627-4250
Fax: 925-403-0900
rvasquez@vbllaw.com

M. Craig Tyler
Perkins Coie LLP
500 W. 2nd Street
Suite 1900

Austin, TX 78701
Phone: 737.256.6100
Fax: 737.256.6300
CTyler@perkinscoie.com

Chao (Wendy) Wang (admitted pro hac vice)
CA Bar No. 289325
NY Bar No. 5002704
Perkins Coie LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Phone: 650-838-4500
Fax: 650-838-4350
wwang@perkinscoie.com

Tariq Javed (admitted pro hac vice)
DC Bar No. 1618071
Perkins Coie LLP
700 Thirteenth Street N.W., Suite 800
Washington, DC 20005
Phone: 202-654-6200
Fax: 202-654-6211
TJaved@perkinscoie.com

Attorneys for Defendant
Dell Technologies Inc.

/s/ Nathan Sabri
Stefani E. Shanberg (Texas Bar No. 24009955)
sshanberg@mofo.com
Nathan B. Sabri (admitted pro hac vice)
nsabri@mofo.com
Robin Brewer (admitted pro hac vice)
rbrewer@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: (415) 268-7000

Attorneys for Defendant Amazon.com, Inc.

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was electronically filed on May 15, 2020, pursuant to Local Rule CV-5(a), and has been served on all counsel whom have consented to electronic service. Any other counsel of record will be served by first class U.S. mail on this same date.

*John M. Guaragna*
John M. Guaragna